UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY SEVY,

     Plaintiff,

v.

PHILIP BARACH and
HAROLD MARSHALL,

     Defendants.

Case No. 17-13789
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [45]

---

Anthony Sevy went to court to pay a $10 parking ticket. He tried to pay with his debit card. The clerk told him that a $1.75 service fee applied to debit card transactions. Believing this to be an outrageous fee, Sevy refused to pay and left.

To express his displeasure with the debit card fee, Sevy returned to the courthouse with $10 in rolled pennies. But the clerk would not accept Sevy's pennies. Sevy was again displeased. He began to argue with the clerk, which attracted the attention of Court Security Officers Philip Barach and Harold Marshall. Sevy was ultimately arrested after a struggle with Barach and Marshall in the court's vestibule. Moments later, another altercation took place in an elevator while Barach and Marshall escorted Sevy to a holding cell. Sevy eventually pleaded no contest to a charge of disturbing the peace in state court and paid a fine.

In time, Sevy sued Barach and Marshall. He alleged that they arrested him unlawfully, used excessive force, and retaliated against him for protesting against the court's payment policies. Now, Barach and Marshall move for summary judgment on all of Sevy's claims. Some survive, some do not.

# I.

At around 12:30 pm on February 13, 2017, Anthony Sevy appeared at the 44th District Court in Royal Oak, Michigan to pay a $10 parking ticket. (ECF No. 45-10, PageID.851, 862.) Sevy tried to pay the ticket with his debit card. (ECF No. 45-4, PageID.698.) But the clerk, Sylvia Mathis, told him that a $1.75 convenience fee would apply to the debit card transaction. (ECF No. 45-4, PageID.698–99.) Sevy "thought that was ridiculous," declined to pay, and decided to leave. (ECF No. 45-4, PageID.699.) But before he left, Sevy asked Mathis if the court would accept change. (ECF No 45-4, PageID.700.) She said it could accept rolled coin. (ECF No. 45-10, PageID.862.) Sevy briefly stopped at home and then proceeded to his bank, where he withdrew $10 in rolled pennies. (ECF No. 45-4, PageID.701–2.)

Sevy's return trip to the courthouse is the source of this suit. The return trip lasted about five minutes and resulted in Sevy's arrest. But neither Sevy nor the court security officers that arrested him agree on exactly what happened. What follows are the parties' versions, interposed with the scene depicted by the court's security cameras.

The security camera captured Sevy's return to the court around 1:07 pm. (ECF No. 45-6.) Philip Barach and Harold Marshall, court security officers, noticed an anomaly when they x-rayed Sevy's bag. (ECF No. 45-2, PageID.520–21.) Barach searched Sevy's bag and discovered his rolled pennies but no contraband. (*Id.*) Barach recalls warning Sevy that the court would not accept payment in pennies, to which he remembers Sevy replying, "[t]hey'll fucking take 'em because they wouldn't take my credit card." (ECF No. 45-2, PageID.521.) Sevy also remembers discussing the pennies with Barach. (ECF No. 45-4, PageID.702.)

Sevy proceeded to the counter at around 1:08. (ECF No. 45-4, PageID.702–3; ECF No. 45-6.) Mathis, who had told Sevy about the debit card fee, was still there. Sevy gave Mathis his

parking ticket and tried to pay with his pennies, but Mathis refused to accept them. (ECF No. 45-4, PageID.703.) She explained that the pennies Sevy slid through the payment slot were not properly identifiable. (ECF No. 45-10, PageID.862.) Within a minute, Marshall joined Mathis behind the window that separated her from Sevy. (ECF No. 45-6.)

Sevy continued to speak with Mathis. Marshall describes the conversation between Sevy and Mathis as "an argument" but notes that Sevy never did anything physically aggressive. (ECF No. 45-3, PageID.594.) And though Marshall recalls other employees being startled or concerned by the dispute between Sevy and Mathis, he admits "it doesn't appear" from security footage that two nearby employees were concerned. (ECF No. 45-3, PageID.595.)

Marshall returned to the lobby from behind the counter between 1:09 and 1:10. (ECF No. 45-6.) He told Sevy that the court did not have to accept coin as payment. (ECF No. 45-3, PageID.596.) And at 1:09:40, surveillance footage shows both Sevy and Marshall pointing toward a sign explaining that, under Mich. Comp. Laws § 21.153, the court is not required to accept payment in coin unless the coins are pure gold or silver. (ECF No. 45-3, PageID.587; ECF No. 45-6.) For a moment, the trio argued about whether the court was required to accept coin, until Marshall directed Sevy to "get out." (ECF No. 45-3, PageID.587.) Marshall describes Sevy as "standing his ground" but not "physically squaring off." (ECF No. 45-3, PageID.588.)

Barach approached the counter around 1:10 pm. (ECF No. 45-6.) He listened to Sevy's complaints and advised him to mail in the fine. (ECF No. 45-2, PageID.524–25.) Barach says Sevy told him, "[y]ou know what, [Mathis] can suck my dick, [Marshall] can suck my dick, and you can suck my dick." (ECF No. 45-2, PageID.526.) Mathis, too, heard Sevy "yelling 'suck' among other things in a very loud voice." (ECF No. 45-10, PageID.862.) Eventually, Barach instructed Sevy "[t]hat's enough, pal. Time to go." (ECF No. 45-2, PageID.525.)

Sevy's recollection differs. Once Sevy realized that the clerk would not accept his change, he asked for his ticket back. (ECF No. 45-4, PageID.704.) He thinks it took Mathis between fifteen seconds and a few minutes to return the ticket. (ECF No. 45-4, PageID.704–5.) During that time, Sevy was "upset" and "going back and forth with the guard." (ECF No. 45-4, PageID.705.) Sevy describes one of the guards as "very aggressive" and says the guard called him a "punk" or "punk bitch." (*Id.*) And Sevy remembers exclaiming, "[t]his is ridiculous, I'm paying with legal tender, call the police." (*Id.*)

The court's security camera captured the physical interactions between Barach and Sevy at the counter. At 1:10:02, Barach reached in front of Sevy to grab a bag or other object. (ECF No. 45-3, PageID.597; ECF No. 45-6.) Barach gestured for Sevy to leave at 1:10:05. (ECF No. 45-3, PageID.598; ECF No. 45-6.) Less than ten seconds later, Sevy turned to leave. (ECF No. 45-6.)

Barach and Sevy disagree about what took place next.

In Barach's version, Sevy was never going to leave. Barach watched Sevy walk straight to the vestibule door. (ECF No. 45-2, PageID.539.) When Sevy reached it, he "froze" while "making abusive statements." (ECF No. 45-2, PageID.538–539.) So Barach put his left arm "towards [Sevy's] spine" to "give him a little nudge" and "guide him out the door." (ECF No. 45-2, PageID.539.) But Sevy "twisted around" and "knocked [Barach's] left hand down." (ECF No. 45-2, PageID.540.) And then Sevy assumed a "defensive . . . combative stance." (ECF No. 45-2, PageID.552.) Seeing Sevy's "aggressive stance," Barach "felt [Sevy] was not going to leave" and decided to arrest him for disorderly conduct. (ECF No. 45-2, PageID.542.) To perform the arrest, Barach "grabb[ed] for [Sevy's] jacket or his collar" to "throw him to the ground." (ECF No. 45-2, PageID.543.) Barach "attempted to throw [Sevy] down," but Sevy "kept pulling away." (ECF No. 45-2, PageID.548.) Once Sevy was on the ground, Barach and Marshall handcuffed him. (*Id.*)

4

Sevy tells a different version. According to Sevy, he was leaving the courthouse when Barach grabbed his arm and neck. (ECF No. 45-4, PageID.709, 712.) Sevy "[i]nitially" resisted and "tried to get [his] grounds," but Barach "thr[ew him] to the ground." (ECF No. 45-4, PageID.706, 710, 713.) While Sevy lay face down on the ground, Barach held the "[b]ack and side" of his neck and choked him. (ECF No. 45-4, PageID.714.) Sevy asked "[w]hy are you choking me?" (ECF No. 45-4, PageID.715.) Between five and ten seconds after Barach threw Sevy down, Marshall arrived. (ECF No. 45-4, PageID.713.) Marshall helped Barach hold Sevy down, and Barach handcuffed Sevy. (ECF No. 45-4, PageID.714–15.) Sevy soon lost consciousness. (ECF No. 45-4, PageID.715.) Within a minute or two, three or four Royal Oak police officers appeared in the vestibule. (ECF No. 45-4, PageID.716.) Eventually, more arrived. (ECF No. 45-4, PageID.718.) Royal Oak police officers picked Sevy up and took him to the elevator. (ECF No. 45-4, PageID.717–18.)

The security footage largely squares with Sevy's version. The footage shows Sevy leaving the counter and walking across the lobby towards the exit, stopping briefly to pick up a piece of paper he dropped. (ECF No. 45-3, PageID.599; ECF No. 45-6.) He reached the vestibule door and started to exit. (ECF No. 45-6) At that moment, Barach pushed Sevy through the vestibule door, and Sevy spun around. (*Id.*) Barach then placed his left hand on Sevy's neck, pushed Sevy backwards towards the outer door, and tried to take him to the ground. (*Id.*) Marshall soon entered the vestibule. (*Id.*) With Marshall's help, Barach pushed Sevy down. (*Id.*) The officers then handcuffed Sevy. (*Id.*) The entire episode lasted less than a minute.

Soon after handcuffing Sevy, Barach and Marshall had Sevy standing up and were taking him back inside the lobby from the vestibule. (*Id.*) Barach guided Sevy towards the elevator. (*Id.*) The three entered the elevator at 1:11:28. (*Id.*)

Another altercation occurred inside the elevator. Like the prior encounter, the parties tell different stories; unlike the prior encounter, there is no video footage. According to Sevy, someone "threw [him] to the ground" in the elevator, and he hit his head on the side of the elevator in the process. (ECF No. 45-4, PageID.718.) However, Sevy does not know which officer was responsible. (*Id.*) Yet Barach remembers throwing Sevy to the ground. (ECF No. 45-2, PageID.530.) Barach says he did so because Sevy "leaned up back and slammed his head against the bridge of [Barach's] nose" for "no reason." (ECF No. 45-2, PageID.530, 550.) However, a police officer who interviewed Barach right after the incident did not observe any injuries on Barach's face. (ECF No. 45-10, PageID.852.) For his part, Marshall was in the elevator as well, and remembers Sevy was "using his body as leverage" to resist the officers' attempts to move him. (ECF No. 45-3, PageID.613.) But Marshall did not see what caused Barach to "put [Sevy] on his butt" because his eyes were "focused on [Sevy's] feet" to prevent being kicked. (ECF No. 45-3, PageID.611–12.)

Viewing the security camera footage from outside the elevator, others in the lobby realized there was a problem inside the elevator. At 1:11:33.50, three individuals in the lobby turned their heads towards the elevator. (ECF No. 45-6.) Two of them rushed towards it and opened the elevator door. (*Id.*) One entered at 1:11:39.26 while the other stayed in the lobby. (*Id.*) Seconds later, another court security officer and one uniformed police officer stepped onto the elevator. (*Id.*) And a few minutes later, additional police officers arrived in the lobby. (*Id.*)

Soon after the elevator ride, Sevy's involvement with Barach and Marshall ceased. Sevy was placed in a holding cell, searched, and interviewed. (ECF No. 45-4, PageID.707.) After about an hour, Sevy was released. (ECF No. 45-4, PageID.707–8.) However, his legal troubles continued.

A few weeks later, a 44th District Court judge issued a warrant for Sevy's arrest on charges of assaulting or obstructing a public officer, Mich. Comp. Laws § 750.479, and disturbing the peace, Mich. Comp. Laws § 750.170. (ECF No. 45-12, PageID.876–77.) The day after Sevy learned about the warrant, he turned himself in at the 44th District Court and was released on bond. (ECF No. 45-4, PageID.741.) Eventually, the prosecutor dismissed the charge of assaulting or obstructing a public officer. (ECF No. 45-13, PageID.879) But Sevy pleaded no contest to the charge of disturbing the peace and paid a fine. (ECF No. 45-13, PageID.881.)

Aggrieved by his ordeal, Sevy sued Barach and Marshall under 42 U.S.C. § 1983. Now, Barach and Marshall move for summary judgment on all counts.

## II.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To evaluate a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But if a videotape shows what happened, then the Court must view "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

## III.

Sevy brings several claims against Barach and Marshall. Sevy says the officers violated his Fourth Amendment rights by using excessive force to make an unlawful arrest. And Sevy alleges the officers used force in retaliation for Sevy's protest against the court's payment policies, violating the First Amendment.

In moving for summary judgment, Barach and Marshall say three defenses entitle them to prevail. One, Sevy abandoned his unlawful arrest claim. Two, *Heck v. Humphrey* bars Sevy from

recovering on the unlawful arrest and retaliation claims. And three, qualified immunity shields the officers from liability.

## A.

Consider, first, abandonment. Barach and Marshall think Sevy's unlawful arrest claim fails as a matter of law because, "[b]y virtue of [Sevy's no contest] plea, [he] has acknowledged that the Defendants had probable cause to arrest him." (ECF No. 45, PageID.486–488.) And thus, *Heck* applies. (*Id.*) The officers say Sevy, in his response, did not address these arguments. (ECF No. 52, PageID.1310.) So they think Sevy abandoned his unlawful arrest claim. (*Id.*)

A plaintiff abandons a claim if the defendant moves for summary judgment on it and the plaintiff fails to address it in his response. *See, e.g.*, *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011); *Hamilton Cty. Bd. of Comm'rs v. Nat'l Football League*, 491 F.3d 310, 319–20 (6th Cir. 2007).

Sevy abandoned his unlawful arrest claim because he failed to respond to Barach and Marshall's arguments in favor of summary judgment. True, Sevy's response once describes his arrest as "unlawful." (ECF No. 50, PageID.949.) But even there Sevy avoids any substance of the officers' arguments explaining why summary judgment on the unlawful arrest claims is proper. The officers insist *Heck* and its principles bar Sevy's unlawful arrest claim. (ECF No. 45, PageID.486–488.) And the officers cite both the facts and law showing why they prevail. (*Id.*) Tellingly, Sevy does nothing to rebut the officers' *Heck* argument. But he does contest whether

*Heck* applies to his retaliation claim. (Compare ECF No. 45, PageID.488–489 with ECF No. 50, PageID.963.) Thus, Sevy abandoned his unlawful arrest claim against both Barach and Marshall.[1]

**B.**

Barach and Marshall argue Sevy's retaliation claim fails for a different reason: *Heck v. Humphrey*, 512 U.S. 477 (1994).

Under *Heck*, a person who has been convicted or sentenced cannot sue under § 1983 if success would "necessarily imply the invalidity of his conviction or sentence." 512 U.S. at 487; *see also Swiecicki v. Delgado*, 463 F.3d 489, 493 (6th Cir. 2006) (explaining that *Heck* prevents a plaintiff from bringing a claim if success would negate an element of the underlying offense), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384 (2007). The Supreme Court explained that *Heck*'s rule promotes "finality and consistency" by limiting "opportunities for collateral attack" on criminal judgments. 512 U.S. at 485. However, a person can sue under § 1983 if their suit and conviction or sentence "are consistent with one another," even if the civil and criminal cases arise from the same set of facts. *Schreiber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010). This makes sense because a challenge that is consistent with a conviction or sentence cannot be used to undermine or mount a collateral attack on the criminal judgment.

And in the Sixth Circuit, *Heck* does not apply to civil plaintiffs who were "precluded as a matter of law from seeking habeas redress." *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 601 (6th Cir. 2007) (internal quotations omitted). Thus, a civil plaintiff who paid a fine for a

---

[1] Barach and Marshall also say Sevy abandoned his claims against Marshall. (ECF No. 52, PageID.1310.) But Sevy's response referenced Marshall's personal conduct repeatedly. (See, e.g., ECF No. 50, PageID.943, 946, 948, 959, 961.) The brief claims "Marshall join[ed] in and the two Defendants slam[med] Mr. Sevy to the ground and handcuff[ed] him." (ECF No. 50, PageID.948.) Because Sevy expressly sought relief against Marshall throughout his response, he did not abandon his excessive force or retaliation claims against Marshall. *See* Am. Broad. Co. v. Blackwell, 479 F. Supp. 2d 719, 733 (S.D. Ohio 2006).

building code violation was not *Heck* barred from challenging the city's actions, regardless of the violation, because the plaintiff was "never 'in custody' and was never eligible for habeas review." *Embassy Realty Invs., LLC v. City of Cleveland*, 877 F. Supp. 2d 564, 575 (N.D. Ohio 2012) (internal quotations omitted).

In this case, Sevy's retaliation claim clears any *Heck* bar. For one, Sevy's First Amendment retaliation claim is consistent with his no contest plea. Sevy says Barach and Marshall used force against him because of his protected speech, not that they arrested him for it (or that he was eventually charged and convicted of a minor offense as a pretext). (*See* ECF No. 50, PageID.960.) Thus, because Sevy might have been both lawfully arrested for disturbing the peace and yet unlawfully subjected to force because of his speech, his First Amendment retaliation claim is consistent with his conviction. In addition, Sevy could not seek habeas review after he pleaded no contest and paid a fine because he was never in custody and so was precluded from challenging his conviction by way of a petition for a writ of habeas corpus. Thus, *Heck* does not bar his § 1983 claim for First Amendment retaliation.

## C.

Next, Barach and Marshall say qualified immunity defeats Sevy's remaining claims. An official enjoys qualified immunity if he or she "reasonably believe[d] that his or her conduct complie[d] with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). Qualified immunity is designed both to protect from liability those officials who perform their duties reasonably and to allow the public to hold irresponsible officials accountable. *Id.* at 231.

Officials are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S.

658, 664 (2012)). A right is clearly established if it was "sufficiently clear" at the time of the officer's conduct such that every "reasonable official would understand that what he is doing" is unlawful. *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). And precedent is "sufficiently clear" if "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply" in the "particular circumstances before him." *Id.* at 590. But "a case directly on point" is not required. *Id.* (quoting *al-Kidd*, 563 U.S at 741.) Courts can decide which prong to apply first "in light of the circumstances" of each case. *Pearson*, 555 U.S. at 236.

To decide whether Barach and Marshall are entitled to qualified immunity, the Court must accept Sevy's version. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). So at this point, Sevy enjoys "the benefit of all reasonable factual inferences from the record," and the Court decides "only whether the officers are entitled to judgment as a matter of law." *Krause v. Jones*, 765 F.3d 675, 679 (6th Cir. 2014).

### 1.

*The vestibule incident.* The Fourth Amendment protects citizens against officers' use of excessive force. *Roell v. Hamilton Cty., Ohio/Hamilton Cty. Bd. of Cty. Comm'rs*, 870 F.3d 471, 480 (6th Cir. 2017). When analyzing excessive force claims, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation omitted). And whether the force used during a seizure is objectively reasonable "depends on the totality of the circumstances, including 1) the severity of the crime, 2) whether the suspect poses an immediate threat to the safety of the officers or others, and 3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (citing *Graham*, 490 U.S. at 396).

*Barach's Use of Force*. In this case, taking the facts in the light most favorable to Sevy, all *Graham* factors weigh against Barach.

First, Sevy's crime was minor. He pleaded no contest to a misdemeanor—disturbing a lawful meeting in violation of Mich. Comp. Laws § 750.170. (ECF No. 45-13, PageID.879.) Offenses like disturbing the peace are generally not serious enough to justify the use of substantial force. *See, e.g.*, *Goodwin v. City of Painesville*, 781 F.3d 314, 322 (6th Cir. 2015) (holding that a jury could find that disorderly conduct under Tennessee law is not a serious offense when deciding whether an officer used excessive force); *Carpenter v. Bowling*, 276 F. App'x 423, 426 (6th Cir. 2008) (determining that an officer must use relatively little force to make an arrest for disorderly conduct in Ohio because it is neither violent nor serious).

Second, on Sevy's version he posed little to no threat. Barach and Marshall outnumbered Sevy. They were both taller than him. (ECF No. 45-4, PageID.711.) Barach knew Sevy was unarmed because he screened Sevy for weapons when Sevy entered the courthouse. (*See* ECF No. 45-3, PageID.582.) Sevy was not physically aggressive at the counter. (*See* ECF No. 45-3, PageID.589–91) Nearby bystanders did not appear concerned. (*See* ECF No. 45-3, PageID.594–95.) And nothing in the video shows Sevy placing the officers in any real danger. (*See* ECF No. 45-6; ECF No. 45-7.) Indeed, the video shows Sevy walking toward the courthouse exist—consistent with Barach's instruction to leave—in the moments before Barach first placed his hand on Sevy. (*See* ECF No. 45-7.) So given Sevy's testimony, plus the video, Sevy posed little threat.

Third, Sevy was not actively resisting before Barach took him down. Active resistance requires "physically struggling with, threatening, or disobeying officers." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012)). It does not include "being compliant" or "having done nothing to resist." *Id.* (internal

quotations omitted). And verbal hostility constitutes active resistance only if it is "the final straw in a series of consciously-resistive acts," *Goodwin*, 781 F.3d at 326 (internal quotations omitted), or otherwise paired with "something more" like noncompliance, *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013).

In this case, Sevy was complying with the officers' instructions when Barach used force. Sevy does admit to a verbal back and forth with the officers at the counter. (ECF No. 45, PageID.705.) So the officers told him "you've got to leave." (ECF No. 45-4, PageID.704.) Crucially, Sevy says he "proceeded to leave" and "walk[ed] out the door" as soon as the clerk returned his ticket. (ECF No. 45-4, PageID.706.) And the security camera confirms as much. The video shows Sevy leaving immediately after a brief verbal exchange with the officers. (ECF No. 45-6.) Only as Sevy is about to open the vestibule door did Barach place his hand on Sevy's shoulder. (ECF No. 45-7.)  At that moment, Sevy stopped and turned around. (*Id.*) Then Barach started to push Sevy out of the courthouse and take him down. (*Id.*) In the context of Sevy's compliance with the officers' instructions, Sevy's verbal jabs do not constitute active resistance.

Strongest for Barach is that Sevy admits he "[i]nitially" resisted the takedown maneuver. (ECF No. 45-4, PageID.713.) But Sevy's admitted resistance happened only after he was "getting thrown around like an animal." (*Id.*) So Sevy did not resist prior to Barach's use of force. *See Lubelan*, 476 F.3d at 406 (instructing courts to "view excessive force claims in segments"). And even if Sevy tried to "get [his bearings]" during the arrest (ECF No. 45-4, PageID.710), the video does not show that Sevy resisted any arrest. (ECF No. 45-7). Thus, on Sevy's version, corroborated by video, Sevy was, at most, a passive resister.

Finally, Barach pushes back on Sevy's version of events. Barach points to his testimony in the record, coupled with the opinion of a defense expert who opined that Sevy was never going

leave, to bolster Barach's speculation that Sevy was never going to comply with Barach's instructions. (*See* ECF No. 45, PageID.481.) But at this stage, the Court accepts Sevy's version as true. *See See v. City of Elyria*, 502 F.3d 484, 489–90 (6th Cir. 2007). So Barach's version of events does not alter the result.

Altogether, Barach's use of force against a passively resisting suspect points to a constitutional violation. Drawing all reasonable inferences in Sevy's favor, his crime was minor, he posed no threat, and his verbal hostility, absent any other evidence of resistance, did not rise to the level of active resistance. And yet, Barach applied so much force that Sevy lost consciousness and defecated in his pants. (ECF No. 45-4, PageID.706; ECF No. 50-6, PageID.1297.) So on Sevy's version of the facts, Barach's conduct was objectively unreasonable.

That leaves the clearly established prong. Sevy was a nonviolent, passively resisting suspect. At the time, Sixth Circuit precedent clearly established his right "to be free from unnecessary pain knowingly inflicted during an arrest." *Kent v. Oakland Cty.*, 810 F.3d 384 (2016); *St. John v. Hickey*, 411 F.3d 762, 774 (6th Cir. 2005), *abrogated on other grounds by Marvin v. City of Taylor*, 509 F.3d 234, 246 n.6 (6th Cir. 2007). So every reasonable officer would have known not to use a takedown maneuver, *see McCaig v. Raber*, 515 F. App'x 551, 555–56 (6th Cir. 2013), or a chokehold, *see Griffith v. Coburn*, 473 F.3d 650, 659–60 (6th Cir. 2007), on him. And yet Sevy says Barach took him down and choked him. (ECF No. 45-4, PageID.706, 710.) The security footage and even (to an extent) Barach's testimony is consistent with Sevy's account. (*See* ECF No. 45-2, PageID.544, 548; ECF No. 45-7.) Thus, at the time the events occurred, Barach's conduct violated clearly established Sixth Circuit precedent. *See, e.g., Oliver v. Greene*, 613 F. App'x 455, 459 (6th Cir. 2015) (affirming denial of qualified immunity to defendant prison guard where the video did not blatantly contradict the plaintiff's claim that he did not create a threat and

that the defendant therefore "needlessly injured him by way of excessive force when he took him to the ground, choked him, and repeatedly punched him in the face.").

In sum, Barach is not entitled to qualified immunity as a matter of law.

*Marshall's Use of Force*. Marshall, however, is entitled to qualified immunity. There is "a *de minimis* level of [force] with which the Constitution is not concerned." *Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 530 (6th Cir. 2018) (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 n.21 (1979)). So "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (quoting *Graham*, 490 U.S. at 396). Here, Sevy alleges only that Marshall "join[ed] in and the two Defendants slam[med] Mr. Sevy to the ground and handcuff[ed] him." (ECF No. 50, PageID.948.) But the security footage shows that Marshall's push—the only possible basis for Sevy's use of the word "slam"—barely contacted Sevy and lasted mere seconds (ECF No. 45-7). *See id.* (reasoning that a "split-second" push was *de minimis*); *see also Leary v. Livingston Cty.*, 528 F.3d 438, 443 (6th Cir. 2008) (finding that an officer's use of force was *de minimis* because the plaintiff "did not suffer any objectively verifiable injury"). And Sevy does not even remember it; he says Marshall only got involved "[w]hen I'm on the ground." (ECF No. 45-4, PageID.712.) On this record, Marshall's use of force was *de minimis*.

### 2.

*The elevator incident*. Sevy claims Barach used excessive force against him in the elevator. A pre-trial detainee has a Fourth Amendment right to be free of "unprovoked and unnecessary blow[s]." *Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 538–39 (6th Cir. 2015) (quoting *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)). For example, shoving a nonviolent, restrained detainee "so that he fell and hit the wall and cement floor" violates the detainee's clearly

established Fourth Amendment rights. *Id.* at 539; *see also Phelps v. Coy*, 286 F.3d 295, 301–2 (6th Cir. 2002).

Sevy's version of events is murky. Sevy remembers someone, possibly Barach, possibly Marshall, possibly Royal Oak Police Officers, leading him into an elevator. (ECF No. 45-4, PageID.717.) Inside the elevator, Sevy remembers "four to seven police officers" present, potentially including Barach and Marshall. (ECF No. 45-4, PageID.718.) Next thing he knew, someone threw him to the ground, threw his head against the wall, and told him to "chill out." (*Id.*) Eventually, someone picked him up by his handcuffs and led him out of the elevator. (ECF No. 45-4, PageID.719.) Sevy thinks the force could have been applied by Barach, Marshall, both, or Royal Oak Police officers—he cannot recall. (*Id.*)

Barach, however, has a better memory of the elevator ride. Barach says he "threw [Sevy] back on the ground." (ECF No. 45-2, PageID.530.) But Barach says he only did so after Sevy "leaned up back and slammed his head against the bridge of my nose." (*Id.*) Marshall was also in the elevator and remembers Barach taking Sevy to the ground, but Marshall did not see if Sevy head-butted Barach. (*See* ECF No. 45-3, PageID.610–611.)

In short, credit Barach's account and qualified immunity is appropriate; credit Sevy and it is not. That is because Barach admits he threw Sevy to the ground, Sevy says he was thrown down without provocation, there is no video footage of the elevator's interior, and Marshall claims not to have seen the entire exchange. Thus, on the present record, it is not possible to discern whether Sevy surrendered in the elevator without resistance, or whether Sevy fought back as Barach suggests. Moreover, Sevy's lack of recall about which officer threw him down does not shield Barach from liability. *See Fazica v. Jordan*, 926 F.3d 283, 291–92 (2019). Because the facts that determine qualified immunity require a credibility determination, a jury must decide whether

Barach is entitled to qualified immunity. *See Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015); *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007).

**3.**

*The retaliation claim*. Barach and Marshall also insist qualified immunity shields them from liability on Sevy's retaliation claim. Consider first whether the right in question was clearly established. Sevy says he had a clearly established right to protest the debit card fee and criticize court policies and personnel without being subjected to the officers' use of a chokehold and takedown maneuver.

The right "to criticize public officials is well-established and supported by ample case law." *McCurdy v. Montgomery Cty., Ohio*, 240 F.3d 512, 520 (6th Cir. 2001) (quoting *Berrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997)), *abrogated on other grounds by Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006). So retaliation against an individual for criticizing public officials violates the individual's clearly established rights. *See id.; Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 219 (6th Cir. 2011) (finding that the "right to be free from retaliatory arrest after insulting an officer was clearly established"); *see also Cook v. Greenleaf Twp.*, No. 16-cv-14060, 2018 WL 2219642, at *6–7 (E.D. Mich. May 15, 2018) (denying qualified immunity when "a citizen was physically assaulted after making comments critical of public officials" because the officers were "on notice that assaulting individuals for exercising their First Amendment rights is clearly unconstitutional").

Moreover, Sevy has a clearly established right to protest public policies in the courthouse. *See Cohen v. California¸* 403 U.S. 15, 26 (1971). And he has a clearly established right to make his protest using symbolic speech. *See Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995). For his symbolic speech to receive First Amendment protection,

Sevy must carry a slight burden to show that his symbolism conveyed "a particularized message" likely to be understood by those who viewed it. *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 388 (6th Cir. 2005) (citing *Spence v. State of Washington*, 418 U.S. 405, 411 (1974) (per curiam)).

Sevy says he "symbolically protested the 17.5% service . . . fee by returning with $10 in rolled pennies." (ECF No. 50, PageID.959.) And the record offers enough evidence to show Barach and Marshall received the message. Marshall met Sevy during Sevy's first visit to the courthouse and recalls that Sevy was "angry because he didn't want to pay a service fee with a credit card." (ECF No. 45-3, PageID.581.) When Sevy returned to the courthouse, Barach noticed the pennies. (ECF No. 45-2, PageID.521.) Barach then advised Sevy that the court would not accept them. (*Id.*) Sevy replied "[t]hey'll fucking take 'em because they wouldn't take my credit card." (*Id.*) Sevy also yelled about his "right" to pay in coin, and Marshall recalled Sevy referencing the "Constitution" during his time at the counter. (ECF No. 45-3, PageID.585, 636.) Added up, the evidence allows for the inference that Sevy's attempt to pay his ticket with $10 in rolled pennies conveyed a particularized criticism of court policy that the officers likely understood. So Sevy's First Amendment rights were clearly established.

Turn next to whether Sevy's Constitutional right was violated. To show a violation of his First Amendment rights, Sevy must establish that (1) he "engaged in protected conduct;" (2) an "adverse action was taken against [him] . . . [,]" and (3) "there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [his] protected conduct." Maben v. Thelen, 887 F.3d 252, 262 (6th Cir. 2018) (quoting Thaddeus–X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).

Every reasonable officer would know Sevy engaged in protected conduct. As just mentioned, Sevy's protest against the debit card fee and his verbal attacks against the officers are protected by the First Amendment. The officers disagree. They say qualified immunity is appropriate, even on Sevy's version of events, because Sevy's day in court was light on civic protest and heavy on disorderly conduct.

True, the First Amendment does not protect all speech. For example, the First Amendment does not protect "[f]ighting words" that "by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Barnes*, 449 F.3d at 717 (quoting *Greene v. Barber*, 310 F.3d 889, 896 (6th Cir. 2002)). But individuals have the right "verbally to oppose or challenge police action." *Id.* (quoting *City of Houston, Tex. v. Hill*, 482 U.S. 451, 462–63 (1987)). And they do not have to use the Queen's English when they do so. *See Lewis v. City of New Orleans*, 415 U.S. 130, 134 (1974); *Cohen*, 403 U.S. at 19, 26; *Hagedorn v. Cattani*, 715 F. App'x 499, 506 (6th Cir. 2017) (noting that an individual has the right to call a police officer an "asshole" and an "idiot"). Moreover, "a properly trained officer may reasonably be expected" to know the difference between fighting words and protected speech and respond appropriately. *Hill*, 482 U.S. at 462 (quoting *Lewis*, 415 U.S. at 135 (Powell, J., concurring)).

Barach and Marshall should have known that Sevy's verbal "back and forth" with court personnel included protected speech. (ECF No. 45, PageID.705.) The evidence reasonably supports the inference that the back and forth was part of Sevy's protest over the debit card fee and court policies. Sevy said it was "ridiculous" that the court refused his coins because he was "paying with legal tender." (ECF No. 45-4, PageID.705.) And Marshall remembers Sevy saying "[y]ou gotta take it, it's my right, this is bullshit." (ECF No. 45-3, PageID.585–86.) In giving voice to his criticism, Sevy was free to employ profanity to articulate his message.

Admittedly, Sevy may also have engaged in disorderly conduct. That is not protected by the First Amendment. *See, e.g.*, *Hartman v. Thompson*, — F.3d —, No. 18-5220, 2019 WL 3297198, at *8 n.5 (6th Cir. July 23, 2019); *Hagedorn*, 715 F. App'x at 506; *Swiecicki*, 463 F.3d at 499. But Sevy no longer challenges the lawfulness of his arrest, nor does he argue that he was arrested in retaliation for his protest. Instead, his retaliation claim depends on the officers' use of force. Thus, his claim survives even if Sevy was disorderly at some point during his visit.

Second, Sevy needs to show that the officers took an adverse action against him that would "deter a person of ordinary firmness" from engaging in protected conduct. *Maben*, 887 F.3d at 266 (quoting *Thaddeus–X*, 175 F.3d at 396). Sevy points to the officers' use of excessive force. And excessive force would easily deter a person of ordinary firmness from criticizing or protesting the court, especially since something less intrusive, like a mere traffic stop, also counts as an adverse action. *See Cruise-Gulyas*, 918 F.3d at 497 (citing *Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822, 824 (6th Cir. 2007)) (finding that at least as far back as 2007 a seizure counts as an adverse action). To reiterate, taking Sevy's version as true—and his version is consistent with the video—Sevy was "grabbed and forcefully thrown to the ground," "assaulted," and "strangled unconscious" by Barach. (ECF No. 45-4, PageID.706, 708.) It is also not disputed that Sevy defecated during his arrest. (*See* ECF No. 50-6, PageID.1296.) So Barach's force counts as an adverse action.

However, Sevy cannot establish that Marshall took an adverse action against him. Sevy's briefing defined the adverse action as Sevy being "choked, wrestled around the vestibule, and slammed to the ground." (ECF No. 50, PageID.960.) But as explained above, Marshall's role in the takedown and chokehold was *de minimis*. Indeed, Sevy does not remember that Marshall was involved at all—even after watching the video. (*See* ECF No. 45-4, PageID.712.) So the minimal

force Marshall applied would not deter a person of ordinary firmness from engaging in protected conduct. Thus, Sevy cannot establish a First Amendment claim against Marshall.

That leaves a causal connection between the protest and Barach's use of force. The plaintiff bears the initial "burden of establishing that his protected conduct was a motivating factor behind any harm," which can be satisfied with circumstantial evidence. *Maben*, 887 F.3d at 267 (quoting *Thaddeus–X*, 175 F.3d at 399). Then, "[i]f the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id.* (quoting *Thaddeus–X*, 175 F.3d at 399)

Temporal proximity between protected conduct and retaliatory acts supports "an inference of retaliatory motive." *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012). And while tight temporal proximity alone can meet the plaintiff's burden, more is also sometimes required. *See Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 401 (6th Cir. 2010); *Hazel v. Quinn*, 933 F. Supp. 2d 884, 889 (E.D. Mich. 2013). Where more is required, courts look to "the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn" from temporal proximity. *Vereecke*, 609 F.3d at 401.

Once a plaintiff adduces sufficient evidence of motive, the burden of production shifts to the defendants. *See Maben*, 887 F.3d at 268. A defendant who has "done little more than deny the allegations put forth" by the plaintiff fails to meet their burden. *Id.* (quoting *Thaddeus–X*, 175 F.3d at 399); *see Hazel*, 933 F. Supp. 2d at 890 (finding a defendant's unsupported assertion insufficient to establish a lack of causation at the summary judgment stage).

In this case, Sevy has adduced sufficient evidence to show that his protected conduct motivated Barach's use of force. The short time between the protected conduct and the adverse action allow for an inference of motive. Only minutes elapsed between the time Sevy produced his

pennies and the takedown. Moreover, Sevy says Barach "[gave] me a hard time the second I walked in the door" and called Sevy a "punk" because Sevy wanted to pay with change. (ECF No. 45-4, PageID.768.) These statements support a reasonable inference that Sevy's protest motivated Barach's adverse action. And earlier in the day when Sevy tried to pay his fine by debit card, he had no trouble with the court security officers. So, based on the totality of the circumstances, a jury could infer that Sevy's speech caused Barach to use force against him from.

For his part, Barach resists that conclusion by insisting he had probable cause to arrest Sevy for disorderly conduct. Otherwise, he has done little more than deny Sevy's allegations. While Barach's claim that he had probable cause to arrest might matter in a retaliatory arrest case, *see Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019), it does little to help rebut Sevy's claim that Barach retaliated by using excessive force. So Barach's final argument is unpersuasive.

Taking the facts in Sevy's favor, Sevy establishes that Barach violated his First Amendment rights. Coupled with the fact that Sevy's rights were clearly established at the time, Barach is not entitled to qualified immunity on Sevy's First Amendment claim. But Marshall is.

### IV.

For the reasons stated above, Sevy abandoned his unlawful arrest claim but did not abandon his other claims against Marshall. Yet Marshall is entitled to qualified immunity on Sevy's remaining claims. However, Barach is not entitled to qualified immunity on Sevy's claims of excessive force and First Amendment retaliation. Accordingly, the defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Date: August 5, 2019

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, August 5, 2019, using the Electronic Court Filing system.


<u>s/William Barkholz</u>
Case Manager