1                    **UNITED STATES DISTRICT COURT**
                     **EASTERN DISTRICT OF MICHIGAN**
2                         **SOUTHERN DIVISION**

3

4    **ANTHONY SEVY,**

5                  Plaintiff,
                                      **HONORABLE LAURIE J. MICHELSON**
6         v.

7                                    **No. 17-13789**
     **PHILIP BARACH,**
8
                  Defendant.
9    _____/

10
                          **JURY TRIAL - (VOLUME 4)**
11           **(Excerpt: Anthony Sevy-Cross-Examination)**

12           **Detroit, Michigan --  Thursday, June 30, 2022**

13

14   **APPEARANCES:**

15   **Jonathan R. Marko, Esq.**          **T. Joseph Seward, Esq.**
     **Charlie Kersten, Esq.**           **Kali M. L. Henderson, Esq.**
16   Marko Law, PLLC                 Seward Peck & Henderson, PLLC
     1300 Broadway Street, 5th Floor  210 East 3rd Street, #212
17   Detroit, MI 48226               Royal Oak, MI 48067
     Tel: (313) 777-7529             Tel: (248) 733-3580
18   jon@markolaw.com                jseward@sewardhenderson.com
     charlie@markolaw.com            khenderson@sewardhenderson.com
19   On behalf of Plaintiff          On behalf of Defendant

20                          -    -    -

21        <u>To Obtain A Certified Transcript, Contact:</u>
          **Nefertiti A. Matthews, Official Court Reporter**
22           **Theodore Levin United States Courthouse**
                **231 West Lafayette Boulevard**
23              **Detroit, Michigan  48226**
     **www.transcriptorders.com • jodi_matthews@mied.uscourts.gov**
24
             Proceedings recorded by mechanical stenography.
25        *Transcript produced by computer-aided transcription.*

**Jury Trial**
**Thursday, June 30, 2022**

1

                        I   N   D   E   X

2                          -   -   -

3   PLAINTIFF'S CASE-IN-CHIEF:                    Page:  Vol.:

4   **ANTHONY SEVY**

5        Cross-Examination By Mr. Seward            3     4

6

   Certification of Reporter ......................73

7

8

9                          -   -   -

10  Plaintiff's Exhibits

11         Number     Description              Id'd Rcvd Vol.

12         A      Photograph of Anthony Sevy    31   31   4
                  Taken on Day of Incident
13
           B      Photograph of Anthony Sevy    31   31   4
14                Taken on Day of Incident

15         C      Photograph of Anthony Sevy    31   31   4
                  Taken on Day of Incident
16
           D      Photograph of Anthony Sevy    31   31   4
17                Taken on Day of Incident

18

19

20

21

22

23

24

25

                **17-13789; Anthony Sevy v. Philip Barach**

```
 1                              Detroit, Michigan

 2                              Thursday, June 30, 2022

 3                              11:00 a.m.

 4                         -   -   -

 5              (Excerpt: Anthony Sevy-Cross-Examination)

 6                         -   -   -

 7         THE COURT:  Thank you, Mr. Marko.

 8      And Mr. Seward.

 9         MR. SEWARD:  Thank you.

10                         -   -   -

11                       CROSS-EXAMINATION

12   BY MR. SEWARD:

13   Q.   I'm going to be jumping around because I have a lot of

14   questions for you.  So, if you don't understand my question,

15   please let me know.  Fair enough?

16   A.   Yes.

17   Q.   Because you said something just now -- well, let me ask

18   you this, are you embarrassed by your actions at the 44th

19   District Court on February 13th, 2017?

20   A.   No.

21   Q.   Okay.  You think you did anything wrong, do you?

22   A.   No.

23   Q.   All right.  And you just talked to us about how there was

24   something on TV and then some time later somebody said, you

25   know, "You're that guy," right?
```

 1    **A.**    Yes.

 2    **Q.**    You just told us about that, right?

 3    **A.**    Yes.

 4    **Q.**    Now, was it the video where your lawyer was on TV having a

 5    press conference about suing?  Was that the video?

 6    **A.**    I don't know.

 7    **Q.**    Well, you know your attorney did have a press conference

 8    that went to all the newspapers and the TV stations, right?

 9    **A.**    Yeah.

10    **Q.**    Okay.  And you were there, right?

11    **A.**    No, I was not.

12    **Q.**    Okay.  But you knew your attorney was going to do that,

13    right?

14    **A.**    I don't recall.

15    **Q.**    Okay.  So, are you making a claim against Mr. Marko for

16    publicizing your lawsuit?

17    **A.**    No.

18    **Q.**    Okay.  Now, another interesting thing.  You said that

19    Harold Marshall was mediating and appropriate and polite,

20    correct?

21    **A.**    Yeah.

22    **Q.**    Why did you sue him?

23          **MR. MARKO:**  Objection, Judge.  Relevance and calls

24    for a legal conclusion.

25          **THE COURT:**  Sustained.

 1           THE WITNESS:  He was part of the assault.

 2   BY MR. SEWARD, CONTINUING:

 3   Q.   Okay.  So, he's part of the assault, but he's not a

 4   defendant here, is he?

 5           THE COURT:  Counsel, approach, please.

 6                        - - -

 7           (Side Bar Conference at 11:28 a.m.)

 8           MR. SEWARD:  Judge --

 9           THE COURT:  I sustained the objection.  I thought it

10   was your motion in limine to exclude any mention of the

11   dismissed claims or parties, was it not?

12           MR. SEWARD:  Candidly, I don't remember, but --

13           THE COURT:  Okay.  Let me . . .

14                    (A brief pause)

15           THE COURT:  Did you-all stipulate?  I thought we'd

16   agreed not to reference any dismissed claims or parties, but

17   maybe I'm wrong about that.

18           MR. MARKO:  No, we did.  You previously sustained an

19   objection of the same kind from Ms. Henderson when they tried

20   to bring up Marshall.

21           THE COURT:  Because I thought you had that agreement.

22   I may be wrong about that.

23           MR. MARKO:  Yeah.

24           THE COURT:  I thought it was you were not going to

25   discuss dismissed claims or parties, that's why I sustained it.

1      **MR. SEWARD:** I don't have that recollection. I'm not

2  saying it didn't happen. I don't have that recollection. But

3  when he brings up the fact that, you know, Marshall was so

4  polite and so forth, I think it's inconsistent with bringing a

5  suit. So, that's -- if --

6      **THE COURT:** But he did sue him. I dismissed it.

7      **MR. SEWARD:** Right.

8      **MR. MARKO:** She dismissed it. Just like the First

9  Amendment claim that you've been preventing me from talking

10  about this whole case.

11      **THE COURT:** Because that's again, I thought -- which

12  I would have not sustained.

13      **MR. SEWARD:** Well, then you can't come in here and

14  say, He's nice and polite and so forth.

15      **MR. MARKO:** That's what he said in his deposition.

16  This means if he had a failure to intervene --

17      **MR. SEWARD:** No, there isn't.

18      **MR. MARKO:** The procedure history is irrelevant. You

19  want to start talking about Sixth Circuit and Judge Michelson's

20  opinions? We don't get to do that. That's completely

21  irrelevant.

22      **THE COURT:** Okay. One at a time.

23      **MR. MARKO:** It's irrelevant.

24      **THE COURT:** There are two issues, one is, it's not

25  accurate. He did sue him. I dismissed a claim against him, so

1  we'd have to get into that.  I mean, the question was the, "Why

2  didn't you sue him?"  He did sue him.

3          **MR. SEWARD:**  Right, that's the whole point.  I want

4  that, but I just want to --

5          **THE COURT:**  Okay.  He answered it.  Can you now move

6  on?

7          **MR. SEWARD:**  Oh yeah.

8          **MR. MARKO:**  Yeah, but no more.

9          **THE COURT:**  All right.  Then let's move on, okay.

10             **(Side Bar Conference end at 11:32 a.m.)**

11                     **- - -**

12          **THE COURT:**  All right.  Thank you.  You may proceed.

13  **BY MR. SEWARD,** CONTINUING:

14  **Q.**   Now, you've always a worked hard, correct?

15  **A.**   Correct.

16  **Q.**   I mean, you've had different jobs and different businesses

17  yourself, correct?

18  **A.**   Correct.

19  **Q.**   You've tried your own start-up businesses even before

20  this, right?

21  **A.**   Correct.

22  **Q.**   And you know what it takes to start a new business,

23  correct?

24  **A.**   Yes.

25  **Q.**   Okay.  You got to put a lot of time and effort into it,

1  right?

2  **A.**   Yes.

3  **Q.**   It's all consuming, correct?

4  **A.**   What's all consuming?

5  **Q.**   The new business.  Like, the business you started, like, I

6  think there was one, like, in 2011, correct?

7  **A.**   I don't recall.

8  **Q.**   There was something in the 2010, '11, '12, '13, '14,

9  right?

10  **A.**   I don't recall.

11      **MR. SEWARD:**  Your Honor, can we approach?  There's an

12  area that I'd like to get into, but I don't want to run afoul

13  of anything.

14      **THE COURT:**  All right.

15                              - - -

16      **(Side Bar Conference at 11:33 a.m.)**

17      **MR. SEWARD:**  There was a motion in limine not to talk

18  about the import business because of -- and I don't want to

19  talk about the substance, but I want to talk about the fact

20  that he's been spent a ton of time on that business.  So, I

21  don't want to violate the order, but I want to use the word

22  like that import business.

23      **MR. MARKO:**  We filed a motion on this, Judge.  We

24  filed a motion on this in limine --

25      **THE COURT:**  All right.  I understand.

1     I don't know what the import business is revealing?

2         **MR. MARKO:**  We had a bench --

3         **MR. SEWARD:**  But that's --

4         **THE COURT:**  Just wait a minute.  One at a time.

5         **MR. MARKO:**  Sorry.

6         **THE COURT:**  Just mention it as a business.  He says

7  he doesn't recall the type.  He knows he had a business of some

8  sort.

9         **MR. SEWARD:**  That's all I'm trying to do.

10         **THE COURT:**  He knows he had a business of some sort.

11         **MR. SEWARD:**  Right.

12         **THE COURT:**  So, just establish:  You had a business

13  of some sort.  He don't recall what it was?  You had some

14  business.

15         **MR. SEWARD:**  Okay.

16      **(Side Bar Conference end at 11:34 a.m.)**

17               - - -

18  **BY MR. SEWARD,** CONTINUING:

19  **Q.**   The Detroit Cookie Company is not your first business, is

20  it?

21  **A.**   That's my main business.

22  **Q.**   I didn't ask that.  It's not your first business, is it?

23  **A.**   Correct.

24  **Q.**   You've had some other businesses before this, correct?

25  **A.**   Correct.

1  **Q.**   And you know that it takes a lot to build that business,

2  correct?

3  **A.**   Correct.

4  **Q.**   And you have been quite successful, haven't you?

5  **A.**   My businesses have been successful.

6  **Q.**   Okay.  Because from what we've heard, only you and your

7  wife's efforts and investment, investment of time and money,

8  correct?

9  **A.**   Correct.

10  **Q.**   And we heard that at one point you moved to a house in

11  Pleasant Ridge, correct?

12  **A.**   Correct.

13  **Q.**   Now, that butts up to the City of Royal Oak, doesn't it?

14  **A.**   Correct, it sits in between it.

15         **THE COURT:**  Can you talk a little closer to the

16  microphone?  Thank you.

17  **BY MR. SEWARD**, CONTINUING:

18  **Q.**   And you've now moved to a much nicer house, right?

19  **A.**   I moved to another house, yes.

20  **Q.**   A much nicer house?

21  **A.**   Of value, yes.

22  **Q.**   Well, it's a lot bigger, too, isn't it?

23  **A.**   Yes.

24  **Q.**   Okay.  And you're now starting to reap the rewards of your

25  hard work, correct?

 1   **A.**   I don't know what you're asking me.

 2   **Q.**   Well, not only did you move into that house, but you

 3   bought a '21 Corvette Convertible, correct?

 4   **A.**   I've since sold it.

 5   **Q.**   And you bought a BMW M5, the sport one, correct?

 6   **A.**   That's my wife's car.

 7   **Q.**   Okay.  And then you bought the two Teslas, correct?  All

 8   '21 vehicles, right?

 9   **A.**   So, those were tiered out and sold, yes.

10   **Q.**   Okay.  But they were all '21 vehicles, correct?

11   **A.**   Correct.

12   **Q.**   And I noticed, like, every single one of those cars are,

13   like, sports cars, aren't they?

14   **A.**   They're cars.

15   **Q.**   Well, I mean, the Corvette Convertible is a sports car,

16   right?

17   **A.**   I put 300 miles on it and sold it.

18   **Q.**   I appreciate that.  You probably sold it for more than

19   what you paid for it.

20   **A.**   Correct.

21   **Q.**   And the BMW M5, I mean, that's a sports car, correct?

22   **A.**   That's my wife's car.

23   **Q.**   Thank you.  But it's a sports car, correct?

24   **A.**   It's a four-door Sedan.

25   **Q.**   But it's the M5 Series, right?

1   **A.**   It's all wheel drive, four-door Sedan.

2   **Q.**   And then the Teslas were the top of the line Performance

3   Models, correct?

4   **A.**   No.

5   **Q.**   Yes, they were.

6   **A.**   The best in the top of the line Teslas will be a Plaid, I

7   have a Model 3.

8   **Q.**   Right, the Model 3 Performance, correct?

9   **A.**   Correct.  And I've sold them both.

10  **Q.**   Okay.  All right.  And so you've had the opportunity to

11  experience the joy of driving those vehicles and then selling

12  them for probably more than what you paid for them, correct?

13  **A.**   Yes.

14  **Q.**   Okay.  Now, here's the -- another thing, wasn't it Deputy

15  Rob Miller from the Oakland County Sheriff's Department that

16  you had conversations with?

17  **A.**   I don't recall.

18  **Q.**   Okay.  You think his name was Brown, but you're not one

19  hundred percent sure?

20  **A.**   That's what I said.

21  **Q.**   Okay.  But we know it's the Oakland County Sheriff's

22  Department, correct?

23  **A.**   Correct.

24  **Q.**   Now, the day after this incident -- well, no, let me back

25  up.  The day of the incident did you speak with Spangler or

1    Stehlin?

2    **A.**   I don't recall.

3    **Q.**   What you do recall is that you talked with a Royal Oak

4    Police Officer?

5    **A.**   I talked to many Royal Oak Police Officers that day.

6    **Q.**   Okay.  And then you had some conversations with a Royal

7    Oak Police Officer, correct?

8    **A.**   Correct.

9    **Q.**   About the incident, correct?

10   **A.**   Correct.

11   **Q.**   And you were able to tell them your side of the story,

12   correct?

13   **A.**   Yes.

14   **Q.**   All right.  You didn't lie or anything like that, did you?

15   **A.**   No.

16   **Q.**   And the next day, you thought the Royal Oak Police had

17   treated you appropriately, correct?

18   **A.**   I didn't think one way or the other.

19   **Q.**   Okay.  You didn't have any bad thoughts about them?

20   **A.**   I knew that something bad had taken place, but it was with

21   Barach, not --

22   **Q.**   Can you stay focused on my question, though?

23   **A.**   What was your question?

24   **Q.**   Okay.  My question to you is, when you're up in the second

25   floor of the courthouse, talking to one of the Royal Oak Police

1  Officers, you feel comfortable with them?

2  **A.**  He was --

3  **Q.**  Correct?

4  **A.**  Yes.

5  **Q.**  Okay.  And not only did they ask you about the incident,

6  but there were some small talk about families and stuff like

7  that, correct?

8  **A.**  Yes.

9  **Q.**  All right.  And you felt comfortable with whomever you

10  were talking with, correct?

11  **A.**  Yes.

12  **Q.**  Such that the next day you thought, Geez, you should go

13  see if you can get a copy of the videos from the courthouse,

14  correct?

15  **A.**  The police department.

16  **Q.**  Well, the police department today is not the same place

17  that the police department was in February of 2013, correct?

18  **A.**  Correct.

19  **Q.**  All right.  Now --

20       **MR. MARKO:**  Judge, I believe 2017.

21       **THE COURT:**  2017, I think you meant.

22  **BY MR. SEWARD,** CONTINUING:

23  **Q.**  Yeah, I'm sorry.  In any event, that police station

24  doesn't exist any more, does it?

25  **A.**  I don't know.

**ANTHONY SEVY - Cross**
**Thursday/June 30, 2022**

15

1  **Q.**  Okay.  Well, you know that it's across the parking lot of

2  the 44th District Court, don't you?

3  **A.**  I haven't been to the Royal Oak Police Department.

4  **Q.**  Okay.  In any event, you went to the Royal Oak Police

5  Department, it was across the street, across Troy Street,

6  correct?

7  **A.**  I believe it's actually on 4th Street or 5th Street at the

8  time.

9  **Q.**  Fifth and Williams?  It was across a street, correct?

10  **A.**  It was around the corner.

11  **Q.**  Okay.  But you had to cross a street, correct?

12  **A.**  I don't believe so.

13  **Q.**  Okay.  It was an ugly, yellow brick building?

14  **A.**  I don't recall.

15  **Q.**  All right.  But in any event, you went into the police

16  department to get a video of what?

17  **A.**  Of the incident that took place the day at the court.

18  **Q.**  At the courthouse?

19  **A.**  Correct.

20  **Q.**  And when you went there you brought your wife's -- you

21  bought you and your wife's cookies?

22  **A.**  For the officer that I sat with in the jury room, yes.

23  **Q.**  Okay.  Because you thought he treated you quite well and

24  professionally, correct?

25  **A.**  He was not part of any of the situation that took place

1  prior.

2  **Q.**   Okay.  And so you felt comfortable going to the police

3  station talking with him and even bringing cookies?

4  **A.**   Yes.

5  **Q.**   All right.  And all of it changed when on a Friday or

6  Saturday morning they came banging on your door, correct?

7  **A.**   No.

8  **Q.**   Okay.  They did bang on your door, correct?

9  **A.**   After I was released on personal bond, yes.

10  **Q.**   Right.  And you had gotten a -- and the reason you went to

11  the 44th District Court to turn yourself in is because you got

12  a call from the Oakland County Sheriff's Department, you think

13  it was Deputy Brown, is that accurate?

14  **A.**   Whatever the name was.

15  **Q.**   Okay.  Whether it was Deputy Brown or Deputy Miller, it

16  was --

17  **A.**   Somebody from the Oakland County Special Investigations

18  Unit, correct.

19  **Q.**   Told you that they requested charges against you, correct?

20  **A.**   Correct.

21  **Q.**   Okay.  Now, the container of coins, that was a mailing

22  envelope, as I understand it?

23  **A.**   Yes.

24  **Q.**   Okay.  You've been present during the trial, correct?

25  **A.**   Half of it.

1  **Q.**  Okay.  You were here when Dr. Frank was testifying,

2  correct?

3  **A.**  Yes.

4  **Q.**  And you were here when Officer Barach, Philip Barach was

5  talking, correct?

6  **A.**  Yes.

7  **Q.**  Okay.  And you were able to do that, correct?

8  **A.**  Yes.

9  **Q.**  And you were here for your attorney's opening statement,

10  correct?

11  **A.**  Correct.

12  **Q.**  And so he misspoke when he said that the container of the

13  rolls was a bag from the bank?  It was never a bag from the

14  bank, was it?

15  **A.**  I wouldn't consider it a bag, it was -- the pennies were

16  rolled from the bank, yes.

17  **Q.**  Oh, I understand that.  That's not my question, though.

18  My question is --

19  **A.**  So, can you rephrase your question so I can understand it?

20  **Q.**  Certainly.  He said during his opening statement that not

21  only were the pennies rolled by the bank, but it was also in a

22  bank bag.  And that wasn't -- that's not accurate, is it?

23  **A.**  Correct.

24  **Q.**  Correct, it is not accurate?

25  **A.**  It was a USPS bubble mailer.

1   **Q.**   Okay.  Now, you're the general manager?

2   **A.**   Yes.

3   **Q.**   Okay.  In addition -- so, you handle the business side and

4   you've learned how to also make dough?

5   **A.**   I know how to make cookies, yes.

6   **Q.**   So, you had to learn how to make the dough -- let me say

7   it this way.  I got the impression that making the dough is

8   part of the key of the cookies that are baked?

9   **A.**   No.

10  **Q.**   Oh, okay.  All right.  But you know how to make the dough

11  and not eat -- and you know how to bake the cookies?

12  **A.**   Yes.

13  **Q.**   Okay.  And you, as I understand it in 2016 -- are you

14  looking at something?

15  **A.**   I'm paying attention to you.

16  **Q.**   Pardon me?

17  **A.**   I'm paying attention to you.

18  **Q.**   I'm just asking are you looking at something?

19  **A.**   My hands.

20  **Q.**   Okay.  All right.

21        In 2016, there was already a commitment to have the store

22  front in Ferndale?

23  **A.**   In '17.

24  **Q.**   Okay.  I thought there was -- you had decided -- did I

25  mishear you on talking about the store front in 2016?

1  **A.**  So, we spoke with the owner of the -- the agent, the

2  broker in '16 about the building and it was in probate court

3  and someone purchased it.  And in '17 we signed the lease.

4  **Q.**  Okay.  So, the process began in 2016, formalized in 2017?

5  **A.**  Yes.

6  **Q.**  And was it formalized -- do you know when you signed the

7  lease?

8  **A.**  I don't recall.

9  **Q.**  Was it before or after this incident?

10  **A.**  I don't recall.

11  **Q.**  Okay.  Pretty sure, though, that the store opened after

12  the incident, correct?

13  **A.**  Correct.

14  **Q.**  All right.  And are you the bookkeeper?  Do you hire that

15  out?  Is it all right if I refer to your wife as Lauren?

16  **A.**  That's fine.

17  **Q.**  I'm not being disrespectful, am I?

18  **A.**  I have -- to answer your question, we have an accountant.

19  **Q.**  Okay.  Who sets the pricing?

20  **A.**  My wife.

21  **Q.**  Your wife.  Okay.  And there's a lot that goes into that

22  pricing, correct?

23  **A.**  Yes.

24  **Q.**  I mean, it's just not the ingredients, you've got

25  overhead, rent, electricity and so forth, correct?

1    **A.**   Correct.

2    **Q.**   And you take credit cards, correct?

3    **A.**   Correct.

4    **Q.**   And you have surcharge -- there's a fee associated with

5    that, correct?

6    **A.**   We do not charge a surcharge.

7    **Q.**   I understand that.  You don't charge a surcharge because

8    it's baked into the price of the cookies, correct?

9    **A.**   Correct.

10   **Q.**   Okay.  So, it's okay -- you've got to recover the charges

11   that somebody else imposes upon you to use plastic, whether a

12   debit card or credit card, correct?

13   **A.**   A processing fee, right.

14   **Q.**   Pardon me?

15   **A.**   The processing fee?

16   **Q.**   Right.  Yeah.  So, if somebody comes in and pays for it

17   with cash, do they get a discount?

18   **A.**   No.

19   **Q.**   Because they're going to pay that surcharge even though

20   it's -- they didn't incur it, correct?

21   **A.**   It's their choice to pay via cash, card.

22   **Q.**   So, you don't think there's any problem with passing on

23   the plastic charges in your business, do you?

24   **A.**   As identified, we don't charge a surcharge.

25   **Q.**   No, you bake it into the price of the cookies, correct?

1   **A.**   We pay a third party to process the payment.

2   **Q.**   Right, and there's a cost involved in that, correct?

3   **A.**   Less than three percent, yes.

4   **Q.**   Okay.  But you bake that into the ultimate cost of the

5   cookie?

6   **A.**   We don't consider that.

7   **Q.**   You don't put that in there?

8   **A.**   We don't consider it a processing fee, no.

9   **Q.**   Okay.  Now, I heard something, one of the attributes --

10  maybe that's not the right one.  One of the cool things about

11  your wife Lauren is ever since you've known her, she likes to

12  make dinner?

13  **A.**   Yes.

14  **Q.**   And she makes dinner everyday?

15  **A.**   Not everyday, maybe four or five days a week.

16  **Q.**   And she even makes -- well, I wrote down this from earlier

17  today.  You said she makes dinner even to this day, correct?

18  **A.**   Yes.

19  **Q.**   And it's just about everyday?

20  **A.**   We had carryout last night, so I wouldn't say it's

21  everyday.  As I identified, it's four or five days a week.

22  **Q.**   Okay.  And so that's still going on?

23  **A.**   Correct.

24  **Q.**   And you're home for the dinner?

25  **A.**   Correct.

```
 1   Q.   And you enjoy that, right?

 2   A.   Yes.

 3   Q.   Okay.  Now, do you recall meeting with a Royal Oak Police

 4   Officer James Stehlin?

 5   A.   I don't.

 6   Q.   Do you recall being asked about -- do I understand it

 7   correctly, more than one Royal Oak Police Officer on

 8   February 13th, 2017, I'll get it right, you spoke to several

 9   different Royal Oak Police Officers, correct?

10   A.   Correct.

11   Q.   And you told them the truth, correct?

12   A.   Yes.

13   Q.   And do you recall, when you were asked if you used any

14   obscenities, you said, "I thought about telling them to suck my

15   . . .," do you remember telling the officer that?

16   A.   I don't recall that.

17   Q.   Okay.  But you don't dispute it, do you?

18   A.   No.

19   Q.   And do you think Mr. Barach has some special abilities to

20   hear your thoughts?

21   A.   No.

22   Q.   Does it seem somewhat unusual to you that when asked about

23   expressing obscenities that you would say, "Suck my. . .," and

24   yet Officer Barach recalls you saying that?

25   A.   Can you repeat the question, please?
```

1   **Q.**   Sir, didn't you say, "Suck my . . .," while you were in

2   the court?

3   **A.**   No.

4   **Q.**   Okay.  But you were thinking of saying it?

5   **A.**   I said, "This court sucks."

6   **Q.**   My question to you is, you admit that you were thinking of

7   saying that?

8   **A.**   No.

9   **Q.**   Okay.  Now, you have a very good relationship with your

10  father, correct?

11  **A.**   I have a good relationship with him, yes.

12  **Q.**   Pardon me?

13  **A.**   Yes.

14  **Q.**   Okay.  And you were probably very candid with your father

15  about what took place, correct?

16  **A.**   Well, I'm a grown man at this point.

17  **Q.**   Okay.  Now, you had the pleasure of meeting my partner

18  Kali Henderson at a deposition, correct?

19  **A.**   Yeah.

20  **Q.**   And you were sworn to tell the truth, the whole truth,

21  correct?

22  **A.**   Yes.

23  **Q.**   And you told the truth, correct?

24  **A.**   Yes.

25  **Q.**   And even before that, you answered some written questions,

1  correct?

2  **A.**   If you want to show them to me, I could tell you.

3  **Q.**   Sure, I can show them to you.

4  **A.**   Are you referring to the deposition?

5  **Q.**   No, no, no, the interrogatories.

6  **A.**   You can show me anything.  I don't really recall.

7  **Q.**   Okay.  I'm just getting them for you.

8                       (A brief pause)

9         **MR. SEWARD:**  May I approach, Your Honor?

10        **THE COURT:**  You may.

11        **MR. SEWARD:**  And Mr. Marko?

12        **MR. MARKO:**  Got it.

13        **MR. SEWARD:**  Perfect.

14        **THE WITNESS:**  Thank you.

15  **BY MR. SEWARD,** CONTINUING:

16  **Q.**   And at the very end is your signature, correct?

17  **A.**   Yes.

18  **Q.**   And you understood that these are basically sworn

19  testimony, correct?

20  **A.**   Yes.

21  **Q.**   All right.  And they had to be factually correct?

22  **A.**   Yes.

23  **Q.**   And you wouldn't mistake facts, would you?

24  **A.**   No.

25  **Q.**   All right.  So, question Number 11 asked if it will be

1    necessary for you to have future medical treatment, correct?

2    And that is page 8?

3    **A.**   You said page 11 or page 8?

4    **Q.**   It's question Number 11 and it's on page 8.

5    **A.**   So, what are you asking?

6    **Q.**   Okay.  Do you see the question Number 11?

7    **A.**   Yes.

8    **Q.**   Okay.  And the question was:  "Of your knowledge, will it

9    be necessary to have future medical treatment by reason of this

10   incident?"  And your answer, under oath, then was what?  Read

11   it to the jury, please.

12   **A.**   "Yes, I may have my surgery to open the airway."

13   **Q.**   Now, when you made that factual statement, you had no

14   basis to say that, correct?

15   **A.**   Well, my --

16   **Q.**   Sir --

17        **MR. MARKO:**  Judge, he's trying to answer the question

18   and he cut him off and won't even allow him to answer the

19   question.

20        **THE COURT:**  I think it was a yes or no.

21        **THE WITNESS:**  Can you repeat the question?

22   **BY MR. SEWARD,** CONTINUING:

23   **Q.**   Certainly.  When you made this statement, you had no

24   factual basis to say that, did you?

25   **A.**   My throat's -- I would -- my throat's different, so I

1    would say yes.

2    **Q.**   Okay.  You hadn't gone -- no doctor had told you that,

3    correct?

4    **A.**   Well, my throat --

5    **Q.**   Sir, no doctor had told you that you needed surgery,

6    correct?

7    **A.**   Correct.

8    **Q.**   Okay.  In fact, you only went to EPIC once, correct?

9    **A.**   Correct.

10   **Q.**   And they didn't tell you you had to have surgery, correct?

11   **A.**   No.

12   **Q.**   Okay.  And you're certainly not a medical doctor, are you?

13   **A.**   I'm not a doctor, no.

14   **Q.**   Okay.  So, to say that you may need surgery, no medical

15   professional ever told you that, is that an accurate statement?

16   **A.**   Yes.

17   **Q.**   Okay.  You weren't trying to mislead us, were you?

18   **A.**   No.

19   **Q.**   Now, there's no reason why you can't seek treatment, is

20   that true?

21   **A.**   Correct.

22   **Q.**   Okay.  Financially, you can seek treatment, right?

23   **A.**   Yes.

24   **Q.**   Mobility, you could seek treatment?

25   **A.**   Yes.

1    **Q.**   And you can make time to seek treatment, correct?

2    **A.**   Yes.

3    **Q.**   And you haven't had any treatment, correct, other than you

4    went the one time to EPIC, the day after?

5    **A.**   I've went to doctors.

6    **Q.**   But not for this incident?

7    **A.**   For multiple incidents.

8    **Q.**   Okay.  But not for this incident, is that accurate?

9    **A.**   Correct.

10   **Q.**   Okay.  Now, in fact, Dr. Shiener never even told you what

11   his diagnosis was, correct?

12   **A.**   I don't recall.

13   **Q.**   And it's clear that your lawyer told you to go see

14   Dr. Shiener, correct?

15   **A.**   Yes.

16           **MR. SEWARD:**  May I approach John to look at the

17   photographs?

18           **THE COURT:**  Sure.

19                         (A brief pause)

20           **THE COURT:**  Actually, Mr. Seward, while you do that,

21   we'll take our second morning break.  I'll remind the members

22   of the jury, please do not discuss the case during the break

23   and we'll see you back here at 12:15.

24                   **(Jury out at 11:59 a.m.)**

25           **THE COURT:**  All right.  We'll be in recess until

1    12:15.

2              **(A break was taken from 11:59 a.m.to 12:16 p.m.)**

3                              **- - -**

4              **THE CLERK:**  The Court recalls Case Number 17-13789;

5    <u>Sevy versus Barach</u>.

6        Will counsel please restate their appearances, for the

7    record?

8              **MR. MARKO:**  John Marko and Charlie Kersten, for the

9    plaintiff.

10             **MR. SEWARD:**  Joe Seward and Kali Henderson, on behalf

11   of the defendant.

12             **THE COURT:**  All right.  Good afternoon.  You-all may

13   be seated.

14       And Mr. Seward, I've been advised that Mr. Barach is not

15   feeling well and has left, which is fine.  Do you want me to

16   say anything to the jury?

17             **MR. SEWARD:**  Yes, I think it's appropriate.  He

18   hasn't tested positive for COVID, but his wife has and now he's

19   got the same symptoms.  So, out of an abundance of caution, but

20   I --

21             **THE COURT:**  What would you like me to tell them?

22             **MR. SEWARD:**  That Mr. -- that out of an abundance of

23   caution --

24             **THE COURT:**  Okay.  You want me to indicate exactly

25   what's happening?

1          **MR. SEWARD:**  Correct.

2          **THE COURT:**  Okay.

3          **MR. SEWARD:**  And is it okay if I tell him to go home?

4          **THE COURT:**  Mr. Marko, you have any problem with

5   that?

6          **MR. MARKO:**  Judge, I ask for a general instruction:

7   "Don't concern yourself with why, but I've excused him for the

8   day."

9          **THE COURT:**  All right.  Do you have any problem if I

10  indicate that Mr. Barach has a health matter and is not going

11  to be here for the remainder of the day?

12         **MR. MARKO:**  I think you could say he's not feeling

13  well and won't be here for the remainder of the day.

14         **THE COURT:**  All right.  Do you have any problem with

15  that, Mr. Seward?

16         **MR. SEWARD:**  At this point, no, but if he test

17  positive, I hope we would tell the jury why.

18         **THE COURT:**  Well, yes, we're going to have a bigger

19  decision if he test positive.

20         **MR. MARKO:**  We'll cross that bridge when we get

21  there.

22         **THE COURT:**  Agreed.

23         **MR. SEWARD:**  Okay.  So, it's okay for Mr. Barach to

24  leave?

25         **THE COURT:**  Yes.

1          **MS. HENDERSON:**  Your Honor, can I go let him know?

2          **MR. MARKO:**  He's right there.

3          **MR. SEWARD:**  You could go.

4          **MS. HENDERSON:**  Leave.

5          **MR. SEWARD:**  And don't shake anybody's hand.

6          **THE COURT:**  Okay.  We could bring the jury back in,

7    please.

8                    **(Jury In at 12:19 p.m.)**

9          **THE COURT:**  All right.  Thank you.  You-all may be

10   seated.

11       And Mr. Seward, you may continue -- oh, I'm sorry, I

12   forgot, I need to advise, ladies and gentlemen of the jury,

13   that Mr. Barach is not feeling well and will not be with us for

14   the remainder of the day.

15       All right.  So, Mr. Seward.

16         **MR. SEWARD:**  Thank you.

17       Now, John, can you put up the photographs?

18         **MR. MARKO:**  Hold on a second.

19         **THE COURT:**  Hold on.

20         **MR. MARKO:**  I'm perfectly happy to admit all of these

21   photos, but they haven't been admitted yet.

22         **MR. SEWARD:**  You're right.

23         **MR. MARKO:**  So, are we admitting them?

24         **MR. SEWARD:**  Do you want me to move to admit yours?

25         **MR. MARKO:**  I move to admit these exhibits, any

 1  objection?

 2              **MR. SEWARD:**  No.

 3              **THE COURT:**  All right.  Which exhibits in particular?

 4              **MR. MARKO:**  This is Plaintiff's "A" through "D"?

 5              **THE COURT:**  All right.  They will be admitted.

 6          (Plaintiff's Exhibit A, Photograph of Anthony Sevy Taken

 7          on Day of Incident, identified.)

 8          (Plaintiff's Exhibit A received into evidence.)

 9          (Plaintiff's Exhibit B, Photograph of Anthony Sevy Taken

10          on Day of Incident, identified.)

11          (Plaintiff's Exhibit B received into evidence.)

12          (Plaintiff's Exhibit C, Photograph of Anthony Sevy Taken

13          on Day of Incident, identified.)

14          (Plaintiff's Exhibit C received into evidence.)

15          (Plaintiff's Exhibit D, Photograph of Anthony Sevy Taken

16          on Day of Incident, identified.)

17          (Plaintiff's Exhibit D received into evidence.)

18  **BY MR. SEWARD,** CONTINUING:

19  **Q.**   All right.  Mr. Sevy, are those picture of you?

20  **A.**   Yes.

21  **Q.**   And those pictures were taken when?

22  **A.**   In the Royal Oak Court the day of the incident.

23  **Q.**   The day of the incident?

24  **A.**   Correct.

25  **Q.**   Okay.  And by whom?

1   **A.**   The Royal Oak -- somebody from the Royal Oak Police

2   Department.

3   **Q.**   Okay.  And I don't see any bruising on the front of your

4   throat, do you?

5   **A.**   I do, if you zoom in.

6   **Q.**   Okay.  Maybe my monitor's terrible.  I'll look at this

7   one.  Tell us where you think you see bruising on the front of

8   your throat?

9   **A.**   I see redness on the front lower portion of my beard.

10  **Q.**   Is there --

11         **MR. SEWARD:**  Your Honor, I remember from Judge Lawson

12  he had something that allowed the witness to circle?

13         **THE COURT:**  That does not happen on this one.  It's

14  not interactive.

15  **BY MR. SEWARD,** CONTINUING:

16  **Q.**   Try to describe it, okay, John's got his cursor.  Can you

17  tell him where to move the cursor?

18  **A.**   Toward the middle of my neck, up a little bit.  Right

19  around that area.

20  **Q.**   And you could see bruising there?

21  **A.**   I could see redness.

22  **Q.**   Okay.  So, you could see redness?

23  **A.**   Correct.

24  **Q.**   Now, let's go to the next picture.  Now, this is again

25  you?

1    **A.**   Correct.

2    **Q.**   And this is again you the day of the incident?

3    **A.**   Yes.

4    **Q.**   And did you ask the Royal Oak officers to take these

5    pictures?

6    **A.**   I did not.

7    **Q.**   Okay.  And does this -- this would be your left side of

8    your neck, correct?

9    **A.**   Yes.

10   **Q.**   Okay.  And can you -- do you see any swelling, bruising,

11   redness?

12   **A.**   I see two areas of redness.

13   **Q.**   Okay.  And where?  Help us out?

14   **A.**   Right under -- two inches under my ear, near my hairline.

15   And then also --

16   **Q.**   Okay.  Hold on, let's make sure we get that.

17   **A.**   To the left a little bit.

18   **Q.**   That wouldn't be a pimple or anything like that?

19   **A.**   No.

20   **Q.**   And then where?

21   **A.**   Down about two inches to the left.  (Witness instructing

22   Video Tech) Left, down, down, right, right.  Yep, correct.

23   **Q.**   Okay.  And that's what you contend is the bruising?

24   **A.**   Redness.

25   **Q.**   Redness, okay.

1    And let's go to the next picture.  Again, do you see any
2  redness in this picture?
3  **A.**   Nothing to document.
4  **Q.**   Pardon me?
5  **A.**   Nothing to document.
6  **Q.**   I don't understand that answer.
7  **A.**   No.
8  **Q.**   No.  Okay.  And again, this is a closer view of your
9  throat?
10  **A.**   Yes.
11  **Q.**   And it's, again, taken the same day as all of these
12  pictures, correct?
13  **A.**   Yes.
14  **Q.**   Okay.  All right.  And then let's go to the next picture.
15  Do you see any redness, swelling or bruising in this picture?
16  **A.**   Yes, so right by my white tee shirt you could see right
17  above there, there's a bunch of redness.
18  **Q.**   Okay.  And that's basically where your shoulders
19  transitions into your neck, is what you're saying?
20  **A.**   Yes.
21  **Q.**   Okay.  Any other bruising or redness or swelling that you
22  could see in this picture?
23  **A.**   A little bit to the right as well.  A little bit more.
24  Right around that area, left, a little bit.  Up.  Right in that
25  area as well.

1    **Q.**    Okay.  And you think you could see redness there?

2    **A.**    Yep.

3    **Q.**    Any other pictures?

4          The next picture, John.  All right.  Does this show any

5    bruising, redness, or swelling?

6    **A.**    Yes, we've already addressed this picture right below my

7    hairline looks like a fingermark right there, yes.

8    **Q.**    Okay.  And that's the full extent of what we can -- that

9    you could see, right?

10   **A.**    By my neck as well, down to the left.  Yes, up a little

11   bit.  Yep, that area as well.

12   **Q.**    Okay.  Anywhere else?

13   **A.**    Not in that picture.

14   **Q.**    Okay.  And are there any more?  All right.  Now, do you

15   see any redness, bruising, or swelling in this picture?

16   **A.**    I see redness in multiple places.  Looks like a handprint

17   on the back of my neck.

18   **Q.**    The back of your neck?

19   **A.**    Correct.

20   **Q.**    Okay.  Anywhere else?

21   **A.**    No.

22   **Q.**    All right.  Now, I noticed you never described any type of

23   scratching or abrasions or anything like that?

24   **A.**    No.

25   **Q.**    And it's certainly the officer was trying to push you onto

1    the ground, correct?

2    **A.**    Yes.

3    **Q.**    And you weren't willingly going to the ground, were you?

4    **A.**    I was thrown to the ground.

5    **Q.**    You were not willingly going to the ground, were you?

6    **A.**    I don't recall.

7    **Q.**    Okay.  You can take those down, John.

8         Now, my partner asked me to ask this question, but is all

9    the dough still being made in Ferndale?

10   **A.**    Yes.

11   **Q.**    Okay.  And then you have to drive it out to Grand Rapids

12   and Ann Arbor?

13   **A.**    I do not, but it is done.

14   **Q.**    Somebody does, you or Lauren?

15   **A.**    No, staff does.

16   **Q.**    Oh, okay.  All right.  But you visit the Grand Rapids

17   store and the Ann Arbor store?

18   **A.**    Rarely.

19   **Q.**    Okay.  And is there a commissary kitchen now?

20   **A.**    It's commissary.

21   **Q.**    Commissary, okay.  Is that something new?

22   **A.**    2020.

23   **Q.**    Okay.  And help me out, because the best dinner I make is

24   reservations.  What is a commissary?

25   **A.**    A commissary?

1    **Q.**   Yes.

2    **A.**   It's where everything is centrally made.

3    **Q.**   Okay.  So, you had to expand the business?

4    **A.**   Correct.

5    **Q.**   Expand the building?

6    **A.**   No, it's a different building.

7    **Q.**   Oh, okay.  Where is that?

8    **A.**   In Ferndale.

9    **Q.**   Is it right next to the store front?

10   **A.**   One mile south.

11   **Q.**   Okay.  Closer to Eight Mile?

12   **A.**   Correct.

13   **Q.**   All right.  And you go there, too?

14   **A.**   On occasion.

15   **Q.**   And so were you involved in expanding the business to that

16   new building?

17   **A.**   Yes.

18   **Q.**   All right.  And I'm assuming you had to buy equipment and

19   all that?

20   **A.**   Yes.

21   **Q.**   Okay.  And you were involved in that?

22   **A.**   Yes.

23   **Q.**   Was it primarily you?

24   **A.**   Yes.

25   **Q.**   Okay.  Another question.  You know longer live in Royal

1   Oak?

2   **A.**   Correct.

3   **Q.**   But at your deposition you did, correct?

4   **A.**   Can you refresh my memory of the deposition date, please?

5   **Q.**   The date of your deposition?

6   **A.**   Yeah.

7   **Q.**   Sure.  The date of your deposition is Tuesday, July 10th,

8   2018.

9   **A.**   Yes.

10  **Q.**   Okay.  And at that time you had no plans on moving out of

11  Royal Oak, is that an accurate statement?

12  **A.**   I don't recall.

13  **Q.**   Okay.  Well, you swore to tell the truth at your

14  deposition, right?

15  **A.**   Yes.

16  **Q.**   Do you still have your transcript?

17  **A.**   Of my deposition?

18  **Q.**   Yes.

19  **A.**   I never received it from you.

20          **MR. SEWARD:**  And, Your Honor, we have the ability to

21  play the clip.  Are we allowed to do so?

22          **THE COURT:**  Yes.

23          **MR. SEWARD:**  Pardon me?

24          **THE COURT:**  Yes.

25          **MR. MARKO:**  Judge, first he has to try to refresh his

1    recollection with the deposition transcript and then it will be

2    used for --

3            **THE COURT:**  No, this is cross examination.

4            **MR. MARKO:**  Nor impeachment, though.  It's for

5    impeachment.

6            **THE COURT:**  I think he asked the question.

7            **MR. SEWARD:**  Right.  I asked at the time of your

8    deposition, you did not have any plans to move out of Royal

9    Oak, correct?

10            **THE WITNESS:**  I don't recall.  If you want to show it

11    to me, I can see what it said.

12    BY MR. SEWARD, CONTINUING:

13    **Q.**  Okay.  I'm going to draw your attention to Page 12, Lines

14    6 through 8.  And I'd like you to read it to yourself and then

15    I'll ask John to display it to the jury.

16            **MR. MARKO:**  Well, wait, Judge --

17            **THE COURT:**  If it refreshes his recollection.

18            **MR. SEWARD:**  Well, I'm not trying to refresh his

19    recollection, Your Honor, I think this is an attempt at

20    impeachment.

21            **THE COURT:**  Okay.  Then ask the question a little

22    different way.

23    **BY MR. SEWARD**, CONTINUING:

24    **Q.**  Okay.  At the time of your deposition, did you have any

25    plans on moving in the near future?

1    **A.**   And I said:  "We'll see what the future has in store.

2    Nothing as of now."

3    **Q.**   Sorry?  Can you speak up?

4    **A.**   "We'll see what the future has in store.  Nothing as of

5    now."

6    **Q.**   So, that was your answer then?

7    **A.**   Correct.

8    **Q.**   And that was a true statement, correct?

9    **A.**   Correct.

10   **Q.**   That you had no plans on moving at the time of your

11   deposition, July 10th of 2018?

12   **A.**   Okay.

13   **Q.**   Is that true?

14   **A.**   Can you ask the question what you're looking for?

15   **Q.**   Certainly.  That was a true statement--

16   **A.**   Yes.

17   **Q.**   --that as of July 10th of 2018, you had no plans to move

18   from Royal Oak, is that a true statement?

19   **A.**   As I said, "We'll see what the future has in store.

20   Nothing as of now."  So, I wasn't conclusive on that.

21   **Q.**   Okay.  Can you answer the question that I asked?

22   **A.**   I thought I just did.

23   **Q.**   No, you didn't.

24   **A.**   So, can you rephrase it, please?

25   **Q.**   Certainly.  Is it true that as of July 10, 2018, you had

1   no plans to move from Royal Oak, true or false?  Why are you

2   looking at your attorney?

3   **A.**   I don't know what you're trying to ask me.  I said, "We'll

4   see what the future --

5   **Q.**   Sir --

6           **MR. MARKO:**  Your Honor, he's trying to answer the

7   question.

8           **THE COURT:**  All right.  If you can't answer it the

9   way he's asking it, then tell him you're not able to answer.

10          **THE WITNESS:**  I'm not understanding your question.

11  **BY MR. SEWARD**, CONTINUING:

12  **Q.**   Okay.  I'll try again.  Why don't you put that down.  All

13  right.  I'll take it back.

14      As of July 10th of 2018, you had no plans to move from

15  Royal Oak, true or false?

16  **A.**   Once again, I'm --

17  **Q.**   That's your options, either true or false?

18          **MR. MARKO:**  Judge, he's answered --

19          **THE COURT:**  Or yes or no.

20          **MR. MARKO:**  He's answered the question.

21          **THE WITNESS:**  I answered the question.  I read my

22  deposition answer.

23          **THE COURT:**  He wants a "yes" or "no" or you can't

24  answer it yes or no.

25          **THE WITNESS:**  I can't answer the question.

1   **BY MR. SEWARD,** CONTINUING:

2   **Q.**   Okay.  But you told us the truth at your deposition,

3   correct?

4   **A.**   Yes.

5   **Q.**   Okay.  You're not changing your deposition now, are you?

6   **A.**   No.

7   **Q.**   Okay.  Now, I heard before we took the break that since

8   February of 2017 you have gone to see doctors for reasons

9   unrelated to this incident, correct?

10  **A.**   Yes.

11  **Q.**   Okay.  You've had checkups?

12  **A.**   Yes.

13  **Q.**   Okay.  Probably illnesses and the like, correct?

14  **A.**   Yes.

15  **Q.**   Okay.  And they've taken care of you, correct?

16  **A.**   Yes.

17  **Q.**   Okay.  And so you've had that opportunity but you have not

18  sought out any treatment for what you believe is related to

19  this incident, accurate?

20  **A.**   Yes.

21  **Q.**   Thank you.  And you told Shiener the truth when you met

22  with him in November of 2017, correct?

23  **A.**   Yes.

24  **Q.**   And you're aware that you acknowledge using cannabis,

25  correct?

 1   **A.**   Yes.

 2   **Q.**   And you told him that you had a medical marijuana card to

 3   justify using it legally, correct?

 4   **A.**   At the time, yes.

 5   **Q.**   Okay.  But when, in fact, you did not have a medical

 6   marijuana card, isn't that true?

 7   **A.**   I had one from 2016 to 2018.

 8   **Q.**   Do you recall giving sworn answers to a second set of

 9   interrogatories on July -- excuse me, August 7th of 2018?

10   **A.**   I don't recall, if you could -- is this what I have in my

11   hand or is it separate?

12   **Q.**   I can approach.

13           **MR. SEWARD:**  May I, Your Honor?

14           **THE COURT:**  Yes.

15           **MR. MARKO:**  Can you just tell me what it is?

16           **MR. SEWARD:**  I'm sorry.

17                     (A brief pause)

18           **MR. MARKO:**  No objection at all.

19   **BY MR. SEWARD,** CONTINUING:

20   **Q.**   Can I draw your attention to Interrogatory 21 and your

21   answer on the following page.  Have you had a chance to look at

22   your answer?

23   **A.**   Yes.

24   **Q.**   Okay.  And the question that you were asked is whether you

25   had a medical marijuana card issued by the State of Michigan,

1   correct?

2   **A.**   Correct.

3   **Q.**   And then it went on to say who prescribed it, the date

4   prescribed and the time of your last visit, among a couple of

5   other questions, correct?

6   **A.**   Correct.

7   **Q.**   And your answer was, you don't have a medical marijuana

8   card; is that correct?

9   **A.**   That's what it says.

10  **Q.**   Pardon me?

11  **A.**   Correct.

12  **Q.**   Okay.  All right.  So, that is factually true, correct?

13  **A.**   I --

14  **Q.**   Sir, is that factually true?

15  **A.**   I do have a possession of a medical marijuana card.

16  Whether it's for my wife's or mine, I believe it's mine.  Yes

17  and yes.

18  **Q.**   Okay.  Do you understand the answer that you gave under

19  oath was you do not have a medical marijuana card?  So, which

20  one is it?

21  **A.**   I don't remember signing or writing this, so --

22  **Q.**   My question -- I don't care when you signed it.  What I

23  want to know is, which -- when did you tell the truth, to

24  Shiener or to sworn answers to interrogatories?

25  **A.**   I've had a medical marijuana card.

1  **Q.**  Okay.  Didn't ask that question.  Asked:  "Do you have a

2  medical marijuana card?"  And you said, in sworn answers to

3  interrogatories that you don't.  Is that a true statement?

4  **A.**  What's the --

5  **Q.**  Sir, is that a true statement or is that a false

6  statement?

7  **A.**  Can you repeat the question, please?

8  **Q.**  The truth really shouldn't change, should it?

9  **A.**  Well, I have had a medical marijuana --

10  **Q.**  Sir, don't argue with me.  The truth shouldn't change,

11  should it?

12  **A.**  No.

13  **Q.**  Okay.  So, you made an affirmation of fact that you did

14  not have a current medical marijuana card, is that a -- did I

15  accurately say what you said in your answers to

16  interrogatories?

17  **A.**  Sir, I didn't sign this, but I did have a medical

18  marijuana card.

19  **Q.**  Okay.  So, it was -- doesn't it say at the bottom,

20  "Anthony Sevy, with permission?  Signed Anthony Sevy, with

21  permission?"

22  **A.**  It does say that, yes.

23  **Q.**  Okay.  And it was submitted by your lawyers, correct?

24  **A.**  Yes.

25  **Q.**  Okay.  And it was submitted in response to questions that

1   we asked, correct?

2   **A.**   Yes.

3   **Q.**   And it was supposed to be factually true, correct?

4   **A.**   Yes.

5   **Q.**   It was supposed to be sworn testimony, correct?

6   **A.**   Yes.

7   **Q.**   Okay.  So, all I want to know is, did you truthfully

8   answer that question?

9   **A.**   I do not recall signing this or seeing this.

10  **Q.**   And you know what, doesn't answer the question that I

11  asked.  Mine's a real simple one, sir:  Did you truthfully

12  answer that question under oath?  Yes, you did; no, you didn't?

13  **A.**   I didn't personally sign this.

14  **Q.**   Well, why are you dodging the question that I'm asking?

15  **A.**   I had a medical marijuana card.

16  **Q.**   Oh, you did have a medical card?  So, the answer to this

17  interrogatory then is factually wrong, correct?

18  **A.**   I don't recall whether -- I never saw this.

19  **Q.**   I'm confused.  I'm confused.  I thought you said the truth

20  doesn't change?

21  **A.**   It doesn't change.

22  **Q.**   You know, this is such a -- the fact whether you have a

23  medical marijuana card, I don't care one way or the other, all

24  right.  I'm not making any judgment calls.  Don't care.  What I

25  want to know is, did you tell the truth, that's all.  Did you

1  tell the truth or did you lie?

2  **A.**  Yes, I told the truth.

3  **Q.**  Okay.  So, you didn't have a medical marijuana card, is

4  that a true statement?

5  **A.**  No, I had --

6  **Q.**  Okay.  That's not a true statement.  So, it's factually

7  inaccurate, right?

8  **A.**  It may have expired.  It says, Plaintiff currently does

9  not have a medical marijuana card issued by the State of

10  Michigan.  I know that I did have one, it expired.  I'm unaware

11  of the dates.

12  **Q.**  Okay.  All right.  But you're asked all those questions.

13  Did you fill that in?

14  **A.**  I don't recall seeing this.

15  **Q.**  Is it in your answers to interrogatories?

16  **A.**  It says, Plaintiff currently does not have --

17  **Q.**  No, no, no.  Do you see where -- I understand you've got a

18  story that you want to tell the jury, but can you answer the

19  question that I'm asking?

20          **MR. MARKO:**  Judge, that's argumentative.

21          **THE COURT:**  All right.  He's going to ask the

22  question.

23  **BY MR. SEWARD,** CONTINUING:

24  **Q.**  The question asked you who prescribed it, correct?  That's

25  Paragraph 21A?

1    **A.**   Correct.

2    **Q.**   Okay.  Paragraph 21B, the date it was prescribed, correct?

3    Paragraph "D", the date of your last visit to the prescribing

4    doctor, correct?

5    **A.**   Um-hum.

6    **Q.**   All right.  Did you give us any of that information?

7    **A.**   It doesn't appear so.

8    **Q.**   Doesn't appear so?  Absolutely you did not give us that

9    information, correct?

10   **A.**   As I identified, I didn't sign this.  If you want to have

11   my attorney look into this and look into my medical marijuana

12   card dates, we can do so.

13   **Q.**   Your attorney did.  He prepared it with your permission.

14   Sent it to us with your signature, correct?

15   **A.**   Well, my signature is not on this.

16   **Q.**   It says, "With the permission from your attorney,"

17   correct?

18   **A.**   Yes.

19   **Q.**   I mean, you were trying to, with your attorney,

20   communicate some factual material to us, correct?

21   **A.**   Can you repeat the question, please?

22   **Q.**   The whole purpose of the interrogatories is to

23   communicate, to tell us certain facts, correct?

24   **A.**   If that's what this is defined as.

25   **Q.**   Sure.  And these were representations to be true?

1    **A.**   Yes.

2    **Q.**   Okay.  And now we hear the representations are not true,

3    accurate?

4    **A.**   I couldn't answer that question without looking into the

5    records.

6    **Q.**   Okay.  All right.  Kind of like your story that initially

7    you just said you were pushed from behind, correct?

8    **A.**   Can you repeat the question?

9    **Q.**   This incident at the Royal Oak courthouse.  You've told

10   people from the beginning you were pushed from behind, correct?

11   **A.**   Walking out of the door, yes.

12   **Q.**   Okay.  And that you didn't resist.  You, in fact,

13   resisted, didn't you?

14   **A.**   I did not.

15   **Q.**   Now, you agree that you're using a stern voice at the

16   Royal Oak courthouse, the 44th District Court, correct?

17   **A.**   Yes.

18   **Q.**   Your voice was raised, correct?

19   **A.**   Stern, not raised.

20   **Q.**   Okay.  Stern?

21   **A.**   Stern.

22   **Q.**   Stern.  Was anybody yelling at you?

23   **A.**   Barach, yes.

24   **Q.**   Okay.  Was he yelling at -- was Harold Marshall yelling at

25   you when he was up there?

1   **A.**   He was stern as well.

2   **Q.**   Was he yelling at you?

3   **A.**   Marshall?

4   **Q.**   Yes.

5   **A.**   No.

6   **Q.**   He wasn't yelling at you, okay.

7         John, can we get to the lobby view, please?  And what I'd

8   like to do is, again, see if we can see the people at the

9   corner when Mr. Sevy is at the front.  So, I'd like to see both

10  of those.  And if you could rotate a little bit

11  counter-clockwise.  Not quite so much.  A little bit more

12  clockwise.  All right.  Now, let's have it play.

13                    (Video Recording Played.)

14          **MR. SEWARD:**  And can you jump to where he's walking

15  to the -- well, let me stop.  I'm going to go step by step like

16  your attorney did.

17  BY MR. SEWARD, CONTINUING:

18  **Q.**   At this point, Mr. Barach is politely telling you he

19  doesn't think the court is going to take the pennies, correct?

20  **A.**   There was nothing polite about it, no.

21  **Q.**   Okay.  Is he swearing at you?

22  **A.**   He called me a punk at that time.

23  **Q.**   He called you a punk right when you walked in?

24  **A.**   Correct.

25  **Q.**   Where have you written that down in any statements that as

1   soon as you walked in Barach called you a punk?

2   **A.**   I don't recall.

3   **Q.**   I mean, you knew when you were writing a statement to the

4   police, when you were talking to the police officers, they

5   wanted to know what happened, right?

6   **A.**   Yes.

7   **Q.**   And that was an important fact, right?  That right off the

8   bat he called you a punk?

9   **A.**   He was, like I said, he was argumentative from the start.

10  **Q.**   That's an important fact isn't it because that sets the

11  stage for this whole thing, right?

12  **A.**   I don't know.

13  **Q.**   Okay.  Fair to say that in your written statement or your

14  words with the officer who interviewed you, you didn't say,

15  "Right off the bat he called me a punk," true?

16  **A.**   I don't know, I'd have to look at the statements.

17  **Q.**   All right.  So, right off the bat he says, "Punk, they

18  ain't going to take those," right?

19  **A.**   Yes.

20  **Q.**   All right.  And I'm sure you responded kindly, "Oh, sir, I

21  was told they would"?

22  **A.**   No, that's not -- no.

23  **Q.**   What did you say in response to being told, right from the

24  beginning, the first time we hear it today, is that, "Punk,

25  they won't take these pennies"?

1   **A.**   I said they, told me they would accept rolled pennies.

2   **Q.**   You told him that?

3   **A.**   Rolled change, yes.

4   **Q.**   Did you say, "They will take my pennies"?

5   **A.**   Yes.

6   **Q.**   It's not that, "I was told."  You said, "Oh, they're

7   taking my pennies," right?

8   **A.**   Yeah, but I didn't say it at that tone.

9   **Q.**   Pardon me?

10  **A.**   I didn't say it with such a loud tone.

11  **Q.**   I get it.  But those words came out?

12  **A.**   Something to that extent.

13  **Q.**   Okay.  Now, let's keep walking.  (Video playing) Can we

14  speed it up?  Can we speed it up a little, John.  Not speed it

15  up, but jump ahead?  Can we rotate it?  Yeah, so we can focus

16  in on the people to see what's going on when they turn around.

17  Go ahead, rotate a little bit more clockwise.  And why don't we

18  expand that a little bit.  All right.

19                          (A brief pause)

20          **MR. SEWARD:**  Okay.  Stop it.  Can you zoom in on

21  that?

22  **BY MR. SEWARD,** CONTINUING:

23  **Q.**   So, now we just saw a lady turn and look toward the front

24  of the counter, correct?

25  **A.**   Yes.

1   **Q.**   All right.  Can we see what's going on at this point?

2   **A.**   If you turn the camera.

3   **Q.**   At this point, you're in Harold Marshall's face, correct?

4   **A.**   It looks the other way around.

5   **Q.**   It looks the other way around?

6   **A.**   He's got a hand up and he's in my face.

7   **Q.**   Okay.  So, this is at 1:09:33.  Can we back it up a couple

8   of seconds, John.  Okay.

9        And if I recall correctly, you said Mr. Marshall was

10  polite to you.  Professional.  Didn't you say that to the jury

11  today?

12  **A.**   Yes.

13  **Q.**   Okay.  Let's watch -- because he just explained the note

14  on the wall -- on the window, correct?  That's what you told

15  the jury this morning, correct?

16  **A.**   Yes.

17  **Q.**   Okay.  All right.  You never mentioned that he was in your

18  face, correct?

19  **A.**   I don't recall.

20  **Q.**   You don't recall?

21  **A.**   I don't recall the --

22  **Q.**   He was in your face, was he?

23  **A.**   He was in my face.

24  **Q.**   Okay.  So now the truth is changing again?

25            **MR. MARKO:**   Judge, argumentative to form.  And it

 1   mischaracterizes his testimony.

 2            **THE COURT:**  All right.  The witness is answering.  He

 3   knows what he testified.

 4   **BY MR. SEWARD,** CONTINUING:

 5   **Q.**   Right.  Do you remember telling the jury today that he was

 6   polite and he explained the sign on the wall, correct?

 7   **A.**   Correct.

 8   **Q.**   Okay.  You never said he got into his -- your face,

 9   correct?

10   **A.**   If you want --

11   **Q.**   Sir, listen to my question.  Today, during your direct

12   exam, you never said he got into your face, is that a true

13   statement?

14   **A.**   I believe I did.

15   **Q.**   Oh, you believe you told the jury today that he got into

16   your face?

17   **A.**   When we were reviewing the video, yes.

18   **Q.**   Okay.  All right.  Let's watch it.  Let's play it to

19   1:09:33 (Video playing).  Stop it.

20        Do you see how you just moved your head into Harold

21   Marshall's space?

22   **A.**   Yes.

23   **Q.**   Okay.  You initiated that, correct?

24   **A.**   I turn my head.

25   **Q.**   Oh, you moved it in because you were making your point,

1   weren't you?

2   **A.**   I turned my head.

3   **Q.**   You moved your head in toward Harold Marshall, didn't you?

4   **A.**   No, I did not.

5   **Q.**   Can you back it up, let's see if that's true (Video

6   Playing).  Stop it.

7        You just see your head moving forward, don't you?

8   **A.**   I turned my head, sir.

9   **Q.**   Okay.  So, you're telling the jury that you are not moving

10  your head forward, is that what you're telling the jury?

11  **A.**   Yes.

12  **Q.**   Okay.  You're very stern at this point, correct?

13  **A.**   Yes.

14  **Q.**   You're telling Harold Marshall and that clerk, they're

15  going to take your pennies, correct?

16  **A.**   Yes.

17  **Q.**   Okay.  But they've already told you, "No," correct?

18  **A.**   I don't recall.

19  **Q.**   Well, you already know that they're not going to take your

20  pennies, correct?

21  **A.**   I don't have the audio of what's currently being said.

22  **Q.**   Sir, I didn't ask that question, did I?

23  **A.**   What's your question?

24  **Q.**   Okay.  Okay.  Can you listen to my question?

25  **A.**   I have been.

1   **Q.**   You already know they're not going to take your rolled

2   pennies, correct?

3   **A.**   No.

4   **Q.**   Okay.  But even though you don't know that, you're telling

5   them, "Yes, you are going to take your pennies," correct?

6   Correct?

7   **A.**   Can you repeat the question?

8   **Q.**   Certainly.  Even though you don't know that they're not

9   going to take your pennies like you just told us, you're

10  telling Harold and that clerk, "You're taking my pennies,"

11  correct?

12  **A.**   Yes.

13  **Q.**   Okay.  And at that point, you're clearly speaking, aren't

14  you?

15  **A.**   Yes.

16  **Q.**   Okay.  And it's grabbing the attention of somebody all the

17  way down at the end of the lobby, correct?

18          **MR. MARKO:**  Objection to foundation.

19          **THE COURT:**  Sustained.  If you can lay a foundation.

20  **BY MR. SEWARD**, CONTINUING:

21  **Q.**   Okay.  When you're raising your voice, people are looking

22  around the corner toward you, correct?

23          **MR. MARKO:**  Objection to foundation, Judge.  How does

24  he know if --

25          **THE COURT:**  He can tell him.

1          **THE WITNESS:** I don't know.

2     **BY MR. SEWARD,** CONTINUING:

3     **Q.**   Pardon me?

4     **A.**   I don't know.

5     **Q.**   You don't know?

6     **A.**   My face --

7     **Q.**   Let's play it again. We can see that they're turning

8     their heads toward there, right?

9     **A.**   My face is facing the window and the clerk.

10    **Q.**   Right, you're facing Harold Marshall.

11    **A.**   Correct. So, how would I know what people are doing

12    behind me?

13    **Q.**   Well, I didn't ask that.

14    **A.**   Yes, you do.

15    **Q.**   Okay. Let's look at the video. When this is going on, we

16    could see that somebody turned around and look at your

17    direction, correct?

18    **A.**   From what it appears in the video.

19    **Q.**   Okay. Now, other than you having this argument with

20    Mr. Marshall, was anything else going on that would cause them

21    to look this way?

22    **A.**   Well, there's a gentleman walking toward her.

23    **Q.**   Okay. So, you think she may be looking at that gentleman?

24    **A.**   Let's play the video and see.

25    **Q.**   Okay. Let's play the video and see.

1        (Video Recording Played.)

2    **BY MR. SEWARD,** CONTINUING:

3    **Q.**   Do you see any action that makes it looks like there's

4    communications going on between that lady that turns her head

5    around and this gentleman walking around?

6    **A.**   Well, the gentleman just proceeds --

7    **Q.**   Can you answer the question I asked, please?

8    **A.**   Can you ask the question again, please?

9    **Q.**   Certainly.  Is there any indication from the video right

10   now that the woman that turns her head around to look in your

11   direction is having any communication with this gentleman

12   standing in front of the elevator?

13   **A.**   I don't know that.

14   **Q.**   Okay.  All right.  Let's focus in on the lobby again.

15   You're saying -- you're suing the word, "Suck," aren't you,

16   during this time?

17   **A.**   No.

18   **Q.**   You're not at all?

19   **A.**   No.

20   **Q.**   Okay.  Now, in fact, this young lady that's at the

21   counter, all she asked you to do was put your name and address

22   on the rolled pennies, didn't she?

23   **A.**   I don't recall what she said.

24   **Q.**   So, if she comes in here and says, "I would have taken his

25   pennies, all I asked him to do is put his name and contact

1    information on it," you can't dispute that, can you?

2    **A.**    I don't recall her saying that.

3    **Q.**    Can you answer the question that I asked, please?

4    **A.**    What's your question?

5    **Q.**    Okay.  Will you stay focused on my question, please?

6    **A.**    Yes.

7    **Q.**    Thank you.  If that young lady comes before this jury

8    probably Tuesday and says, "I told him I would take his

9    pennies, all he had to do was put his name and contact

10   information on it," you can't dispute that testimony, could

11   you?

12   **A.**    I don't know.

13   **Q.**    Okay.  All right.  Let's keep -- can we focus on this

14   again, John.  Now, let's back up before Officer Barach comes

15   in.  All right.  Let's play it (Video Playing).  Now, let's

16   stop it right here.

17        You're still telling her and Harold, "You're going to take

18   my pennies," aren't you?

19   **A.**    I don't recall what was said at that moment.

20   **Q.**    Okay.  At this point, you're not picking them up and going

21   out, are you?

22   **A.**    Not yet, no.

23   **Q.**    No, okay.  Because you want them to take your pennies,

24   right?

25   **A.**    Yes.

1    **Q.**   And you're standing up for yourself, aren't you?

2    **A.**   I'm trying to pay the parking ticket.

3    **Q.**   Okay.  You're standing up for yourself, correct?

4    **A.**   Yes.

5    **Q.**   Okay.  And you're making sure that they know that they're

6    going to take Anthony Sevy's pennies, correct?

7    **A.**   Can you repeat the question, please?

8    **Q.**   You're making it clear to them that they're going to take

9    Anthony Sevy's pennies, correct?

10   **A.**   Yes.

11   **Q.**   Okay.  Let's keep watching (Video Playing).  Now, at this

12   point you're now -- you don't even look at Officer Barach, do

13   you?

14   **A.**   If you could play the video, I can properly analyze it.

15   **Q.**   Okay.  Can we back it up?  (Video Playing) All right.

16        Just before Officer Barach starts talking to you, you had

17   been talking to Harold Marshall, correct?

18   **A.**   Yes.

19   **Q.**   Okay.  And you're, again, reiterating that they're going

20   to take your pennies, correct?

21   **A.**   Yes.

22   **Q.**   All right.  And let's watch it from this point forward.

23   (Video Playing).  Okay.  Let's stop.

24        Officer Barach just told you, "You're done.  Go," correct?

25   **A.**   I don't recall what he was saying exactly.

1    **Q.**   You could see his hands going like, C'mon on, let's go,

2    right?

3    **A.**   Yes.

4    **Q.**   And that's the words he said, We're done.  Let's go.

5    You're done, words to that effect, correct?

6    **A.**   Yes.

7    **Q.**   Okay.  And do you see how you have your head extended

8    into, facing into Officer Barach?

9    **A.**   I'm speaking.

10   **Q.**   Pardon me?

11   **A.**   I'm just speaking here.

12   **Q.**   Well, no, you're doing more than speaking.  You've got

13   that stern voice, correct?

14   **A.**   I don't recall.

15   **Q.**   Oh, do you think your tone calmed down?

16   **A.**   Oh no, I was aggravated.

17   **Q.**   Oh, aggravated.  Upset, correct?

18   **A.**   Yes.

19   **Q.**   Causing a commotion?

20   **A.**   I don't believe so.

21   **Q.**   You don't believe so?

22   **A.**   No.

23   **Q.**   Can we pan the whole lobby to see who else is in there?

24   Okay.  Slowly (Video Panning).  We see you, Officer Barach and

25   Officer Marshall, correct?

1    **A.**    Yes.

2    **Q.**    Okay.  Tell me when you see somebody else.  Okay.  Let's

3    stop it.  The gentleman that was standing in the elevator is no

4    longer there, correct?

5    **A.**    Correct.

6    **Q.**    And then we have the two persons down by what's called the

7    probation area, correct?

8    **A.**    Correct.

9    **Q.**    All right.  Was there any other loud crashes or noises or

10   voices other than yours?

11   **A.**    Well, there's people behind the glass talking as well.

12   **Q.**    Okay.  All right.  But they can't really hear too well,

13   you don't think?

14   **A.**    I'm not behind the glass.

15   **Q.**    Okay.  Let's keep watching (Video Playing).  So, now,

16   you're arguing.  You're standing your ground saying, "I'm not

17   leaving.  They're taking my pennies," correct?

18   **A.**    Barach was -- got in my face at that point.

19   **Q.**    Okay.  Let's stop it.  He got into your face?

20   **A.**    Correct.

21   **Q.**    Now, let's walk back.  How did he get into your face?

22   **A.**    Are we going to walk the video back?

23   **Q.**    Can we walk the video back, John?

24   **A.**    (Video Playing)  Right there, he's got his hand up in my

25   face.

 1   **Q.**   So, you leaning like this is him getting into your face?

 2   **A.**   Can we rewind it so I can give you my take of it?

 3   **Q.**   Okay.

 4   **A.**   (Video Playing)  So right there, he's approaching me.

 5   **Q.**   Yes, he's telling you, "You're done," right?

 6   **A.**   Let's rewind it a little and play it in realtime.

 7   **Q.**   Sure.  That's good, John.  Let's play it.

 8   **A.**   So, he's about a foot away and then two feet and

 9   six inches and he's basically touching.  Almost pushes me right

10   there.

11   **Q.**   Almost pushes you.  And he's just telling you --

12   **A.**   He made a gesture and I made a gesture and he asked me to

13   leave and I proceeded to leave.

14   **Q.**   He actually told you to leave before that, correct?

15   **A.**   Well, I asked for my ticket back.

16   **Q.**   Oh, okay.  And as you're walking out, correct?

17   **A.**   Correct.

18   **Q.**   You drop -- and all the time, you're looking at Officer

19   Barach telling him, "This sucks," correct?

20   **A.**   Something to that extent.

21   **Q.**   Okay.  Now, you've heard that Officer Marshall recalls you

22   using words, Something sucker, correct?

23   **A.**   I said, "This court sucks."  I said, "This is ridiculous,"

24   is what I recall.

25   **Q.**   You're upset.  You're angry.

1   **A.**   Yes.

2   **Q.**   You're causing a disturbance?

3   **A.**   I would not say that.

4   **Q.**   Okay.  All right.  You're not going to accept any

5   responsibility for this incident, are you?

6   **A.**   Of me being assaulted?  No.

7   **Q.**   You don't think you did anything wrong, do you?

8   **A.**   No.

9   **Q.**   So, if somebody were to come up to one of these clerks and

10   say, "This sucks," and makes it real loud, the Marshals better

11   not come in and do anything about it, correct?

12   **A.**   Push and choke and throw someone down, no.

13   **Q.**   And tell you to leave?

14   **A.**   And I proceeded to leave.

15   **Q.**   Okay.  Let's watch it.

16                    (Video Recording Played.)

17   **BY MR. SEWARD,** CONTINUING:

18   **Q.**   Okay.  Stop.  Let's go to the other view.  Can we jump

19   ahead to when they're walking down?  Thanks.  There we go.  All

20   right.  Let's watch this (Video Playing).  Okay.  Stop it.

21        What we're going to see next is that he grabs you by your

22   arm and then your neck, correct?

23   **A.**   Replay it.

24   **Q.**   Is that your memory?

25   **A.**   Yes.

1    **Q.**   Okay.  Let's watch it (Video Playing).  Okay, let's stop

2    it.  Now, let's go back.  And you did not react, correct?

3    **A.**   I turned around when I got pushed.

4    **Q.**   So, if someone were to say that you did not react, that

5    would be a false statement?

6    **A.**   I don't know how to answer that question.

7    **Q.**   Well, it's either yes or no.

8    **A.**   Repeat the question?

9    **Q.**   Okay.  If someone were to say that you did not react when

10   he grabbed you by the arm and the neck, that would be a false

11   statement, correct?

12   **A.**   Correct.

13   **Q.**   Okay.  Let's take a look at then -- let's take a look at

14   Page 65 starting at Line 23 through Page 66, Line 4?

15   **A.**   I don't have a copy of that.

16         **MR. MARKO:**  Actually Line 6, you have to read the

17   whole thing, not one line of an answer.

18         **MR. SEWARD:**  I'm going to read the whole thing, is

19   that all right?  Is it all right if we just play the whole

20   clip?

21         **MR. MARKO:**  Shouldn't he show it to the witness

22   first, Judge?

23         **THE COURT:**  Well, this is this witness's statement?

24   **MR. SEWARD:**  Yes, it is.

25         **THE COURT:**  All right.  Is there an objection?

1          **MR. MARKO:**  I'm just objecting to the use of it being

2    used for impeachment or to refresh his recollection.

3          **THE COURT:**  Well, either way, if it's this witness's

4    statement, it's probably in admission.

5    **BY MR. SEWARD**, CONTINUING:

6    **Q.**   Page 66, Line 6.  Read it to yourself and so there's no

7    ifs, ands, or butts, I'll ask John to play that.

8    **A.**   What page?

9    **Q.**   Page 65, starting at Line 23 through 66 Line 6.  Tell me

10   when you've had a chance to read it.

11   **A.**   I've read it.

12   **Q.**   Okay.  John, can you play it?

13              (Video Deposition Recording Played.)

14   **BY MR. SEWARD**, CONTINUING:

15   **Q.**   Thank you.  So, you did say you did not react, correct?

16   **A.**   I don't recall.

17   **Q.**   Okay.  But that's what's in the transcript and we just

18   heard it, correct?

19   **A.**   Correct.

20   **Q.**   Okay.  So, you did react.  In fact, you were going to

21   stand your ground, correct?

22   **A.**   I was trying to exit the building.

23   **Q.**   Pardon me?

24   **A.**   I was just trying to exit the building and I was pushed.

25   So, I was spun around.

1   **Q.**   Okay.  Now, I heard a lot of questions by your attorney

2   about trying to cover the fact that originally you said there

3   was, like, four to six officers on you, correct?  And that now

4   that you've had a chance to look at the video, your memory was

5   incorrect.  Is that what you told the jury this morning?

6   **A.**   Can you repeat the question?

7   **Q.**   Certainly.  Your attorney asked you a whole bunch of

8   questions about how your memory wasn't so great and so forth

9   and that you misspoke when there was four to six officers on

10  you, correct?  Because you now saw it in the video that that

11  did not occur.  Do you remember those questions of your

12  attorney?

13  **A.**   Yes.

14  **Q.**   Okay.  And the video show that your answers were not

15  correct, accurate?

16  **A.**   So, I was referring to when I was put in handcuffs and put

17  in the elevator and when I was choked unconscious I thought

18  there was more than two people because that's how it felt.

19  **Q.**   The police officers, there were three or four police

20  officers when you went unconscious, correct?

21  **A.**   That's what I thought at the time.

22  **Q.**   Okay.  And now you know you're wrong?

23  **A.**   I saw the video.

24  **Q.**   Okay.  You saw it on the video, okay.  Does that make you

25  a liar?

1   **A.**   No.

2   **Q.**   Okay.  Now, if somebody sees something on the video that

3   they didn't remember, does that make them a liar?

4   **A.**   No, I was disoriented at the time.

5   **Q.**   No, no.  Listen to my question.  If any person, not just

6   Anthony Sevy, but if they now see something on the video that

7   they didn't recall, does that make them a liar?

8   **A.**   I don't know what you're asking me.

9   **Q.**   Okay.  But we know that it doesn't make Anthony Sevy a

10  liar, correct?

11  **A.**   I don't know what you're asking me.

12  **Q.**   Okay.  I'll try it again.  Your memory was not accurate

13  about the three to four officers on you when you went

14  unconscious, correct?

15  **A.**   Correct.

16  **Q.**   Okay.  You saw the video and you saw that that was

17  incorrect, accurate?

18  **A.**   Correct.

19  **Q.**   Does that make you a liar?

20  **A.**   I misspoke, yes.

21  **Q.**   Pardon me?

22  **A.**   I said I misspoke.

23  **Q.**   Okay.  I didn't ask that question.  I said, does that make

24  you a liar?

25  **A.**   You can consider it that.

1   **Q.**   Okay.  So, it's fair for the jury to consider that you're

2   a liar?

3   **A.**   No, I'm admitting that after reviewing the video there

4   were two people and then there were more people.

5   **Q.**   And my only point is that if somebody else other than

6   Anthony Sevy now see something that they didn't recall, they

7   should be afforded that same latitude, right, that doesn't make

8   them a liar?

9   **A.**   I can't make that judgment.

10  **Q.**   Pardon me?

11  **A.**   I can't make that call.

12  **Q.**   Okay.  Now, you agree that you were resisting, correct?

13  **A.**   No.

14  **Q.**   You don't agree to that?

15  **A.**   No.

16  **Q.**   Okay.  When you -- when he put his hand to guide you out

17  and you turned around, true statement that you initially

18  resisted?

19  **A.**   I turned around.  I wouldn't consider it resisting.

20  **Q.**   Pardon me?

21  **A.**   I would not consider it resisting.  I turned around.

22  **Q.**   So, if somebody said under oath that you initially did

23  resist, that would be a lie, correct?

24  **A.**   No.

25  **Q.**   Okay.  So now what do you say, that you did initially

1  resist?

2  **A.**   I was trying to get my ground.  I was -- I was never once

3  was told, "You're under arrest."  I was spun around and that's

4  what happened.

5  **Q.**   And then you initially resisted, correct?

6  **A.**   It all happened so fast, I do not recall.

7  **Q.**   Can you answer the question?

8  **A.**   I just did.

9  **Q.**   Okay.  So, now you don't recall?

10  **A.**   I don't recall.  I don't believe I was resisting.

11  **Q.**   Okay.  Now, if you, under your deposition sworn to tell

12  the truth back in 2018, and if you said you initially resisted,

13  that would be a true statement then, correct?

14  **A.**   Yes.

15  **Q.**   And it would be a true statement today, correct?

16  **A.**   Yes.

17  **Q.**   Okay.  So, let's just take a look at Page 69, Lines 16

18  through 17.

19       **MR. MARKO:**  Well again, you, under best evidence rule

20  and the rule of completeness --

21       **MR. SEWARD:**  Your Honor --

22       **MR. MARKO:**  Excuse me.  Excuse me.

23       **THE COURT:**  All right.  What is the objection?

24       **MR. MARKO:**  The objection is he's picking out

25  particular things without reading the entire section.

1        **THE COURT:**  Okay.  All right.  I understand the

2   objection.  This is just a very limited question.  So,

3   Mr. Seward, if you're going to do this, ask it based on what

4   specifically is set forth in the transcript.

5        **MR. SEWARD:**  And that's what I did.

6   BY MR. SEWARD, CONTINUING:

7   **Q.**   Okay.  Have you read the question and answer?

8   **A.**   You're referring to -- what's the question again, please?

9   **Q.**   You know what, I will read the question.  Are you on Page

10  69?

11  **A.**   Yes.

12       **THE COURT:**  Before you do that, you've established he

13  was deposed, why don't you ask him while at his deposition he

14  testified to something.

15  **BY MR. SEWARD**, CONTINUING:

16  **Q.**   Okay.  You were asked a question:  "So, did you resist

17  what they were doing to you?"

18       And your answer was, "Initially, yes."  That's what you

19  told us in your deposition, correct?

20  **A.**   It says, "Did you go down right away though?"

21       "Yes, I hit the glasses wall and went down.  My glasses

22  flew off".

23       "Okay.  Did you resist what they were doing to you at

24  all?"

25       I said, "I was taken back.  I didn't understand why I was

1    getting thrown around like an animal."

2        "Did you resist what they were doing to you?"

3        "Initially, yes."

4        That is my response.

5    **Q.**    Okay.  That's all I ask.

6            **MR. SEWARD:**  Thank you, sir.  I have no other

7    questions.

8            **(Whereupon excerpt Cross Examination concluded)**

9                            **- -**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                           -   -   -

 3               C E R T I F I C A T I O N

 4          I, Nefertiti A. Matthews, official court reporter

 5     for the United States District Court, Eastern District of

 6     Michigan, Southern Division, appointed pursuant to the

 7     provisions of Title 28, United States Code, Section 753,

 8     do hereby certify that the foregoing is a correct

 9     transcript of the proceedings in the above-entitled cause

10     on the date hereinbefore set forth.

11          I do further certify that the foregoing

12     transcript has been prepared by me or under my direction.

13

14     Date: July 1, 2022

15

16     s:/Nefertiti A. Matthews
       Nefertiti A. Matthews,
17     Official Court Reporter

18                           -   -   -

19

20

21

22

23

24

25
```

17-13789; Anthony Sevy v. Philip Barach