1                **UNITED STATES DISTRICT COURT**
                 **EASTERN DISTRICT OF MICHIGAN**
2                      **SOUTHERN DIVISION**

3

4    **ANTHONY SEVY,**

5               Plaintiff,

                                      **HONORABLE LAURIE J. MICHELSON**
6        v.

7                                     **No. 17-13789**
     **PHILIP BARACH,**
8
                Defendant.
9    _____/

10

                        **JURY TRIAL - (VOLUME 2)**
11
            **Detroit, Michigan --  Tuesday, June 28, 2022**
12

13

     **APPEARANCES:**
14
     **Jonathan R. Marko, Esq.**          **T. Joseph Seward, Esq.**
15   **Charlie Kersten, Esq.**            **Kali M. L. Henderson, Esq.**
     Marko Law, PLLC                  Seward Peck & Henderson, PLLC
16   1300 Broadway Street, 5th Floor  210 East 3rd Street, #212
     Detroit, MI 48226                Royal Oak, MI 48067
17   Tel: (313) 777-7529              Tel: (248) 733-3580
     jon@markolaw.com                 jseward@sewardhenderson.com
18   charlie@markolaw.com             khenderson@sewardhenderson.com
     On behalf of Plaintiff           On behalf of Defendant
19

20                          -   -   -

21        To Obtain A Certified Transcript, Contact:
          **Nefertiti A. Matthews, Official Court Reporter**
22          **Theodore Levin United States Courthouse**
                **231 West Lafayette Boulevard**
23              **Detroit, Michigan  48226**
     **www.transcriptorders.com • jodi_matthews@mied.uscourts.gov**
24
            Proceedings recorded by mechanical stenography.
25       *Transcript produced by computer-aided transcription.*

I N D E X

- - -

Plaintiff's Case in Chief                Page  Vol.

**DR. GERALD SHIENER**

   Cross-Examination By Mr. Seward, *(Cont.)*   4    2

   Redirect Examination By Mr. Marko     21   2

**PHILIP BARACH (Adverse Witness)**

   Cross-Examination By Mr. Marko        42   2

   Direct Examination By Mr. Seward     126   2

   Recross-Examination By Mr. Marko     166   2

   Redirect Examination By Mr. Seward    183   2

**HAROLD MARSHALL (Adverse Witness)**

   Cross-Examination By Mr. Marko      185   2

Certification of Reporter .....................221

- - -

Plaintiff's Exhibits

| Number | Description | Id'd | Rcvd | Vol. |
|---|---|---|---|---|
| 5 | One-Page Document: Oath from Constitution | 48 | 48 | 2 |
| 9A | Photograph of Philip Barach | 121 | 121 | 2 |
| 9B | Photograph of Philip Barach | 121 | 121 | 2 |

- - -

Defendant's Exhibits

| Number | Description | Id'd | Rcvd | Vol. |
|---|---|---|---|---|
| 1 | Court Notice Document | 131 | 131 | 2 |

**17-13789; Anthony Sevy v. Philip Barach**

**Jury Trial**
**Tuesday, June 28, 2022**

3

```
 1                            Detroit, Michigan

 2                            Tuesday, June 28, 2022

 3                            8:34 a.m.

 4                            -  -  -

 5          THE CLERK:  The Court calls Case 17-13789; Sevy

 6   versus Barach.

 7       Counsel, will you please state your appearances, for the

 8   record.

 9          MR. MARKO:  Good morning, Your Honor.  John Marko,

10   along with Charlie Kersten, on behalf of Mr. Sevy.

11          THE COURT:  Good morning.

12          MR. SEWARD:  Good morning, Your Honor. Joe Seward and

13   Kali Henderson, on behalf of Philip Barach.

14          THE COURT:  All right.  Good morning, everyone.  The

15   jury is ready.  Do we have Dr. Shiener?

16          MR. MARKO:  Yes, he's just out in the hall.

17          THE COURT:  All right.  Bring him in.

18                     (Jury in at 8:36 a.m.)

19          THE COURT:  All right.  Thank you.  You-all may be

20   seated.  Good morning, everyone.  Nice to see you again.  We

21   are ready to proceed.

22       And Dr. Shiener, you may take the witness stand, please.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  And Dr. Shiener, you understand you're

25   still under oath?
```

DR. GERALD SHIENER - Cross
Tuesday/June 28, 2022

4

1          **THE WITNESS:**  I do.

2          **THE COURT:**  Thank you very much.

3       And Mr. Seward, when you're ready.

4                    -   -   -

5                  **DR. GERALD SHIENER,**

6          **at 8:36 a.m., previously being first duly**

7          **sworn by the Court to tell the truth, was**

8          **examined and testified upon oath as follows:**

9                    -   -   -

10                 **CROSS-EXAMINATION**

11  BY MR. SEWARD, CONTINUING:

12  **Q.**  Sir, after your testimony yesterday, you had discussions

13  with Mr. Marko?

14  **A.**  I did.

15  **Q.**  And you discussed your testimony?

16  **A.**  No.

17  **Q.**  And you discussed what he was going to ask you?

18  **A.**  No.

19  **Q.**  And were there any phone calls after yesterday when we

20  left at 1:30 or so?

21  **A.**  Yes.

22  **Q.**  And did that have any discussions about what your

23  testimony was and what he was going to go over?

24  **A.**  No.  The only discussion was that I asked him for a copy

25  of the statement that we had discussed yesterday so I could

1  speak to it if you had any more questions about it.

2  **Q.**  And were there any text messages?

3  **A.**  No.

4  **Q.**  Okay.  Now, you choose your words carefully, don't you?

5  **A.**  I try to.

6  **Q.**  And you wouldn't try to mislead the jury about what your

7  findings are or what other records say, would you?

8  **A.**  I would try not to.

9  **Q.**  Okay.  Because let's go back to the EPIC Records.  And you

10  mentioned yesterday that there were some objective complaints.

11  Now, that first full paragraph, the only objective finding was

12  the one and a half and the two-inch bruise, correct?

13  **A.**  Well, first of all, in response to your question --

14  **Q.**  Sir, Sir, can you answer the question that I'm asking?

15  **A.**  You mischaracterized what I said, so I don't think I can

16  proceed.

17  **Q.**  Isn't it true in the first full paragraph under, "History

18  of Present Illness," the only objective finding was the 1 1/2

19  by 2-inch or 4 by 5-inch centimeter bruise on the neck, is that

20  an accurate statement?

21  **A.**  What's accurate is that there's mild bruising and swelling

22  point tenderness and soft tissue in the area approximately

23  4 centimeters by 5 centimeters, right neck.

24  **Q.**  Thank you.  Now, you weren't there, correct?

25  **A.**  At that examination, no.

DR. GERALD SHIENER - Cross
Tuesday/June 28, 2022

6

1   **Q.**   Do you know where on the neck?

2   **A.**   On the right neck.

3   **Q.**   On the right neck?

4   **A.**   Yes.

5   **Q.**   Okay.  Now, the doctor's report has a review of systems,

6   correct?

7   **A.**   It does.

8   **Q.**   And a review of systems what you understand that is what

9   the doctor's actually looking at, correct?

10  **A.**   No, that's not correct.

11  **Q.**   Isn't he asking questions and taking tests?

12  **A.**   He's not taking tests.  I can tell you what a review of

13  systems is like.  If I have to answer yes or no, I would say

14  that's a mischaracterization of what a review of system is.

15  **Q.**   Would you agree with me that under the review of systems

16  it says, General, there's nothing present, no fever, correct?

17  **A.**   No, that's not correct.

18  **Q.**   Does it say that he has a fever?

19  **A.**   What it says is, "Not Present - Fever."  You said,

20  "Nothing present."  You want to be careful when choosing your

21  words properly and carefully.

22  **Q.**   And "Skin, Not present, a Rash," correct?

23  **A.**   Yes, there's no rash noted.

24  **Q.**   Correct.  And then:  "Head, Ears, Eyes, Nose, Throat",

25  "Rhinitis"?

DR. GERALD SHIENER - Cross
Tuesday/June 28, 2022

7

1  **A.**   Rhinitis.  "Not Present - Rhinitis."

2  **Q.**   Okay.  "Neck, Not Present - Swollen Glands"?

3  **A.**   That's correct.

4  **Q.**   "Respiratory, Not Present - Wheezing"?

5  **A.**   That's correct.

6  **Q.**   So, these are objective findings, correct?

7  **A.**   Review of system is --

8  **Q.**   Sir, can you answer --

9  **A.**   No, that's not correct, I'm sorry.

10  **Q.**   And then, "Cardiovascular, Not Present - Shortness of

11  Breath"?

12  **A.**   That's what it says.

13  **Q.**   Okay.  So, that means the doctor's noting that they didn't

14  notice a shortness of breath, correct?

15  **A.**   No, that's not correct.  That's not what a review of

16  systems is.

17  **Q.**   Sir, isn't the reflection, "Not Present - Shortness of

18  Breath," mean that the doctor did not see or hear or diagnose

19  shortness of breath?

20  **A.**   That's a mischaracterization of what a review of systems

21  is.

22  **Q.**   Okay.  "Gastrointestinal, Not Present - Constipation,

23  Diarrhea and Vomiting"?

24  **A.**   That's what it says.

25  **Q.**   "Male Genitourinary, Not Present - Change in Urinary

DR. GERALD SHIENER - Cross
Tuesday/June 28, 2022

8

1   Stream."

2   **A.**   It's, "Male Genitourinary, Not Present - Change in Urinary

3   Stream."

4   **Q.**   Okay.  Now, here's something, "Musculoskeletal, Present -

5   Muscle Pain and Neck Pain," correct?

6   **A.**   That's correct.

7   **Q.**   All right.  But then right below that, "Neurological, Not

8   Present - Seizures and Tremors," correct?

9   **A.**   That's correct.

10  **Q.**   "Psychiatric, Not Present - Inability to Concentrate," is

11  that accurate?

12  **A.**   You read it accurately, yes.

13  **Q.**   "Endocrine, Not Present - Appetite Changes," correct?

14  **A.**   That's correct.

15  **Q.**   "Hematology, Not Present - Petechiae"?

16  **A.**   Petechiae.

17  **Q.**   "Not Present," correct?

18  **A.**   Correct.

19  **Q.**   Now, let's go to your first report because I have some

20  questions about that.  Because you've testified before,

21  correct?

22  **A.**   I have.

23  **Q.**   And you know how important it is to be precise, correct?

24  **A.**   Precision is important.

25  **Q.**   Pardon me?

**17-13789; Anthony Sevy v. Philip Barach**

DR. GERALD SHIENER - Cross
Tuesday/June 28, 2022

9

| 1 | **A.** Precision is important. |
| 2 | **Q.** Okay. Cool. Now, you examined Mr. Sevy on November 21st |
| 3 | of 2017, correct? |
| 4 | **A.** That's right. |
| 5 | **Q.** When did you tell Mr. Sevy of your diagnostic impressions? |
| 6 | **A.** At the end of the interview. |
| 7 | **Q.** Pardon me? |
| 8 | **A.** At the end of the interview. |
| 9 | **Q.** And when did you send the report to Mr. Marko? |
| 10 | **A.** June 11th, 2018. |
| 11 | **Q.** So, seven, eight months later? |
| 12 | **A.** Yes. |
| 13 | **Q.** Now, you knew when you were doing this that this was |
| 14 | involving litigation, correct? |
| 15 | **A.** I knew the potential was there. I didn't know the status |
| 16 | of litigation. |
| 17 | **Q.** Okay. And let's just take a look at a couple of things |
| 18 | that you wrote. Now, we went over how in under "History" we |
| 19 | talked about how you wrote that two of them attacked and pushed |
| 20 | him down, four more officers came and they were choking him. |
| 21 | We went over that yesterday, correct? |
| 22 | **A.** We did. |
| 23 | **Q.** All right. And then going to the second page. |
| 24 | **THE COURT:** Are you intending to admit the report? |
| 25 | **MR. SEWARD:** No. |

1          **THE COURT:**  All right.  Then just ask him questions

2     about it and we'll see if he needs to have his memory refreshed

3     or . . .

4          **MR. SEWARD:**  Okay.

5     **BY MR. SEWARD**, CONTINUING:

6     **Q.**   And you wrote that he told you how on the Friday after he

7     turned himself in, that Saturday morning police officers came

8     to his house to arrest him, correct?

9     **A.**   Well, you left out a sentence; but, yes.  Police officers

10    came to arrest me -- came to his house to arrest him.

11    **Q.**   And being precise with your words, it was police officers,

12    not court security officers, correct?

13    **A.**   That's right.

14    **Q.**   Thank you.  And he went on to tell you that he was

15    physically restrained by the police, correct?

16    **A.**   Yes, that's what it says.

17    **Q.**   And then he also told you that at the time he lives in

18    Royal Oak, correct?

19    **A.**   That's right.

20    **Q.**   And that the circumstances of his encounter with the Royal

21    Oak Police continued to bother him, correct?

22    **A.**   That's right.

23    **Q.**   Okay.  And he said that he has panic reactions and is

24    always vigilant for the prospect of being arrested or having

25    the police harass him, isn't that accurate?

1   **A.**    That's what it says.

2   **Q.**    Okay.  As they did when they came to his house while he

3   was out on bond, correct?

4   **A.**    That's correct.

5   **Q.**    So, the focus was on the police, correct?

6   **A.**    Not exactly.

7   **Q.**    Okay.  Well, we know that you're precise, correct?

8   **A.**    We do.

9   **Q.**    Okay.  Thank you.

10      Now, in that whole paragraph where he talks about panic

11  reactions and always being vigilant for the prospect of being

12  arrested by the police, in that whole paragraph is there any

13  mention of the word, "Court Security"?

14  **A.**    There's not.

15  **Q.**    Thank you.  Now, he also went on to say that he has a

16  panic reaction when he encounters police officers, correct?

17  **A.**    That's right.

18  **Q.**    And he described the incident with the police officers

19  where they were -- the police officers were sitting around his

20  condo and would drive by his house, correct?

21  **A.**    That's right.

22  **Q.**    And he said he's very frightened.  They tried to arrest

23  him for something he had turned himself in for, correct?

24  **A.**    He said, "They tried to arrest me for something I had

25  turned myself in for," is what's written in the report.

**DR. GERALD SHIENER - Cross**
**Tuesday/June 28, 2022**

12

1   **Q.**   Right.  And the point is the "They" refers to police

2   officers, correct?

3   **A.**   Well, I wouldn't say that's exactly what the point.  I

4   know what the point is.

5   **Q.**   Okay.  In that paragraph is there any reference to court

6   security officers?

7   **A.**   No, there's no not.

8   **Q.**   Is the only reference is to police?

9   **A.**   It is.

10  **Q.**   Okay.  And again, you're being precise, correct?

11  **A.**   Yes, I am.

12  **Q.**   Thank you.  Now, he also told you that he was working long

13  hours, correct?

14  **A.**   That's right.

15  **Q.**   And he told you that since 2015, he and his fiance had

16  been trying to put together and promote that cookie business,

17  correct?

18  **A.**   Yes.

19  **Q.**   Okay.  And that since 2015, he and his fiance, his then

20  fiance, were working very hard and very long hours, correct?

21  **A.**   What he said was -- what I said was, The patient

22  structures his activities of daily living by working long hours

23  running his business up to 18 hours a day.

24  **Q.**   And that he will see his fiance and see friends and his

25  family and play soccer, correct?

**17-13789; Anthony Sevy v. Philip Barach**

DR. GERALD SHIENER - Cross
Tuesday/June 28, 2022

13

1  **A.**    That's correct.

2  **Q.**    Then you wrote something about, "The patient", referring

3  to Mr. Sevy, speaks of a conscious fear of police officers and

4  having a panic reaction when exposed to police officers,

5  correct?

6  **A.**    Where's that?

7  **Q.**    That's under, Mental and Content of Thought on the fourth

8  page.

9          **MR. MARKO:**  Judge, I don't generally have a problem

10  with the report, but under the Rules of Evidence, the report is

11  not admissible and I think he should be asking questions the

12  doctor can answer so we can move this along.  The report is not

13  in evidence.

14          **THE COURT:**  That's why I inquired.  So, why don't you

15  ask the questions.

16          **MR. MARKO:**  If he wants to, we can put the report in

17  evidence and the jury can see it themselves.  I'm happy to

18  admit the whole report.

19          **MR. SEWARD:**  You know, I appreciate that; but, no.

20  If the doctor doesn't remember, then I'll refer him to the

21  pages to see if it refreshes his memory.

22          **THE COURT:**  So, why don't you just ask general

23  questions as oppose to reading the report?

24          **MR. SEWARD:**  Okay.

25

1   **BY MR. SEWARD,** CONTINUING:

2   **Q.**   And isn't it true that Mr. Sevy said that he has a

3   conscious fear of police officers and that having -- and he has

4   a panic reaction when exposed to police officers?

5   **A.**   That's what he characterized to me, yes.

6   **Q.**   Okay.  Now, he also told you that he had disturbed peace,

7   correct?

8   **A.**   Disturbed peace?

9   **Q.**   Disturbed sleep, I'm sorry.

10  **A.**   Yes, he did.

11  **Q.**   All right.  Now, you don't have him swear to tell the

12  truth, the whole truth and nothing but the truth, do you, when

13  you ask him questions?

14  **A.**   I don't.

15  **Q.**   But you read his deposition, didn't you?

16  **A.**   I didn't.

17  **Q.**   Okay.  You didn't have the benefit of the deposition when

18  you wrote this report, correct?

19  **A.**   If it's a benefit, no, I didn't have it.

20  **Q.**   Okay.  And, of course, you get paid a substantial amount

21  of money to know the file and to come here and testify,

22  correct?

23  **A.**   I've been paid for my services.

24  **Q.**   All right.  Can you point to any place in his deposition

25  where he has disturbed sleep?

**DR. GERALD SHIENER - Cross**
**Tuesday/June 28, 2022**
                                                                    15

```
 1    A.    Oh, I haven't committed it to memory.
 2    Q.    Okay.  Do you want to take a look and refresh your memory?
 3    A.    Sure.  Why don't you provide me with an index and I'll
 4    take a look at it.
 5    Q.    Didn't you do that to prepare?  You know that's what you
 6    told us you did to justify the $3,000, $3,500 for your
 7    testimony, correct?
 8    A.    That's not money for my testimony, that's money for my
 9    time as we discussed yesterday.
10    Q.    Right.  And part of that $3,500 for your testimony
11    included that you would review the file, correct?
12    A.    That's right.
13    Q.    Okay.  So, I'm just asking you, because you must have -- I
14    mean, you earned that money, right?
15    A.    I consider my fees to be fair for the amount of effort and
16    work and expertise I bring to my work.
17    Q.    Well, I appreciate that.  But you did that work, right?
18    You read that deposition to prepare for your testimony,
19    correct?
20    A.    I did.
21    Q.    Okay.  Anything in your mind that says, Yeah, he said
22    something at his deposition when he was sworn under oath that
23    he had disturbed peace -- sleep?
24    A.    Well, reading the deposition I could tell that the theme
25    was that he did have disturbed peace and he's not --
```

**17-13789; Anthony Sevy v. Philip Barach**

DR. GERALD SHIENER - Cross
Tuesday/June 28, 2022

16

1   **Q.**   Sir, can you answer the question that I asked?

2   **A.**   I haven't committed the document to memory so I'm not able

3   to do so without an opportunity to review it.  I don't have a

4   hard copy of it with me today.  So, if you want to provide it

5   to me, I'll be happy to take a look at it and discuss it with

6   you (Brief pause.)  Okay.  Thank you.

7   **Q.**   So, you don't have to go through all 158 pages, will you

8   accept my representation at no time he said, under oath, that

9   he had disturbed sleep?

10          **MR. MARKO:**  Objection, Judge, that mischaracterizes

11  the documents.

12          **THE COURT:**  He can answer.

13          **THE WITNESS:**  I've not deferred to your recollection

14  of your characterization of this lengthy document.  But I'd

15  like a copy with an index, if I could.

16          **MR. SEWARD:**  That's what I have, sir.

17          **THE WITNESS:**  Maybe we should take a break and I can

18  read it and we can come back.

19  BY MR. SEWARD, CONTINUING:

20  **Q.**   I doubt we're going to do that.

21  **A.**   Okay.  Well.

22  **Q.**   Now, you also wrote -- or you also found no physical

23  condition is diagnosed in axis three, correct?

24  **A.**   That's right.

25  **Q.**   Now, May 13th of 2022, some nearly four and a half years

**17-13789; Anthony Sevy v. Philip Barach**

**DR. GERALD SHIENER - Cross**
**Tuesday/June 28, 2022**                                    17

1   later, you see Mr. Sevy again, correct?

2   **A.**    That's correct.

3   **Q.**    At the request of Mr. Marko, correct?

4   **A.**    That's right.

5   **Q.**    In anticipation of trial, correct?

6   **A.**    In anticipation of being able to testify reliably about

7   his condition today.

8   **Q.**    Now, again, and you prepared a report that summarized your

9   discussions with Mr. Sevy and your findings, correct?

10  **A.**    No, not my discussions, my psychiatric evaluations.

11  **Q.**    Okay.  And it's your memory that still he made mention

12  that there were six officers there, four more came up and they

13  were choking him, correct?

14  **A.**    Well, I restate my initial history in the report and then

15  I give an interim history.  So, I just restated the initial

16  history as he had provided it to me.

17  **Q.**    Okay.  And so then you just repeated exactly what you had

18  wrote in November of 2017, correct?

19  **A.**    Written; but, yes.

20  **Q.**    All right.  So, in the interim's history he still said he

21  remains paranoid of police, correct?  Do you remember that or

22  do you have to refresh your memory?

23  **A.**    I want to refresh my memory in the interest of accuracy.

24  **Q.**    Okay.  Great.  Then I suggest you take a look at Page 3.

25  **A.**    He remains paranoid --

1    **THE COURT:**  Doctor, don't read from the report.  If

2    it refreshes your recollection.

3    **THE WITNESS:**  Yes, he characterized he was still

4    frightened of police.

5    **BY MR. SEWARD,** CONTINUING:

6    **Q.**  Okay.  And in fact -- okay.  And in the -- you also

7    believed that he talks about a conscious fear of police

8    officers and having a panic reaction when exposed to police

9    officers, correct?

10   **A.**  Well, that's not my belief, that's my understanding based

11   on a psychiatric evaluation.

12   **Q.**  All right.  Thank you.  Now, did you get into how

13   successful he and his wife had been in building the Detroit

14   Cookie Company?

15   **A.**  We discussed that.

16   **Q.**  Okay.  Because at his deposition you recall he said he had

17   had no plans of moving out of Royal Oak, correct?

18   **A.**  I haven't committed it to memory.

19   **Q.**  So, you don't have that recollection?

20   **A.**  No.

21   **Q.**  Okay.  But then you do have a recollection that they have

22   moved to Pleasant Ridge, correct?

23   **A.**  That's right.

24   **Q.**  And did he tell you about buying a house for $1.3 million

25   in Pleasant Ridge?

1    **A.**   He didn't tell me the price of his house.

2    **Q.**   He was pretty successful, wasn't he?

3    **A.**   If he could afford a 1.3 million dollar plus home, it

4    would seem so.

5    **Q.**   And so it appears he's done quite well.  He's quite driven

6    in business when you first saw him and he's been successful

7    subsequently, correct?

8    **A.**   Well, not exactly.  Yesterday we talked about his --

9    **Q.**   Sir, can you answer my question?

10            **MR. MARKO:**  Can he finish the answers?

11            **MR. SEWARD:**  It's not responsive, Your Honor.

12   **BY MR. SEWARD,** CONTINUING:

13   **Q.**   Let me try it again.  He told you back in November of 2017

14   that he was quite driven in building a business, correct?

15   **A.**   I don't know that I used the word, "Driven," I don't know

16   if I would characterize it that way.

17   **Q.**   Okay.  He spent a lot of hours working on the business up

18   to 18 hours a day, correct?

19   **A.**   He was compulsive in his work habits.

20   **Q.**   Okay.  And it started in 2015 when they were starting to

21   build this business, correct?

22   **A.**   I don't know if his compulsive work habits went back that

23   far.  What he characterized to me was after this he became more

24   compulsive in his work habits and he characterized that he

25   tried to keep busy to avoid experiencing these discomforts that

1    he described to me.

2    **Q.**   Did you delve into the fact that he'd been working five,

3    six, seven days a week, 50 to 100 hours a week as he testified

4    to in his deposition?

5    **A.**   He told me he was compulsive in his work habits.  I don't

6    know that he gave me those exact numbers.  But he shared up to

7    18 hours a day.

8    **Q.**   And it predates this incident, doesn't it?

9    **A.**   Well, my understanding was that he became more compulsive

10   in his work habits after this incident with the goal of

11   blocking out the discomforts that he had encountered.

12   **Q.**   And now he's been quite successful moving into a pretty

13   expensive home in Pleasant Ridge, correct?

14   **A.**   I want to be careful making inferences.  He was able to

15   apparently afford an expensive home.

16   **Q.**   Okay.  Wouldn't you characterize that as being a success?

17   **A.**   I don't want to make unwarranted inferences.  Purchasing

18   an expensive home doesn't necessarily equate to success.

19   **Q.**   Thank you, sir.  I don't have any other questions for you.

20          **THE COURT:**  All right.  Thank you, Mr. Seward.

21   Mr. Marko, anything further?

22          **MR. MARKO:**  Yes, Judge.  I'm sorry, I just have a lot

23   of notes I have to get together.

24                    -   -   -

25

1                    REDIRECT EXAMINATION

2    BY MR. MARKO:

3    **Q.**    Good morning, Dr. Shiener.

4    **A.**    Good morning, Mr. Marko.

5    **Q.**    Good morning, ladies and gentlemen.

6         So, you were asked about precision with the Defense

7    Attorney, do you remember that?

8    **A.**    Yes, I do.

9    **Q.**    It seem like you were having trouble getting out some of

10   your answers this morning, maybe yesterday, too.  Why was that?

11           **MR. SEWARD:**  Your Honor, I object to the leading

12   nature.

13           **THE COURT:**  Is all right.

14           **MR. MARKO:**  Thank you, Judge.

15   **BY MR. MARKO,** CONTINUING:

16   **Q.**    You weren't allowed to finish some of your answers?

17   **A.**    That's correct.

18   **Q.**    Okay.  So, let's try to fill in some of the gaps this

19   morning.  So, we have Ms. Matthews who is sitting up there and

20   she's able to type out everything that people say in this trial

21   so there's going to be a record of it forever.

22           **THE COURT:**  Let's just ask questions.

23           **MR. MARKO:**  Yes, Judge.

24   BY MR. MARKO, CONTINUING:

25   **Q.**    And I ordered one and I want to represent to you that the

1    -- I want you to assume that yesterday morning --

2              MR. SEWARD:  Your Honor, I'm going to object to

3    anything that was stated in the opening statement.

4              THE COURT:  Sustained.  Let me hear the question.

5    BY MR. MARKO, CONTINUING:

6    Q.   If someone told the jury, with regard -- because you were

7    asked a lot of questions about these EPIC Primary Care records.

8         Charlie, can you hand me that board, please, and put it

9    up?  It's Plaintiff's Exhibit 4 or 6, I forget.  Remember, you

10   were asked a lot of questions about these EPIC Primary Care

11   records?

12   A.   Yes.

13   Q.   We went through what's called the Review of Symptoms?

14   A.   Systems -- Review of Systems.

15   Q.   I'm sorry, Review of Systems.  If someone told the jury --

16             MR. SEWARD:  Your Honor --

17             THE COURT:  I have to hear the question.  I don't

18   know what the question is.

19   BY MR. MARKO, CONTINUING:

20   Q.   If someone --

21             MR. SEWARD:  Your Honor, here's my concern, if it's

22   something I asked, he can rebuttal.  But he has a reference

23   that it's a question I asked so I object because of the way the

24   form is coming in and the context of it.

25             THE COURT:  Overruled.

**DR. GERALD SHIENER - Redirect**
**Tuesday/June 28, 2022**                                    23

 1  **BY MR. MARKO**, CONTINUING:

 2  **Q.**   If someone told the jury, quote --

 3          **THE COURT:**  Not -- don't read from anything.  You're

 4  asking a hypothetical.

 5  **BY MR. MARKO**, CONTINUING:

 6  **Q.**   Hypothetically, if somebody told the jury they've been

 7  referring to primary care doctor, doctors, they've reviewed all

 8  of these Review of Symptoms during their exam and noted

 9  nothing, they noted no issues there, would that be a true or

10  false statement?

11  **A.**   It would be false.

12  **Q.**   Why would that be false, Dr. Shiener?

13  **A.**   Well, "Musculoskeletal, Present."  Muscle pain and neck

14  pain is a positive finding.

15  **Q.**   And did that -- and this is the next day, we talked about

16  this yesterday, this is the very next day before there's any

17  litigation or anything of that nature, this is the very next

18  day?

19  **A.**   That's right.

20  **Q.**   After the incident.  And what is a Review of Systems?

21  What does that mean?

22  **A.**   A Review of Systems is when the doctor takes a history

23  from a patient and characterizes the presenting complaint.  His

24  next task is to review or elicit other complaints in other

25  areas that hadn't been the patient's focused.

1    So, typically in a physical exam a doctor should say, "Is

2    there anything else that you need to tell me?"  "Are you having

3    difficulties with anything else besides what we've discussed?"

4    And then to be specific, "What about your head?  Do you have

5    any problem with headaches?  Do you have burning eyes?  Any

6    problems with your vision?"  And the doctor will ask a series

7    of questions by way of an inventory to be thorough and to

8    elicit any complaints.  So, that's a history, it's not an

9    examination portion.

10   Because a physical exam says:  I examined the head, the

11   eyes, the ears, the nose, and the throat and I found a runny

12   nose or I found a sore throat.  A red throat, something like

13   that.  A Review of Systems is the end of the history that's

14   very structured and to inventory questions about other physical

15   complaints that may have been missed in the history of present

16   illness.

17   Q.   What does it say with regards to the neck?

18   A.   It says, "Neck Pain."

19   Q.   And muscle pain?

20   A.   And muscle pain and neck pain.

21   Q.   Now, Charlie can you please go up to the top again?

22   And we talked about this a little bit with Mr. Seward, but

23   tell us why, you know, this idea -- do you have any doubt that

24   Mr. Sevy was choked?

25       MR. SEWARD:  You know, I object to that, the

1    foundation.  He wasn't there and he's not qualified.

2              **MR. MARKO:**  Judge, he was asked questions about it.

3              **THE COURT:**  All right.  Overruled.

4    **BY MR. MARKO,** CONTINUING:

5    **Q.**   Do you have any doubt in your mind, whatsoever, not

6    reasonable doubt, just any doubt, whatsoever, that Mr. Sevy was

7    choked by the defendant in the courthouse --

8              **MR. SEWARD:**  And hence, same objection.

9              **THE COURT:**  All right.  Why don't you lay -- to lay

10   the concern, lay some foundation.

11             **MR. MARKO:**  I apologize, I'm trying to move this

12   along.

13   **BY MR. MARKO,** CONTINUING:

14   **Q.**   Okay.  What did you review when you did?  Tell us

15   everything you reviewed again so we can go through this for the

16   Defense.

17   **A.**   Well --

18             **THE COURT:**  Mr. Marko, just lay some foundation as to

19   how this witness would be able to testify as to whether

20   Mr. Sevy was choked.

21   **BY MR. MARKO,** CONTINUING:

22   **Q.**   Did you review the video?

23   **A.**   I did.

24   **Q.**   Did you review the EPIC Primary Care records we've been

25   talking about yesterday and today?

1   **A.**   I did.

2   **Q.**   Did you review depositions?

3   **A.**   I did.

4   **Q.**   Did you review other things?

5   **A.**   I did -- the statement?

6   **Q.**   The statement?

7   **A.**   And I took a history from Mr. Sevy.

8   **Q.**   You reviewed the statement.  And this was the same

9   statement the Defense attorney asked you about to suggest that

10  Mr. Sevy didn't lose consciousness, correct?

11  **A.**   That's right.

12  **Q.**   Okay.  And this was a statement that Mr. Sevy was told he

13  had to fill out right at the courthouse by Royal Oak Police

14  Officers?

15          **MR. SEWARD:**  Your Honor, I object to the form of the

16  question.  Your Honor, it's leading.

17          **THE COURT:**  Okay.  Just rephrase the question.

18  **BY MR. MARKO,** CONTINUING:

19  **Q.**   Who asked him to fill out this statement?

20  **A.**   Royal Oak Police Department.

21  **Q.**   When did they ask him to fill it out, Dr. Shiener?

22  **A.**   February 13, 2017 at 2:50 p.m.

23  **Q.**   When was the date of this incident, Dr. Shiener?

24  **A.**   February 13, 2017.

25  **Q.**   So, was this close in time to the incident?

1    **A.**   Seems to be, yes.

2    **Q.**   And did you review all these things that you told us about

3    this morning and yesterday to come to your conclusions?

4    **A.**   I did.

5    **Q.**   Okay.  Now, do you feel comfortable because you were asked

6    questions about choking.  Do you have any doubt, based on your

7    expert review of this case, that Mr. Sevy was choked?

8    **A.**   Seems clear.  I'm convinced.  I have no doubt.

9    **Q.**   Who choked him?

10            **MR. SEWARD:**  Your Honor, he doesn't have a

11   foundation.  He wasn't there.  His opinion --

12            **THE COURT:**  Overruled.  If he can answer.

13   **BY MR. MARKO**, CONTINUING:

14   **Q.**   We're going to get through this this morning, I promise.

15        Who choked him?

16   **A.**   Mr. Barach.

17   **Q.**   The defendant?

18   **A.**   Yes.

19   **Q.**   Okay.  Why do you think the defendant choked him,

20   Dr. Shiener?

21   **A.**   What was his motivation or why did I reach that

22   conclusion?

23   **Q.**   Why did you reach that conclusion?

24   **A.**   Because I watched the video, I talked to Dr. Sevy twice, I

25   reviewed all the documents that we've described and they're all

1  consistent, including the EPIC record.  I saw a picture with

2  some bruising under the larynx.  I saw the EPIC record and I

3  read it.  Even in the history of present illness they do say,

4  "Mild bruising and swelling noted.  Point tenderness at the

5  soft tissue in an area of 4 by 5 centimeters."  I mean, that's

6  quite precise for a physical exam.  The statement says, "They

7  strangled me."

8  **Q.**  So, let's talk about that statement because it was

9  referenced yesterday that Mr. Sevy, in his statement, seem to

10  not say that he lost consciousness at the time.

11  **A.**  Proceeded to strangle me, yes.

12  **Q.**  What did he say in his statement?

13       **MR. SEWARD:**  Your Honor, I object to the way the

14  question is being asked.  And it's hearsay.

15       **THE COURT:**  Sustained.

16  **BY MR. MARKO,** CONTINUING:

17  **Q.**  If someone told the jury that Mr. Sevy denied being

18  strangled in a statement, would that be a true or false

19  statement?

20       **MR. SEWARD:**  Same thing, Your Honor.

21       **THE COURT:**  Sustained.

22  **BY MR. MARKO,** CONTINUING:

23  **Q.**  Was your review of the statement -- you reviewed the

24  statement?

25  **A.**  Well, I reviewed it because I was asked about it yesterday

1    and I asked for it to be produced to me.

2    **Q.**    And is it consistent with strangulation?

3    **A.**    It is.

4    **Q.**    Is it consistent with being unprovoked assault?

5    **A.**    I didn't see any evidence of provocation.

6    **Q.**    Okay.  The EPIC Primary Care records, why is it important

7    that they -- that the doctor notes bruising and swelling on his

8    neck?

9    **A.**    Because those are things that can be seen, described,

10   observed, and measured.

11   **Q.**    Why is it important that it notes:  "Point tenderness"?

12   And what does that mean, "Point tenderness"?

13   **A.**    That means if a doctor palpates, which simply means,

14   "presses on an area" and reaches one point where one fingertip

15   pressure elicits pains and the adjacent area does not, that's

16   considered point tenderness.

17   **Q.**    You were asked questions about Sevy's belief regarding the

18   Royal Oak Police and I thought you were trying to answer that.

19   When Mr. Sevy first came to you, how did he identify the

20   defendant?

21   **A.**    I believe he had characterized him as police officers or

22   security guards.

23   **Q.**    Okay.  So, were you aware that the defendant is a former

24   Royal Oak Police Officer?

25   **A.**    No.

1  **Q.**   Did you know that?

2  **A.**   No, I didn't.

3  **Q.**   And you were asked about this idea of four to six

4  officers.

5       Charlie, can you show the video portion?

6       I want to show you, can you see the officers in this

7  video?

8  **A.**   Yes.

9  **Q.**   Did you review this?

10  **A.**   Yes.

11  **Q.**   How many are there?

12  **A.**   Four.  And it's not clear if this gentleman in the light

13  blue tee shirt, I don't know what his credentials are, but

14  there are five people, one, two, three, four, Mr. Sevy, and

15  then a fifth person coming out of the elevator.

16  **Q.**   Did you see the video from downstairs?  And we don't need

17  to go through all the videos again.  But did you see the video

18  downstairs where you could see them getting off the elevator in

19  this particular video?

20  **A.**   And you see them getting on in the other video.

21  **Q.**   Right.  So, they had to get on to get off, right?

22  **A.**   Yes.

23  **Q.**   It's basic.  But when someone suffers trauma like an

24  unprovoked assault where they lose consciousness or they don't

25  lose consciousness, but it's just an unprovoked, sudden

1  assault, how does that affect memory process?

2  **A.**   That can impair memory process.   Sometimes those

3  situations can be overwhelming.   The circumstances of an

4  assault can be overwhelming and recollection may or may not be

5  impaired.

6  **Q.**   Okay.   How about if you blackout because the blood to your

7  brain is shut off?

8          **MR. SEWARD:**   Well, object to the form of the

9  question.

10          **MR. MARKO:**   I'm asking about memory issues, Your

11  Honor.

12          **THE COURT:**   How about if you just ask one question at

13  a time.

14          **MR. MARKO:**   Yes, Your Honor.

15  **BY MR. MARKO,** CONTINUING:

16  **Q.**   If blood to your brain is shut off, can it cause memory

17  problems?

18  **A.**   It can cause a loss of consciousness and it can cause an

19  impairment of recollection.

20  **Q.**   Why?

21  **A.**   Well, the brain has to be functioning and the brain has to

22  maintain consciousness.   Now, that's a complex phenomenon, but

23  consciousness means you are awake and alert.   You can take in

24  information, process it, and interpret it properly.

25          When blood supply to the brain or oxygen supply to the

1    brain, which is carried by blood, is interrupted, there's an

2    impairment in the ability to take in information, process it.

3    There's an impairment in the level of consciousness where

4    people enter a sleep-like state and that becomes -- there are

5    books written about what consciousness is and what it

6    constitutes.

7        But when blood -- even if someone gets up too quickly and

8    they get light headed, they may lose consciousness or they may

9    not be able to see or process what's going on around them.  So,

10   the brain is very delicate in that respect.  And the

11   response -- and then the alertness become very fragile in those

12   instances.

13   **Q.**   Can blackouts be short in time?

14   **A.**   They can be brief, for seconds, or they can be for

15   minutes.

16   **Q.**   You mentioned yesterday something about a flood of, I

17   don't remember the exact word that you used, but when you're in

18   a traumatic experience you, kind of, have a flood of -- was it

19   adrenaline?

20   **A.**   I used the term, "Adrenaline," and I used the term,

21   "Arousal of chemicals in the brain," and I likened it to being

22   startled and there's a rush of adrenaline, which is the

23   language that's used to describe the initial trauma reaction.

24   And I talked about how that changes sometimes transiently and

25   sometimes permanently, the threshold for stimulation in certain

1  arousal systems.  And that's one of the physiologic theories of

2  trauma.

3  Q.   And how does that affect someone's perception and memory

4  of events?

5       MR. SEWARD:  Your Honor, I guess that goes beyond the

6  scope of what his reports are and there's been no disclosures

7  that qualify him to talk about this.

8       THE COURT:  All right.  Yes.  Let's move on to this

9  Doctor's findings in his report.

10      MR. MARKO:  No problem, Judge.

11  BY MR. MARKO, CONTINUING:

12  Q.   You were asked yesterday about treatment?

13  A.   Yes.

14  Q.   Okay.  Tell us about what you recommend for Mr. Sevy?

15  A.   Well, what I recommended was a course of psychotherapy and

16  the possible use of antidepression medication.

17  Q.   He hasn't gotten that?

18  A.   No, he hadn't.

19  Q.   What is -- does that affect your findings at all?

20  A.   It's quite common for trauma victims to be uncomfortable

21  about the prospect of accessing treatment.  The most simple

22  explanation is because they know that treatment means come to

23  talk about something that's upsetting.  And reexperiencing a

24  trauma is very difficult.  It's been my experience with police

25  officers, trauma victims that I've seen in the emergency room

1    and in other contexts, the Concentration Camp Survivor Program

2    at Sinai or the Refugee Program at Wayne State, that trauma

3    victims tend to avoid treatment and they tend to be

4    uncomfortable about remembering, reexperiencing, and working

5    through those uncomfortable feelings and aspects.

6    **Q.**   And do people cope with trauma different ways?

7    **A.**   They do.  Compulsive work habits, repression, sometimes

8    alcohol, drug use, social withdrawal, there's a whole range of

9    reactions.

10   **Q.**   What's Anthony Sevy's reaction?

11   **A.**   Compulsive work habits and avoidance.  And what I try to

12   do in the context of my evaluation was take the approach of

13   what we call a Critical Incident Debriefing Approach.

14   **Q.**   What does that mean?

15   **A.**   That means going over the experience in detail and helping

16   the patient contain the feelings, verbalize them so that the

17   intensity of the feelings can be diminished.  The more you talk

18   about it, the more the feelings diminish.

19        And when I spoke yesterday about treatment, the two

20   encounters that I had with him would be the manner in which I

21   approach treatment and the trauma victim would come to me for

22   help.

23   **Q.**   Yesterday you were asked about this idea that it wasn't

24   that serious because the defendants -- the defendant didn't

25   call an ambulance.  Do you remember that?

1  **A.**   I do.

2  **Q.**   And you said that you've had extensive experience with

3  evaluating paramedics and with the Detroit Fire Department?

4         **MR. SEWARD:**  Your Honor, that's beyond the scope of

5  the disclosures.

6         **THE COURT:**  Overruled.  He's just inquiring about

7  what he was asked about yesterday.

8         **THE WITNESS:**  Yes, I have.

9  **BY MR. MARKO,** CONTINUING:

10  **Q.**   Does it impair your opinion in any way or cast doubt on

11  your findings that the defendant or his partner, after Mr. Sevy

12  was taken down in the courthouse, didn't call Royal Oak Fire

13  Department or an ambulance for him?

14  **A.**   No.

15  **Q.**   Why not?

16  **A.**   First of all, I understood that the loss of consciousness

17  would have been brief and I wouldn't expect if someone loses

18  consciousness and then wakes up and is able to walk from the

19  vestibule to the elevator, there would be no need to call

20  emergency medical services or it could be seen as not

21  needing -- involving emergency medical services.

22  **Q.**   And what happens when emergency medical services are

23  called to a busy courthouse?

24         **MR. SEWARD:**  Your Honor, objection.

25         **THE COURT:**  If you can lay foundation; but otherwise,

1    sustained.

2    **BY MR. MARKO**, CONTINUING:

3    **Q.**    And have you seen instances through your evaluations where

4    a medical services should have been called and they weren't?

5    **A.**    I suppose, yes.

6    **Q.**    Okay.  Is there any other reason in this case, based on

7    your review, as to why not calling medical services is

8    consistent with your opinions?

9    **A.**    Well, again, the loss of consciousness was brief and

10   Mr. Sevy seemed able to ambulate so there is either a lack of

11   appreciation of the need for medical care or an assessment that

12   medical care wasn't urgent at that time.

13   **Q.**    One of the other things you were asked about yesterday was

14   this idea of secondary gain?

15   **A.**    Yes.

16   **Q.**    And just tells us, what is secondary gain?

17   **A.**    Secondary gain is secondary to why symptoms occur.  In

18   psychiatry, symptoms have an internal reasons.  A symptom

19   solves a problem or reduces anxiety, it doesn't work and it's

20   inefficient.  Secondary gain would be the external consequences

21   of symptom formation.

22       In medicine, psychiatry, in short term, people are nice to

23   you when you're sick and the sick role entitles you to be

24   relieved of your day-to-day responsibilities while you're ill.

25   In the medical, legal context, secondary gain can be monetary

1  gain, disability benefits, avoidance of military service,

2  avoidance of criminal responsibilities.

3  **Q.**   Did you see anything, in this case, of Anthony Sevy that

4  he was motivated by what was called secondary gain?

5  **A.**   I found no evidence of that.  He didn't -- he spoke about

6  his internal experiences, his discomfort, and it was consistent

7  with his observations and the mental status examination.  Here

8  was a young man who had a fiance that he married, who liked to

9  play soccer, who has become a workaholic, and is withdrawn and

10  had to move out of his city of residence for fear of

11  retaliation for his actions and for his victimization.

12  **Q.**   What would you expect to see if secondary gain was an

13  issue in this case?

14  **A.**   Instead of talking about it himself or his own experience,

15  he would externalize it and talk about how bad the people who

16  assaulted him were.  He didn't do so.

17  **Q.**   And what about this idea that his business is doing well?

18  We heard from Defense Counsel that he moved out and bought a

19  pretty nice house, it sounds like.  How does that factor in all

20  of this?

21  **A.**   Well, I think that that shows he comes from a background

22  where there's a very traditional work ethic and I think that's

23  consistent with maybe his compulsive traits, but certainly his

24  use of compulsive defenses to deal with the discomfort that he

25  had.  Telling me that he threw himself into his work.  He tried

1   to keep busy to avoid thinking about the things that had been

2   troubling him.

3   **Q.**   And this idea, you were asked questions about, "Well, it

4   was the Royal Oak coming to his house that traumatized him, not

5   the defendant and what happened at the courthouse."  Do you

6   agree with that?

7   **A.**   No, I think that that's misleading because he was

8   traumatized, apparently, by the defendant and he has

9   generalized his concerns to any authority figures or law

10  enforcement figures.  And I wouldn't expect a trauma victim or

11  an assault victim to stop and ask for the credentials of the

12  person who assaulted him and we call that, "Generalization,"

13  any authority figure or law enforcement figure or someone who

14  had the right to either exercise authority and with the

15  breakdown of authority to exercise power in order to compel him

16  to do something.

17       So, I think that his saying he's afraid of police is a

18  generalized way of saying that this experience traumatized him

19  and it's generalized to officers and law enforcement in

20  general.

21  **Q.**   Thank you, Doctor.  And did anything that the Defense

22  attorney ask you about this morning change any of your

23  opinions?

24  **A.**   No.

25  **Q.**   And you were asked questions about a deposition.  I think

 1  it's, like, over a hundred pages?

 2  **A.**   191 pages.

 3  **Q.**   91 pages, close --

 4  **A.**   I thought 191, but I'm not . . .

 5  **Q.**   I can pull it up.  But the point is -- so, let's tell the

 6  jury how this works.  So, for this deposition that was referred

 7  to by Defense counsel, tell us what a deposition is?

 8  **A.**   Well, all right.  A deposition is an opportunity for

 9  lawyers to ask the person who is being deposed a series of

10  questions.  The goal of that endeavor is to find fact.  In

11  contrast to a psychiatric evaluation, which is an exchange by a

12  professional in interviewing in order to gain understanding of

13  that person's difficulty of living.  The techniques and

14  listening information is vastly different and the goals of the

15  endeavor are vastly different.

16  **Q.**   What does that mean, the techniques are different?

17  **A.**   Well, the way a psychiatrist answers questions is very

18  different from the way a lawyer would -- excuse me.  The way a

19  psychiatrist ask questions is very different from the way you

20  see lawyers asking questions here in court or when depositions

21  are read or demonstrated to you.

22  **Q.**   And is a deposition an adversarial proceeding?  In other

23  words, there are attorneys present at the deposition?

24  **A.**   I don't want to say attorneys are always adversarial; but

25  yes, it's an adversarial exercise of establishing facts from a

DR. GERALD SHIENER - Redirect
Tuesday/June 28, 2022

1   positive and negative standpoint.

2   **Q.**   And did you see in the deposition of Mr. Sevy that he said

3   that this incident had effects on him?

4   **A.**   I did.

5   **Q.**   Was that consistent with your examination, your review of

6   all the records?

7   **A.**   It was.

8   **Q.**   Okay.  And by the way, you were asked yesterday about

9   getting paid to come here.  Do all experts who review these

10  cases charge?

11  **A.**   All experts may charge, but there are times when experts,

12  including me, might not charge or might not command a fee and

13  do something.  I think the term in your profession is pro bono.

14  **Q.**   And what did you have to do to be here to talk to the

15  jury?

16  **A.**   Well, yesterday I had to get up early for a dentist

17  appointment, run to the hospital -- not run.  Drive to the

18  hospital, make rounds, debrief my trainees, tell them what to

19  do for the rest of the morning, come here.  And then in the

20  afternoon confer with my trainees, find out what they did and

21  give them further direction and then go to my office for the

22  remainder of the day.  I left my office at seven o'clock last

23  night.

24       This morning, if I weren't here, I'd be at the hospital

25  rounding with my trainees.  And as soon as I leave here, I'll

1  go to the hospital, finish my rounds.

2  **Q.**   One moment, Doctor (Brief pause).

3         **MR. MARKO:**  Okay.  Thank you very much.

4      Judge, I don't have any other questions.

5         **THE COURT:**  All right.  Thank you.  Thank you,

6  Dr. Shiener.  You may step down and you may be excused.

7      Mr. Marko, you may call your next witness.

8         **MR. MARKO:**  Yes, Your Honor.  We'll call the

9  defendant under the Adverse Witness Rule.

10        **THE COURT:**  All right.  Mr. Barach, if you'd come up

11 to the witness stand.  And sir, before you take a seat, if

12 you'd raise your right hand for me?

13                      -   -   -

14                    **PHILIP BARACH,**

15      **at 9:25 a.m., being first duly sworn by the**

16      **Court to tell the truth, was examined and**

17      **testified upon oath as follows:**

18        **THE COURT:**  All right.  Thank you.  Have a seat.

19        **MR. MARKO:**  One moment, I just need to grab my

20 documents.

21        **THE COURT:**  The chair doesn't move, but the

22 microphone does.  So, you can adjust it close to you.

23      And Marko, when you're ready.

24                      -   -   -

25

1                        CROSS-EXAMINATION

2       BY MR. MARKO:

3       **Q.**   Good morning.

4       **A.**   Good morning, sir.

5       **Q.**   Would you agree, sir, that you did not have authority to

6       use deadly force on Mr. Sevy?

7       **A.**   Correct.

8       **Q.**   And you understand that choking someone with your hand is

9       a form of deadly force?

10      **A.**   I didn't choke him; but I understand that, sir.

11      **Q.**   I understand you're denying you choked him?

12      **A.**   Yes, sir.

13      **Q.**   But you didn't have a right to use deadly force, right,

14      sir, you just told us that?

15      **A.**   I just said I didn't.

16      **Q.**   Yes, sir, you did not?

17      **A.**   Correct.

18      **Q.**   You had no authority, based on what we know, based on what

19      was going on in your mind, to use deadly force on Anthony Sevy

20      on February 13, 2017, you agree with that?

21      **A.**   Yes, sir.

22      **Q.**   All right.  Now, deadly force, like the easy thing that we

23      know, is pulling a gun to shoot someone, that's called deadly

24      force, right?

25      **A.**   It's a form, yes, sir.

PHILIP BARACH (Adverse Witness) - Cross
Tuesday/June 28, 2022

43

 1   **Q.**   Taking your hand and choking someone so you included their
 2   corotid arteries, cutting off blood to the brain, is also a
 3   form of deadly force, isn't it?
 4   **A.**   If someone did that.
 5   **Q.**   It is, right?  So, since you're denying you did that, but
 6   we acknowledge that that is a form of deadly force and you
 7   acknowledge that you had no right to use deadly force in this
 8   case, if the jury finds -- if it is a fact, if someone finds
 9   that you did choke Mr. Sevy using deadly force, then you would
10   have violated the Constitution, you'd agree with that?
11   **A.**   I don't know about the Constitution, I have to study it.
12   But I don't know what you're saying here.
13   **Q.**   If we believe that you choked Mr. Sevy by the neck, you
14   weren't allowed to do that?
15   **A.**   If you believe that, correct, okay.
16   **Q.**   And then we have to find that you violated the
17   Constitution because that would be excessive force?
18          **MR. SEWARD:**   You know, I guess it calls for a legal
19   conclusion.  Argumentative.
20          **THE COURT:**   Sustained.
21   **BY MR. MARKO,** CONTINUING:
22   **Q.**   Would it be excessive to use deadly force when you're not
23   allowed to use deadly force?
24   **A.**   Yes, sir.
25   **Q.**   Let's just talk a little bit about your background.  And I

**17-13789; Anthony Sevy v. Philip Barach**

**PHILIP BARACH (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**                                    44

1   apologize, I found out yesterday for the first time that you

2   retired and I didn't know that.  When did you retire?

3   **A.**   I retired from the police force 19 years ago.  I --

4          **THE COURT:**  Sir, if you could talk closer to the

5   microphone?

6          **THE WITNESS:**  I'm sorry, Ma'am.

7          **THE COURT:**  That's all right.  Move it closer to you.

8          **THE WITNESS:**  I retired from the police force 19

9   years ago.  I stopped working for the court three years ago,

10  sir.

11  **BY MR. MARKO**, CONTINUING:

12  **Q.**   Okay.  And you were -- are a former Royal Oak Police

13  Officer; is that correct?

14  **A.**   Yes.

15  **Q.**   And you've arrested hundreds of people, right?

16  **A.**   That's true, sir.

17  **Q.**   And you've used force on hundreds of people, right?

18  **A.**   Yes.

19  **Q.**   And you know how to use force?

20  **A.**   Yes.

21  **Q.**   You're trained in the use of force?

22  **A.**   Yes.

23  **Q.**   You can secure weapons, right?

24  **A.**   I used to, yes, sir.

25  **Q.**   You said you had, like, a nunchaku that you used to carry

1    around?

2    **A.**   We did at one time.

3    **Q.**   Okay.  You used that on people, right?

4    **A.**   No, I didn't utilize it.

5    **Q.**   You just had it?  You never used it all those times?

6    **A.**   I was trained in it and I just wasn't comfortable with it.

7    **Q.**   Okay.  You've sat for a lot of depositions in your career?

8    **A.**   Several.

9    **Q.**   You've testified in court a lot of times, right?

10   **A.**   Yes, sir.

11   **Q.**   So you're, kind of, comfortable with this process?

12   **A.**   I'm familiar with it, sir.

13   **Q.**   Okay.  You worked in the court for how long at the time

14   this incident happened?

15   **A.**   I started there in '05.

16   **Q.**   Okay.  2005.  And so you had been there for, what, 12

17   years?

18   **A.**   Something like that that, sir.

19   **Q.**   Okay.  Twelve years.  And this was, kind of, your

20   workplace, right?

21   **A.**   Yeah.

22   **Q.**   I mean, you felt comfortable there?

23   **A.**   Yes, sir.

24   **Q.**   You knew all the staff, right?

25   **A.**   Mostly.

1   **Q.**   They even had a nickname for you?

2   **A.**   They didn't nickname me, but I had one.

3   **Q.**   Right, I mean -- this was your home turf?

4   **A.**   I worked there, sir, for 14 years and I had been going

5   there since the 70's as a police officer.

6   **Q.**   You know the police, the Royal Oak Police, right?

7   **A.**   I knew the ones that I worked with.

8   **Q.**   You knew the ones that investigated this incident, right?

9   **A.**   I didn't know the young ones that came over.

10  **Q.**   You knew the older ones.  You know we have all the audio

11  transcripts?

12  **A.**   That's okay, sir.  I knew some of them.

13  **Q.**   And they called you by your nickname?

14  **A.**   Yes, sir.

15  **Q.**   Okay.  When they investigated this, right?  Because they

16  came and talked to you after this was all over, didn't they?

17  **A.**   I believe they took some statements but it was handed over

18  to Oakland County Sheriffs for investigation.

19  **Q.**   Oh, wait a minute.  The Oakland County Sheriffs never came

20  to the courthouse, did they?

21  **A.**   Yeah, a detective came and interviewed me.

22  **Q.**   How long later?

23  **A.**   I'm not sure, sir.

24  **Q.**   Not the same day?

25  **A.**   No, sir.

1   **Q.**   Much later?

2   **A.**   At least a few weeks, I think.

3   **Q.**   All right.  But the Royal Oak Police, you knew a lot of

4   the police.  You had been on the force and you were friendly

5   with them, right?

6   **A.**   Yes, sir.

7   **Q.**   And you knew all the court staff?

8   **A.**   All of them -- well, most of them, sir.

9   **Q.**   And you knew the Judges?

10  **A.**   Yes.

11  **Q.**   All right.  And when we talk about force, you understand

12  you have taken an oath to uphold the Constitution, right?

13  **A.**   Okay, sir.

14  **Q.**   Okay.  Well, okay, did you do it or not?  I have your

15  personnel file.  I can show it to you.

16  **A.**   Show it to me.

17  **Q.**   Let's move to enter this as an exhibit.

18           **MR. MARKO:**  Judge, we're going to move to introduce a

19  single page of the defendant's personnel file which is listed

20  on our Joint Final Pretrial Order.  That's the oath from the

21  Constitution.

22           **THE COURT:**  Is there any objection to the one page?

23           **MR. SEWARD:**  Which exhibit you're referring to?

24           **MR. MARKO:**  Number 5, sir.

25           **MR. SEWARD:**  Thank you.  And you're only introducing

**PHILIP BARACH (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**                                    48

```
 1   one particular page?

 2           MR. MARKO:  Yes, I only need to introduce this one,

 3   sir.

 4           MR. SEWARD:  So, that's going to be the full extent

 5   of Exhibit 5?

 6           MR. MARKO:  Yes, sir.

 7           MR. SEWARD:  Okay.  Yeah, then I have no problem with

 8   that.

 9           THE COURT:  All right.  It will be admitted.

10       (Plaintiff's Exhibit 5, One-Page Document: Oath from

11       Constitution, identified.)

12       (Plaintiff's Exhibit 5 received into evidence.)

13   BY MR. MARKO, CONTINUING:

14   Q.  All right.  Even if you didn't sign an oath --

15           MR. SEWARD:  Your Honor, can I approach Mr. Barach

16   with his glasses?

17           THE COURT:  Yes.

18           MR. SEWARD:  Thank you.

19           MR. MARKO:  No problem.

20   BY MR. MARKO, CONTINUING:

21   Q.  And we're not going to hopefully do too much reading this

22   morning, sir.

23   A.  Okay, sir.

24   Q.  I mean, even if you didn't sign a paper, when you become a

25   government official, you have to take an oath, right?
```

**17-13789; Anthony Sevy v. Philip Barach**

**PHILIP BARACH (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**                    49

1   **A.**   I did as a police officer.

2   **Q.**   And as a court officer, right?

3   **A.**   I believe -- I don't remember right now.

4   **Q.**   Well, I'm not trying to trick you, but let me show you --

5   can we pull this exhibit up so the jury can see it as well?

6           **MR. MARKO:**  May I approach the witness, Your Honor?

7           **THE COURT:**  He should have it on his screen also.

8           **THE WITNESS:**  All right, sir.

9   **BY MR. MARKO,** CONTINUING:

10  **Q.**   We'll just read it together.  "I have read and understood

11  the model code of conduct."  What's that?

12  **A.**   That's an agreement with the court.

13          **THE COURT:**  Sir, you're going to have to talk into

14  the mic.

15          **THE WITNESS:**  It's an agreement with the court.

16  **BY MR. MARKO,** CONTINUING:

17  **Q.**   And, "I agree that I will support the Constitution of the

18  United States and the Constitution of the State of Michigan,"

19  right?

20  **A.**   Yes, sir.

21  **Q.**   All right.  And, sir, do you understand that as a

22  government official your conduct is governed by the United

23  States Constitution?

24  **A.**   Okay, sir.

25  **Q.**   Well, when you say, "Okay," I'm not sure if you're

1   agreeing with me?

2   **A.**   Okay, I agree, sir.

3   **Q.**   Okay.  And I just don't want to make sure that we're --

4   because remember, as we learned this morning, precision is

5   important, right?

6   **A.**   All right, sir.

7   **Q.**   Do you have to abide by the Constitution?

8   **A.**   Yes, sir.

9   **Q.**   You understand that as a government official that's a

10  tremendous amount of power and responsibility?

11  **A.**   Yes, sir.

12  **Q.**   All right.  And that there are certain guidelines that you

13  have to follow with regards to use of force?

14  **A.**   Yes.

15  **Q.**   Because first and foremost, don't you think it's a good

16  idea to avoid using force on civilians, if at all possible?

17  **A.**   Correct, sir.

18  **Q.**   I mean, isn't that, like, the starting point, like, Let's

19  just try not to put our hands on people unless we have to?  Do

20  you agree that's a great starting point, guidepost for

21  following the Constitution?  "Let's not beat people up unless

22  we have to"?

23  **A.**   Okay.

24  **Q.**   Okay, so --

25  **A.**   When you're using the term, "Beat people up," what --

1    you don't want me to put hand -- I didn't put hands on him.

2    Let's go.

3    **Q.**   All right.  You didn't put hands on him?

4    **A.**   I put hands on him, yes, sir.

5    **Q.**   Are you sure about that?

6    **A.**   I put hands on him.

7    **Q.**   Can we show the video?

8    **A.**   I put hands on him, I'll agree to that.

9    **Q.**   All right.  Did you choke him, sir?  Can you tell us that

10   you choked him today?

11   **A.**   No, I did not.

12   **Q.**   Can you just admit what we see on the video?

13   **A.**   You saw about two seconds and I was reaching for his

14   collar and I grabbed him somewhere around his shoulder area and

15   threw him to the ground to arrest him.

16   **Q.**   How did you cuff his hands?

17   **A.**   He didn't while I was with him, so --

18   **Q.**   How did he lose consciousness?

19   **A.**   I don't believe he ever lost consciousness.

20   **Q.**   How did he get bruising on his neck that showed up the

21   next day?

22   **A.**   That's from his shirt or his collar being jerked up.  I

23   threw him on the floor to arrest him and put him in custody.

24   **Q.**   How did he have damage to his windpipe?

25   **A.**   Well, that's what you're saying.  I --

1              MR. SEWARD:  I object to that.  There's no evidence

2    to that.

3              THE COURT:  Overruled.  He can answer the question.

4    It's cross examination.

5              THE WITNESS:  Yes, sir.

6    BY MR. MARKO, CONTINUING:

7    Q.   All right.  So, you won't admit that you choked -- that

8    you put hands on his neck today or not?

9    A.   I may have -- it may have slipped up to his neck when I

10   went to grab him from his shoulder area and pull him down.

11   Q.   So, now you might have done his neck?  So, you went from

12   you didn't touch his neck --

13   A.   I didn't choke him, sir.

14   Q.   I'm just trying to understand now because--

15   A.   Go ahead.

16   Q.   --maybe I'm confused.  I thought you said you never

17   touched his neck and your attorney seem to say that, too, in

18   the opening, right?

19   A.   I grabbed for whatever I could grab right here by his

20   collar.

21   Q.   Did you grab his neck or not?

22   A.   I don't believe I did.

23   Q.   Did you choke him?

24   A.   No, sir, at no time did I choke him.

25   Q.   All right.  So, let's just go straight to the event.  And

1    by the way, did you see the urgent care record where it says,

2    "Loss of consciousness is what would be expected to take place

3    with the strangulation process."

4    **A.**   Pretty harsh words, "Strangulation," I don't know where

5    that came from.  And that's Sevy telling the doctor what

6    happened.  That's all history.  It's in the medical history.

7    **Q.**   Who told you that?

8    **A.**   I know of it.

9    **Q.**   Did somebody tell you that?

10   **A.**   Yeah, I got a bunch of doctors in the family.

11   **Q.**   All right.  Are they going to come testify?

12   **A.**   No, I don't need them here.  I don't need them here.

13   **Q.**   Well, Dr. Robert Levine wrote this and it says, "Full is

14   consistent with the strangulation process and a full or partial

15   collapse of the windpipe"?

16   **A.**   He never exhibited that to us.  He never stopped flailing

17   or fighting.  He walked on his own accord.  It never happened.

18   **Q.**   I'm just trying to figure --

19   **A.**   It never happened.

20   **Q.**   I'm just trying to figure out if you put your hands on his

21   neck or not and I still don't know -- I still don't think I

22   have an answer.  Did you do it or not?

23   **A.**   Did I do what, sir?

24   **Q.**   Did you take your left hand, put it on his neck and choke

25   him?

**PHILIP BARACH (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**                                          54

1   **A.**   I couldn't choke him with my left hand.  It barely works.

2   **Q.**   Barely works?

3   **A.**   That's correct.

4   **Q.**   Okay.  Let's watch the video and see if it works.  Go

5   ahead Charlie.

6                   (Video Recording Played.)

7   **BY MR. MARKO**, CONTINUING:

8   **Q.**   All right.  It's barely working there?

9   **A.**   I have tremendous injury to it.

10  **Q.**   Okay.  Go back to it, let's see (Video playing).  Stop it

11  Charlie.

12        Are you choking him there?

13  **A.**   No.

14  **Q.**   Is your hand on his neck?

15  **A.**   It could be, I can't see it.  It's somewhere up on his

16  collar area right here, sir, but I'm not choking him, sir.

17  I've never choked a prisoner in my life.

18  **Q.**   Who trained you -- what police agency in the entire United

19  States of America is that an acceptable takedown maneuver to

20  grab someone by the neck and put pressure?

21  **A.**   It's done all -- I didn't put any pressure on him.  He was

22  thrown to the ground.  It takes a few seconds.  He was

23  handcuffed.

24  **Q.**   Were you just going to say, "It's done all the time"?

25  **A.**   It's done all the time, especially in the bar fights and

1  stuff downtown.

2  **Q.**   Is that how they did it back in the day?

3  **A.**   What day was that, sir?

4  **Q.**   Well, you understand, sir, that that type of chokehold has

5  been outlawed by the Michigan State Police, were you aware of

6  that?

7  **A.**   I didn't choke him.

8        **MR. SEWARD:**  Your Honor, there's no evidence of that.

9  He can't interject things that are not --

10       **THE COURT:**  Sustained.

11       **MR. MARKO:**  Judge, this is cross examination.

12       **THE COURT:**  Sustained.  If you can lay foundation.

13  But that question -- the form of that question is sustained.

14  **BY MR. MARKO,** CONTINUING:

15  **Q.**   All right.  Tell me one police force, in Michigan, where

16  they train that as an acceptable use-of-force technique?

17  **A.**   I grabbed whatever I could grab to throw him on the

18  ground.

19  **Q.**   What question are you answering, sir?

20  **A.**   I don't know what you want me to tell you.  I don't know

21  what other police force is training and what they do.

22  **Q.**   Tell me one police force--

23  **A.**   I can't.

24  **Q.**   --in Michigan, that allows this type of maneuver?  A

25  chokehold.

**17-13789; Anthony Sevy v. Philip Barach**

1   **A.**   I didn't choke him.

2   **Q.**   What question are you answering, sir?

3   **A.**   I told you I don't know of any police agencies that teach

4   that.

5   **Q.**   Tell me one police agency in the United States of America

6   that allows you to --

7   **A.**   I just said I didn't know.  Are you going to beat this to

8   death?  I don't know.  I don't know who teaches that.

9   **Q.**   So, where did you learn how to do it?

10  **A.**   I just -- where did I learn?  I just grabbed what I could

11  grab to put him in custody.

12  **Q.**   Well, you said we did it all the time.

13          **MR. SEWARD:**  Mischaracterizes his testimony.

14          **THE COURT:**  Overruled.  He can answer.

15          **THE WITNESS:**  What's your question, sir?

16  **BY MR. MARKO**, CONTINUING:

17  **Q.**   You said you did it all the time or it's done --

18  **A.**   You grab what you could grab when you're in the midst of

19  bar fights and what have you.

20  **Q.**   Were you in the midst of a bar fight?

21  **A.**   No, I just grabbed him with my left hand to put him in

22  custody.  You're trying to characterize that I choked him and

23  I'm saying I didn't.

24  **Q.**   Okay.  Tell me one police force --

25  **A.**   I said I didn't know.

1   **Q.**   Actually, let's enlarge it.  Tell me one government

2   agency, anywhere, Customs, FBI, Department of Justice, anywhere

3   in America that they train that as an acceptable use-of-force

4   tactic?

5   **A.**   I didn't do anything wrong there.  I grabbed his shoulder

6   area.  Went up by his neck, that's what happened.

7   **Q.**   What question are you answering, sir?  I don't want to be

8   here all morning.  I'm sure you don't want to be in that box

9   all morning.

10   **A.**   I don't know of any.  Does that answer your question?

11   **Q.**   Because nobody allows it?

12   **A.**   I don't know about allowing it.  I grabbed what I could

13   grab to throw him to the ground.

14   **Q.**   So, you can do that?

15   **A.**   I did it.

16   **Q.**   You just grab what you could grab.  Who taught you to grab

17   what you could grab?

18   **A.**   It's just instinct.

19   **Q.**   Okay.  Instinct.  You know you can kill people if you

20   choke them out?

21   **A.**   If you choke 'em, I didn't choke him.

22   **Q.**   You know you could kill people --

23   **A.**   I didn't choke him.

24   **Q.**   Sir, what question are you answering?

25   **A.**   Go ahead with the question.

PHILIP BARACH (Adverse Witness) - Cross
Tuesday/June 28, 2022

58

1    **Q.**    You know you can kill people if you choke them?

2    **A.**    It's about me personally or just in general?

3    **Q.**    Did you know that as an officer, former --

4    **A.**    I never choked anyone in my life.

5    **Q.**    Okay.  You never put your hands on their neck and squeeze?

6    **A.**    No.

7    **Q.**    All right.  My question is, do you know that you can kill

8    people because you told us it's deadly force, that was my first

9    question when I got up here, remember?

10   **A.**    Do I remember what?  Yeah, I remember you asking me that.

11   **Q.**    Is this accurate, sir?  Did I write this down correctly,

12   "Choke equals deadly force," did you say that?

13   **A.**    I suppose if you choke 'em too long, yeah, but I didn't

14   choke him.

15   **Q.**    All right.  And the reason you can't use this type of

16   chokehold is because people can die?

17   **A.**    Okay.

18   **Q.**    What does that mean?

19   **A.**    What's your statement?

20   **Q.**    Do you think people can die?

21   **A.**    If they're choked too long, I suppose, yes.

22   **Q.**    Okay.  Would you know this as a government official,

23   charged with upholding the Constitution, being trained in

24   force, don't you?  You get all kinds of training.  You got

25   training at Royal Oak, didn't you?

17-13789; Anthony Sevy v. Philip Barach

1    **A.**    Yes, sir.

2    **Q.**    Okay.  You know what you can do and what you can't do and

3    when you can do it and when you can't do it?

4    **A.**    Okay.  Yes, I know that.

5    **Q.**    Okay.  And there's guardrails that are put on, right?

6    There's guardrails that's supposed to be followed so people

7    don't get hurt while protecting all of us, while protecting

8    you?  While protecting other citizens and while protecting all

9    of us, you'd agree with that?

10   **A.**    Yes.

11   **Q.**    Okay.  And one of the guardrails is you can't use deadly

12   force unless it's absolutely necessary to protect the life of

13   you or the life of all the people that are around you?

14   **A.**    Okay, I'll agree to that.

15   **Q.**    And a chokehold has been banned because it's deadly force?

16        **MR. SEWARD:**  Your Honor, there's absolutely no

17   evidence of that and I object to the form of the questioning.

18        **MR. MARKO:**  Judge, he state --

19        **THE COURT:**  In terms of the question, if the witness

20   can answer it in that form.

21        **THE WITNESS:**  Repeat it, please.

22   **BY MR. MARKO**, CONTINUING:

23   **Q.**    You can't choke people--

24   **A.**    Yes, sir.

25   **Q.**    --unless you're -- you believe that someone else's life

**PHILIP BARACH (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

60

 1   around you is in danger or--

 2   **A.**   I agree.

 3   **Q.**   --your own life is in danger.

 4   **A.**   I'll agree.

 5   **Q.**   Was your life in danger when you put your hand on

 6   Mr. Sevy's throat?

 7   **A.**   No.

 8   **Q.**   So, if your life wasn't in danger and you couldn't use

 9   deadly force, if you choked Mr. Sevy, it was excessive, right?

10   **A.**   If I choked him.

11   **Q.**   So, if someone finds that you choked him then you want

12   them to say the force was excessive?

13   **A.**   If they believed I choked him, yes.

14   **Q.**   All right.  So, you said -- let's first talk a little bit

15   about some of these rules, okay.  The first rule -- let's just

16   put deadly force aside for one moment and let's talk about some

17   of the general rules about how responsible government

18   enforcement is supposed to work, right.

19       So, the first thing you're supposed to do as a peace

20   officer is try to deescalate situations, right?

21   **A.**   Yes.

22   **Q.**   All right.  Deescalate.  Because -- and deescalate means

23   that we tried to do things to bring the temperature down,

24   right?

25   **A.**   Correct.

1   **Q.**   To keep everybody safe by taking the temperature down,

2   right?

3   **A.**   Okay.  Yes.

4   **Q.**   And so some things to deescalate are, maybe you could just

5   talk to someone.  That's a form of deescalation, right?

6   **A.**   Yes.

7   **Q.**   Use your words, right?  What is said, you know, Teddy

8   Roosevelt said, "Walk softly, but carry a big stick," it's kind

9   of like that, correct?

10  **A.**   Okay.

11  **Q.**   You don't have to agree with my analogies, they may not be

12  good.  But, you know, you carry a big stick.  You carry a lot

13  of power.  But if you can avoid it, you avoid using it, right?

14  **A.**   Yes, sir.

15  **Q.**   All right.  So, we deescalate and we use our words.  You

16  can say, "Hey man, calm down," that would be one way to

17  deescalate, right?

18  **A.**   Tried that.

19  **Q.**   Okay.  What question are you answering?

20  **A.**   All right.  Go ahead, what's your question?

21  **Q.**   We're going to talk about what happened, I promise.  But I

22  just want to set the guidelines and the rules that you were

23  operating under on February 13th, 2017 before we talk about

24  what happened, okay.

25        First we're going to talk about the rules, okay, talked

1    about your -- I didn't give a roadmap at the beginning, so

2    that's my fault.  We talked about your experience.  We're going

3    to talk about the rules and the Constitution a little bit.  And

4    then we're going to talk about what happened in this particular

5    case?

6    **A.**   Okay, sir.

7    **Q.**   All right.  So, the rules, number one, deescalate, always

8    a preferable thing to do, right?

9    **A.**   Makes sense.

10   **Q.**   You're trained to do it?

11   **A.**   Yes, sir.

12   **Q.**   You know you have to do it?

13   **A.**   Try to do it, yes, sir.

14   **Q.**   You know you have to do it?

15   **A.**   It's part of the job.

16   **Q.**   If you can do it, you have to do it.

17   **A.**   Okay.  Yes.

18   **Q.**   Deescalation techniques.  So, you can start with warnings,

19   right?  A warning is always a preferable thing to do, right?

20   **A.**   Helpful.

21   **Q.**   Well, shouldn't you always give a warning, if you can, if

22   it's not endangering anybody?

23   **A.**   I'm not sure what you're talking about here.

24   **Q.**   Well, you know, someone has a knife and you have a gun on

25   him, before you shoot him in the head do you say, "Drop the

1   knife or I'm going to have to shoot you"?

2   **A.**   Okay, I agree.

3   **Q.**   Okay.  Or, "You need to go out that door or I'm going to

4   have to put my hands on you and arrest you"?

5   **A.**   Yes, sir.

6   **Q.**   Those are good deescalation techniques, right?

7   **A.**   Yes, sir.

8   **Q.**   And you want to avoid doing things to escalate situations,

9   right?  Because you said you're in Royal Oak, right, you've

10  probably dealt with a lot of drunk people?

11          **MR. SEWARD:**   I guess I have to object to the form of

12  the question.  There seems to be three in there or at least two

13  statements and a question.

14          **MR. MARKO:**   I'm sorry, I'll rephrase the question,

15  Your Honor.

16  **BY MR. MARKO,** CONTINUING:

17  **Q.**   Did you deal with drunk people in Royal Oak?

18  **A.**   Many times.

19  **Q.**   Did you have to arrest them?

20  **A.**   Sometimes.

21  **Q.**   Did you have to use force on them?

22  **A.**   Sometimes.

23  **Q.**   Okay.  Do you try to talk to people before you do that?

24  **A.**   Yes, sir.

25  **Q.**   Okay.  Do you try to pull things down, even if you think

1   someone's being a little irrational?

2   **A.**   Yes, sir.

3   **Q.**   Even if you don't, maybe, like them or agree with them?

4   **A.**   Correct.

5   **Q.**   As a peace officer you want to try to pull things down

6   first, right?

7   **A.**   Yes.

8   **Q.**   All right.  So, putting hands on someone, is that a way to

9   escalate a situation or deescalate a situation?

10  **A.**   When I put hands on 'em, they're getting arrested.

11  **Q.**   Okay.  When you put hands on them, they're getting

12  arrested.  So, putting hands on is escalation, right?

13  **A.**   Yes.

14  **Q.**   Now, in this case, let's take a look at escalation versus

15  deescalation.  Charlie can you go to the lobby view and we'll

16  start at the beginning.

17       Another way to deescalate is to put some distance in

18  between yourself and someone, right?  Because if I -- I mean,

19  like, sir --

20          **MR. SEWARD:**  Can he answer the question, if he knows?

21          **THE COURT:**  All right.  Yes.

22  **BY MR. MARKO**, CONTINUING:

23  **Q.**   Like, if I walked right over to your podium and bend over,

24  is that going to be an escalation or a deescalation?

25  **A.**   Well, an escalation.

1   **Q.**   And if I step back and I come way over here, do you feel a

2   little more comfortable?  Is that deescalation?

3   **A.**   Maybe go out the door.  I'm just teasing (Witness

4   laughing).

5   **Q.**   Go back to my office and --

6   **A.**   I understand, sir.  I understand.

7   **Q.**   All right.  So, distance.

8        And so let's take a look at what happened here.  All

9   right.  So, you understand that when Mr. Sevy first came in --

10  and Charlie can you swing around to go show the defendant?

11  Just swing the camera to the defendant.  To the front desk when

12  they first walk in.

13       All right.  Sir, you knew, sir, on this day that Mr. Sevy

14  had some penny rolls, twenty penny rolls, don't you?

15  **A.**   I didn't know he had twenty.  But I knew he had pennies, I

16  saw them on the x-ray machine, sir.

17  **Q.**   All right.  And so he came in, you knew he had to go

18  through that metal detector?

19  **A.**   Yes, all the people do.

20  **Q.**   All right.  So, he cleared the metal detector, right?

21  **A.**   No, I stopped him right there and talked to him for a

22  second.

23  **Q.**   Wait, but --

24  **A.**   I'm not following you.

25  **Q.**   But the metal detector didn't start going off when he

1   walked through it, right?

2   **A.**   I think I saw it on the x-ray machine.  I saw the black.

3   **Q.**   I'm just talking about the metal detector, sir, and then

4   we'll get --

5   **A.**   I don't recall if it beeped or not.

6   **Q.**   Well, if it beeps and you take someone aside and you say,

7   "Empty your pockets", you don't want people walking into that

8   courthouse with knives and guns and nunchakus?

9   **A.**   That's correct, sir.

10  **Q.**   So, you knew Mr. Sevy had no weapons, correct?

11  **A.**   Yes.

12  **Q.**   All right.  And that's important, and we're going to get

13  to those guidelines later, but it's helpful to know somebody

14  doesn't have a weapon like a gun or something like that,

15  correct?

16  **A.**   Correct, sir.

17  **Q.**   So, you knew that Mr. Sevy was unarmed, right?

18  **A.**   Yes.

19  **Q.**   No weapons.  Unarmed.  And you knew he was there to pay a

20  parking ticket, right?

21  **A.**   No, I wasn't there the first time he came in.

22  **Q.**   Well, didn't he have the ticket on him?

23  **A.**   I don't know if he pulled it out of his pocket or not.  I

24  don't know what he was there for, sir.

25  **Q.**   You knew he had penny rolls in a bag?

1    **A.**   I suspected it when I saw the black on the x-ray that

2    it -- I looked clear and I'm pretty sure I guessed what it was.

3    **Q.**   And then you gave it to him?  It's not illegal to have

4    United States legal tender, is it?  Well, nobody uses pennies

5    anymore, but it's not illegal, is it?

6    **A.**   No.

7    **Q.**   Especially in a courthouse you're allowed to have --

8    **A.**   It's not illegal to have the pennies with you, no, sir.

9    **Q.**   All right.  And he put his coat through, he had that big

10   coat on, right?

11   **A.**   A winter park, yeah.

12   **Q.**   It's like a pretty big?  Had, like, a hood?

13   **A.**   Yes, sir.

14   **Q.**   Did you see the hood?  It had, like, the furry stuff on

15   the hood?

16   **A.**   I saw it, sir.

17   **Q.**   It was a pretty padded coat, right?  Like, a big winter

18   coat?

19   **A.**   It was a winter jacket.

20   **Q.**   Winter jacket.  We'll get to that in a little bit.  But he

21   puts all of his stuff through the x-ray machine, so you knew he

22   cleared security?

23   **A.**   Yes.

24   **Q.**   And that's important because it's not like when you're

25   walking The Beat in Royal Oak and you encounter somebody, you

1  may not know what they have.  You may not know where they're

2  coming from or whatever.  In this instance, you knew that

3  Mr. Sevy had cleared security?

4  **A.**  Yes.

5  **Q.**  And -- one moment, Your Honor, one moment.

6           **THE COURT:**  All right.  Why don't we take our first

7  morning break.  And I'll just remind members of the jury,

8  please do not discuss the case during the break.  But

9  Ms. Parkin did remind me I neglected to advise you, you can

10  talk about anything else, I just don't want you to talk about

11  the case.  And we'll see you-all back here at about 10:15.

12                      **(Jury out at 9:56 a.m.)**

13           **THE COURT:**  All right.  We'll be in recess until

14  10:15.

15           (A break was taken from 9:56 a.m. to 10:15 a.m.)

16                            - - -

17           **THE CLERK:**  The Court recalls Case Number 17-13789;

18  Sevy versus Barach.  Will counsel please restate their

19  appearances, for the record.

20           **MR. MARKO:**  Yes, Your Honor.  John Marko, along with

21  Charlie Kersten, for Anthony Sevy.

22           **MR. SEWARD:**  Joe Seward and Kali Henderson, on behalf

23  of the defendant, Your Honor.

24           **THE COURT:**  All right.  Thank you.  We're going to

25  bring the jury back in.

1          MR. SEWARD:  Do you want Mr. Barach back in?

2          THE COURT:  Oh, yes, please.

3                    **(Jury In 10:15 a.m.)**

4          THE CLERK:  All right.  Very good.  You-all may be

5     seated.

6         And Mr. Marko, you may proceed.

7     **BY MR. MARKO**, CONTINUING:

8     **Q.**   Sir, you had a chance to confer with your attorneys at

9     break?

10    **A.**   I think we talked briefly.  I don't know what we talked

11    about.

12    **Q.**   You don't remember?

13    **A.**   No.

14    **Q.**   I'm not going to ask.  I don't care.

15        All right.  So, a couple other rules that you have to

16    follow, you only use force when necessary, you agree with that?

17    **A.**   Correct, sir.

18    **Q.**   And when you are allowed to use force in certain

19    circumstances, you only want to use as much force as you need

20    to.

21          MR. SEWARD:  Well, Your Honor, I have to object to

22    that.  I think The Court's going to instruct.

23          THE COURT:  Yes, I will instruct the members of the

24    jury on the law.  But as to this question, if the witness is

25    able to answer it.

1              THE WITNESS:  I forgot it.

2    BY MR. MARKO, CONTINUING:

3    Q.   You can't use excessive force?

4    A.   Yes, sir, I agree with that.

5    Q.   You can't shoot a kid who is stealing a pack of gum?

6    A.   Correct, sir.

7    Q.   If someone is speeding in a car, you can't ripped them out

8    of the car and head slam them into the ground?

9    A.   Yes, sir.

10   Q.   All right.  So, only use force when you absolutely have

11   to, rule one --

12             MR. SEWARD:  Again, he's calling for a legal

13   conclusion and this Court is going to instruct.  And that is

14   not the standard.  So, I object to the way it's being posed and

15   the question that's being posed to the witness.

16             MR. MARKO:  I'm asking the witness regarding his

17   reasonable beliefs and perceptions about when he can use force

18   in particular.

19             THE COURT:  All right.  If you're asking him based on

20   his experiences, if the witness is able to answer, he may

21   answer.

22             THE WITNESS:  Correct, sir.

23   BY MR. MARKO, CONTINUING:

24   Q.   I mean, you know these things, right?

25   A.   Yes, sir.

1    **Q.**   I'm not making these up, you know these?

2    **A.**   Yes, sir.

3    **Q.**   Okay.  And when you use force, only use as much as

4    reasonably necessary?

5             **MR. SEWARD:**  Objection.  Again, it's a legal

6    conclusion.  It's objectively reasonable force.  And the way

7    he's phrasing it and trying to hold the witness to a different

8    standard --

9             **THE COURT:**  Then the witness can answer, presumably.

10   If the witness is able to answer the question.  Now, maybe he

11   needs more information.  He hasn't indicated that, so --

12            **MR. SEWARD:**  But it's an indication of what the

13   standard is and that's my objection because that's not a

14   correct statement of the law.

15            **THE COURT:**  I don't know that he's making up

16   statements of the law.  As I said, and I'll remind the ladies

17   and gentlemen of the jury, I'll be instructing you as to the

18   law.  Let him repeat the question.

19   **BY MR. MARKO**, CONTINUING:

20   **Q.**   You can only use as much force as reasonably necessary?

21   **A.**   I agree.

22   **Q.**   Okay.  Now, there's also other guidelines that you're

23   supposed to follow, right?  So, one guideline using force is,

24   is it an immediate threat to you or other people?

25   **A.**   Agreed.

---

**17-13789; Anthony Sevy v. Philip Barach**

1    **Q.**   Okay.  Another guideline is the severity of the crime.

2    So, for example, if someone is littering is different than if

3    someone who just committed an armed robbery?

4    **A.**   I agree with you, sir.

5    **Q.**   If you're actively resisting a valid, lawful arrest,

6    that's a --

7    **A.**   I agree, sir.

8    **Q.**   If you're evading arrest, so you're trying to escape into

9    the community, that's a guideline, right?

10   **A.**   Yes, sir.

11   **Q.**   Okay.  The need to use force, that's a guideline, right,

12   whether you need to use it or not?

13   **A.**   I'm not sure I'm following that.

14   **Q.**   All right.  I'll move on.  The Judge will instruct the

15   jury on these.

16       And one thing is attempts that are used to temper the

17   severity of the force, in other words, other options that are

18   available other than going straight to force, which we kind of

19   talked about?

20   **A.**   I agree with you.

21   **Q.**   All right.  So, let's take a look at this idea of first

22   escalation versus deescalation.  And Charlie, can you pull up

23   the video?

24       And I want to make clear, sir, that Mr. Sevy never --

25   prior to going to the vestibule, which is that front door of

1    the courthouse, right?

2    **A.**    Agreed.

3    **Q.**    And did you hear me explain to the jury in opening how you

4    have to come in and then go through security and then that's --

5    the other door is the exit?

6    **A.**    Yes, sir.

7    **Q.**    Was that accurate what I told the jury?

8    **A.**    Correct.

9    **Q.**    These double doors right here are the exit to that

10   courthouse, correct?

11   **A.**    That's correct.

12   **Q.**    That's the only public exit, isn't it, in the front?

13   **A.**    In the front, yes, sir.

14   **Q.**    Okay.  And so those doors go one place and one place only

15   if you're coming from the inside to go outside the courthouse,

16   that's the front door?

17   **A.**    That's true.

18   **Q.**    Okay.  And Mr. Sevy never punched you, did he?

19   **A.**    No.

20   **Q.**    He never assaulted you, did he?  He never hit you, did he?

21   **A.**    No, he did not.

22   **Q.**    He never said, "I'm going to hit you"?

23   **A.**    No, he didn't.

24   **Q.**    He never threatened to beat you up?

25   **A.**    No, he didn't sir.

1   **Q.**   He never threaten you at all, did he?

2   **A.**   Physically, no.

3   **Q.**   No physical threats.

4        Did he swing a bag of coins at you?

5   **A.**   No, he did not.

6   **Q.**   Did he ever raise his fists in a fighting stance to you,

7   like this (demonstrating).

8   **A.**   No, he didn't raise his fists.

9   **Q.**   And we watched the video, did he ever raise his hands?

10  **A.**   I think he raised his hand and was pointing at me at the

11  counter, but that was it.

12  **Q.**   Well, after you told him to leave, because you told him to

13  leave, right?

14  **A.**   Several times.  Many, many times.

15  **Q.**   Okay.  You told him to leave?

16  **A.**   Yes, sir.

17  **Q.**   After you told him to leave, did he ever raise his fist to

18  you?

19  **A.**   No, he did not, sir.

20  **Q.**   Did he kick you?

21  **A.**   No, he did not.

22  **Q.**   Did he body slam you?

23  **A.**   No.

24  **Q.**   Did he do any physical assault of your body prior to those

25  doors being opened to the vestibule?

**PHILIP BARACH (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

1   **A.**   No, sir.

2   **Q.**   Okay.  No physical assault.  So, that lessens an immediate

3   threat, right?  That's one of the issues.  Whether it's an

4   immediate threat to you, if someone punches you, hurts you,

5   kicks you, that could be a threat?

6   **A.**   It wasn't an issue to me at this time.  I'm not sure where

7   you're going.

8   **Q.**   All right.  So, you had backup with you, too, right?

9   That's a fact, you had Marshall there, too, correct?

10  **A.**   He was with me, sir.

11  **Q.**   And you're in a secure court facility, correct?

12  **A.**   Yes, sir.

13  **Q.**   How much did you weigh at the time, sir?

14  **A.**   165, 160, I don't know.

15  **Q.**   Size is relevant, that's the only reason I'm asking.  I'm

16  not prying into your weight, but Mr. Sevy is a smaller person

17  than you, right?

18  **A.**   I don't recall.  He's not big.

19  **Q.**   Size is relevant, right?  If you have Hulk Hogan or Andre

20  the Giant --

21  **A.**   I agree.

22  **Q.**   That's a lot different than dealing with a small, skinny

23  soccer player?

24  **A.**   I didn't know he was a soccer player.

25  **Q.**   Small, skinny kid.

1   **A.**   All right, sir.

2   **Q.**   All right.  And if someone is out of their mind on drugs

3   or alcohol, you know, like methamphetamine or something, that

4   could be relevant, too, right?  You don't know what they're

5   going to do?

6   **A.**   Yes, sir.

7   **Q.**   You had no indication whatsoever that Mr. Sevy was drunk

8   or on drugs or alcohol, did you?

9   **A.**   You're correct.

10  **Q.**   Okay.  And skill level, that's relevant too.  If you have,

11  like, a martial artist, like, black belt, Karate Kid, and you

12  know that, that's different than dealing with someone who has

13  no combat training or experience whatsoever, correct?

14  **A.**   Where are you going?  I mean, me and him are about the

15  same size.  I don't know what you want.

16  **Q.**   Okay.  What question are you answering?

17  **A.**   I don't know, repeat it.  You lost me.

18  **Q.**   All right.  You see Mike Tyson in your courthouse, and I'm

19  not trying to be cute here, but it's people who have combat

20  training --

21  **A.**   That would be a tough arrest.

22  **Q.**   Right.  You have a different perception and different

23  ability to use force on Mike Tyson--

24  **A.**   I'll agree.

25  **Q.**   --than you would on a skinny kid?

1   **A.**   I'll agree.

2   **Q.**   Okay.  So, let's talk about how you -- if you escalated

3   the situation or deescalated the situation.  All right.

4   Charlie, go ahead and play the video.

5                    (Video Recording Played.)

6   **BY MR. MARKO**, CONTINUING:

7   **Q.**   All right.  Stop it right there.  Charlie, roll it back

8   just a little bit.

9        So, you tell Mr. Sevy to leave the courthouse, correct?

10  **A.**   Many times.

11  **Q.**   And he's not under arrest at that time, is he?

12  **A.**   He is not.

13  **Q.**   He has not been charged with a crime at that time, has he?

14  **A.**   You're correct.

15  **Q.**   He has not been given a ticket that says, you know,

16  "You're disturbing the peace," correct?

17  **A.**   That's correct, sir.

18  **Q.**   Okay.  So, he's free to leave the courthouse, correct?

19  **A.**   I wanted him to leave.

20  **Q.**   You want him to leave?

21  **A.**   Yes, sir.

22  **Q.**   You want him to walk out those double doors, don't you?

23  **A.**   Yes, I do.

24  **Q.**   And you want him to walk out those other doors, don't you?

25  **A.**   Yes, to exit the building, I agree.

1   **Q.**   And that would have been the end of this whole situation

2   correct?

3   **A.**   It would have been great.

4   **Q.**   All right.  It would have been great.

5   **A.**   Yes, sir.

6   **Q.**   You want Mr. Sevy to leave?

7   **A.**   Yes, sir.

8   **Q.**   And you told him to leave, right?

9   **A.**   Many times.

10  **Q.**   What does he do?  Does he begin to leave, sir?

11  **A.**   He begins to leave, yes, he does.

12  **Q.**   Okay.  He goes -- and how is he leaving?

13  **A.**   Walking.

14  **Q.**   And let's see, you quicken your pace and you quicken up to

15  Mr. Sevy and you close that distance as he's leaving, didn't

16  you?

17  **A.**   That's because he's talking his smack on the way out the

18  door.

19  **Q.**   Oh, that made you mad, didn't it?

20  **A.**   It's irritating me, yes.

21  **Q.**   Okay.  You know what the First Amendment is?

22          **MR. SEWARD:**  I object to that.

23          **THE COURT:**  Sustained.

24          **MR. MARKO:**  Let me rephrase it.

25

1   **BY MR. MARKO**, CONTINUING:

2   **Q.**   People can say things you don't like?

3   **A.**   That's correct, sir.

4   **Q.**   And you can't beat him up, can you?

5   **A.**   I didn't beat him up, but I'm listening.

6   **Q.**   Okay.  People can say things you don't like.  I may be

7   saying things you don't like right now, but that's not a basis

8   to use force, is it?

9   **A.**   That's correct, sir.

10  **Q.**   And so this whole idea, because we heard about it in

11  opening that -- from your counsel that Mr. Sevy challenged you,

12  do you remember that?

13  **A.**   I don't remember that.

14  **Q.**   Well, challenging someone or saying things they don't like

15  is not a basis to choke them, correct?

16  **A.**   Correct, sir.

17  **Q.**   Saying things that you don't like, even if you disagree

18  with it, is not a basis to choke somebody, is it?

19  **A.**   Agreed.

20  **Q.**   Or use force, right?  Or use force at all, even push them.

21  If I say something you don't like, can you push me as I'm

22  walking out those doors?

23  **A.**   What did you ask me?  Would I push you?  No, I wouldn't

24  push you.

25  **Q.**   Okay.  Because you know that's illegal, right?

**PHILIP BARACH (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

80

1    **A.**   Okay.  Yes.

2    **Q.**   So, talking smack, as you put it, is not a valid basis to

3    use force, is it?

4    **A.**   I didn't use --

5           **MR. SEWARD:**  That calls for a legal conclusion and

6    just leaving it general like that is inappropriate.

7           **THE COURT:**  In terms of -- if the question is being

8    framed to this witness based on this training and experience,

9    he can answer the question.

10          **THE WITNESS:**  I'm sorry, I lost the question, sir.

11   **BY MR. MARKO,** CONTINUING:

12   **Q.**   Talking smack.

13   **A.**   Okay.  I agree.

14   **Q.**   All right.  But you were mad because he was talking smack?

15   **A.**   I wasn't mad.  I knew at that time he was never going to

16   leave.

17   **Q.**   He was never going to leave?

18   **A.**   Never going to leave.

19   **Q.**   What was he going to do?

20   **A.**   He stopped at the door.  He turned around using foul

21   language.  I had already made my mind up I was going to arrest

22   him.

23   **Q.**   Oh, you did?

24   **A.**   Yes, sir, right at the door.

25   **Q.**   How did you make up your mind that you were going to

**17-13789; Anthony Sevy v. Philip Barach**

1  arrest him?

2  **A.**   Right at the door when his back tensed.  When he tensed

3  up, I knew he would not leave unless he got a last few words

4  in --

5  **Q.**   We'll, let's watch --

6          **MR. SEWARD:**  Hold on, can he finish his answer?

7  **BY MR. MARKO**, CONTINUING:

8  **Q.**   Do you have more you'd like to say?

9  **A.**   Sure, I got a lot more I'd like to say, but I don't know

10  when I can say it.

11  **Q.**   All right.  Because your counsel is going to get a chance

12  to question you.

13  **A.**   All right.  I'll wait.

14  **Q.**   When I ask a question, I don't want to be -- we all saw

15  what happened with Dr. Shiener, I don't want to cut you off.

16  **A.**   All right, sir.

17  **Q.**   Do you want to tell us more right now?

18  **A.**   It's okay.

19  **Q.**   All right.  Now, I'm hearing some things I've got to ask

20  you about.  So, first of all, you decided that you were going

21  to arrest him for talking smack to you?

22  **A.**   No, not for that.

23  **Q.**   But talking --

24  **A.**   His body tensed up, I don't know if you could see it when

25  the door partially opens, he stopped, he stopped, he wasn't

**PHILIP BARACH (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**
82

1   going to go, he wanted to continue this.

2   **Q.**   Okay.  So, did he turn around to you?  Is that when you

3   decided to arrest him?

4   **A.**   At some point I made my decision.

5   **Q.**   What point?

6   **A.**   Right in the doorway there at some point I decided.  I

7   figured, he's not a first grader, how many times do I have to

8   tell him to leave.  I don't have to tell him.  I really, really

9   mean it this time.  It's time to go to jail.

10  **Q.**   Okay.  And so show me how he tensed up?

11  **A.**   His back.  I could feel it.  I had my hand on the small of

12  his back.

13  **Q.**   Show us.

14  **A.**   I can't -- I'm just saying, I could feel the tenseness.  I

15  knew when he stopped moving, he wasn't going to go.

16  **Q.**   What does that mean, like, tenseness like he need to get a

17  massage?

18  **A.**   What, are you being funny here?  He just stopped.

19  **Q.**   Sir, show me.

20  **A.**   He didn't want to go.

21  **Q.**   Show all of us right now so we can watch the video

22  together and see how somebody tenses up warrants choking them

23  out --

24  **A.**   I didn't choke him.

25  **Q.**   --and throwing them onto the ground?

**17-13789; Anthony Sevy v. Philip Barach**

1   **A.**   You show me how I choked him.  You're saying I choked him.

2   That thing took three seconds, threw him on his rear end.

3   **Q.**   Show me right now how he tensed up, sir.

4   **A.**   His body language.  He tensed up with his body language.

5   With his mouth, it was running.  He wasn't going to go.  He

6   wanted to continue this confrontation.

7   **Q.**   What question are you answering, sir?

8   **A.**   I'm just making a statement.

9   **Q.**   Show us.  Please, show us.

10  **A.**   I'm not standing up being demonstrative.  I'm not required

11  to do that.

12  **Q.**   Show us.

13  **A.**   Not doing it.

14         **MR. SEWARD:**  Your Honor, it's been asked and

15  answered.

16         **THE WITNESS:**  Not doing it.  He tensed up.

17  **BY MR. MARKO,** CONTINUING:

18  **Q.**   You're refusing to show us?  You want to use that as a

19  defense in this case and you're refusing to show us?

20  **A.**   He tensed up.  His body language, it tensed up.

21         **MR. SEWARD:**  Your Honor --

22         **THE COURT:**  What is the objection?

23         **MR. SEWARD:**  Argumentative, and I'd move to strike.

24         **THE COURT:**  All right.  It's cross-examination.

25  Overruled.

PHILIP BARACH (Adverse Witness) - Cross
Tuesday/June 28, 2022

84

1   **BY MR. MARKO,** CONTINUING:

2   **Q.**   Sir, you are basing this tense up for using force --

3   **A.**   For him not wanting -- you always use force when you

4   arrest somebody.

5   **Q.**   Excuse me, what question are you answering?

6   **A.**   All right.  Go ahead, ask your question.

7          **THE COURT:**  One at a time.  Let Mr. Marko finish his

8   question and let Mr. Barach finish his answer.

9   **BY MR. MARKO,** CONTINUING:

10  **Q.**   You're telling us that the arrest is based on a tense up,

11  what in the world is that?

12  **A.**   It's all my intuition from all my years and I knew he

13  wasn't going to go willingly and he didn't want to go.  He

14  should have just walked out the door.

15  **Q.**   So, when you say that you're going to arrest a citizen

16  walking out of the front door of the courthouse, put your hands

17  on them, throw them to the ground because they tensed up, show

18  us, sir, what you mean?

19  **A.**   I felt he wasn't going to go.

20  **Q.**   What question are you answering?

21  **A.**   I thought I was answering your's, sir.

22  **Q.**   Show us what he did -- how hard is it to do?  Can you just

23  not do it?

24  **A.**   His body language.  He tensed up.  His back muscles tensed

25  up.  He didn't want to go.

**PHILIP BARACH (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

1   **Q.**   What does that mean?  Show us?

2   **A.**   I don't think I'm required to stand up and do anything

3   here.

4   **Q.**   You want us to rely on this as a defense in the case and

5   you won't show us what he did?

6   **A.**   I'm relying on you being fictitious and making up lies

7   about me choking him.  It's no different.  I've got a right to

8   say my peace.

9   **Q.**   Well, if you want us to consider this, why don't you show

10  us what he did?

11  **A.**   I don't have to show you anything.

12  **Q.**   What did you do?

13  **A.**   His body tensed up.  He did not want to go.  I think all

14  these jurors know what it means when he tensed up.

15  **Q.**   Show it to me and I'll do it for the jury right now.  What

16  do you mean?  Tell me what to do?

17  **A.**   I'm done.

18          **MR. SEWARD:**  Your Honor, this is asked and answered

19  and it's argumentative.

20          **MR. MARKO:**  I'm trying to understand the witness's

21  testimony, Judge.

22          **THE WITNESS:**  I'm trying to understand your

23  questions.

24          **THE COURT:**  All right.  The testimony is based on the

25  video.  What if you show the video.

**17-13789; Anthony Sevy v. Philip Barach**

1  **BY MR. MARKO**, CONTINUING:

2  **Q.**   We'll show the video.  I'll be the demonstrative if you

3  don't want to show the jury.  But this is your testimony, do

4  you understand that?  You understand this is your testimony and

5  you tell me what to do and I'll do it right now or I'll get

6  Charlie or I'll get one of the people from my office to do it

7  and you can describe what happened so I -- and we can all

8  understand why you needed to do this to Anthony Sevy?

9         **MR. SEWARD:**  This is argumentative.  If he wants to

10  refer to the video.

11         **THE COURT:**  All right.  Let's ask a question.  What

12  is the question?

13  **BY MR. MARKO**, CONTINUING:

14  **Q.**   The question is, sir, can you please describe to me so I

15  can demonstrate it, rather than use words, for what Anthony

16  Sevy did to tense up that warranted you to use force on him?

17  **A.**   I was trying to escort him out the door, I had a hand on

18  the small of his back, maybe one hand on his arm or his

19  shoulder and he stopped.

20  **Q.**   Tell me -- I want to focus on this tense up because you

21  just told us the arrest was based on a tense up.  The force was

22  used on a tense up, you said that, didn't you?

23  **A.**   I just repeated what I said.

24         **THE COURT:**  Mr. Barach, the question is are you able

25  to visually demonstrate--

PHILIP BARACH (Adverse Witness) - Cross
Tuesday/June 28, 2022

87

```
 1            THE WITNESS:  No.
 2            THE COURT:  --what you mean by tensing up?  Are you
 3    able to physically demonstrate that?
 4            MR. MARKO:  I'll do it right now.
 5            THE COURT:  Not you, you asked the witness if he
 6    could do that.
 7            THE WITNESS:  No, I can't do it.
 8            THE COURT:  All right.  Then let's move on.
 9    BY MR. MARKO, CONTINUING:
10    Q.  Why can't you do it?
11    A.  I just said I can't do it.
12    Q.  It didn't happen, did it?
13    A.  No, it happened.
14    Q.  All right.  Show us in the video where -- show us -- did
15    his shoulders go up like this?
16    A.  I don't remember now, it's been five years.  I'm 72 years
17    old.
18    Q.  Did he tense up like a back-flex or something?  I don't
19    understand what it is.  Let's watch the video and you tell us
20    what happened.
21    A.  Okay.  Let's watch it.
22                     (Video Recording Played.)
23            THE WITNESS:  Right in there he stopped.
24    BY MR. MARKO, CONTINUING:
25    Q.  Okay.  And that's when he tensed up?
```

1    **A.**    Somewhere in there.

2    **Q.**    What you mean somewhere in there?

3    **A.**    I can't see, there's a door in the way.  He's there.  He's

4    confronting me.  He doesn't want to leave.  Look how he turns

5    to me.

6    **Q.**    Sir, you were right there, what did you see?  What did he

7    look like when he tensed up?

8    **A.**    He didn't want to go, that's all there is to it.

9    **Q.**    Charlie, roll it back.  Please, roll it back.

10         So, when we talk about escalate versus deescalate?

11   **A.**    I understand.

12   **Q.**    Can you stop it, Charlie?

13        You are now quickening your pace to close the gap between

14   yourself and Mr. Sevy, aren't you?

15   **A.**    Yes, sir.

16   **Q.**    And where is Mr. Sevy heading towards?

17   **A.**    Looks like he's going out the door.

18   **Q.**    And what does he do when he gets to the door?  Does he

19   open the door or does he shut it?

20   **A.**    Well, he doesn't shut it.  I think he's going through it.

21   **Q.**    Okay.  Let's play it (Video playing).  Stop it right

22   there.

23        So, Mr. Sevy is putting his hand on the door?

24   **A.**    I think he is.  It looks like it.

25   **Q.**    Like you think you didn't choke him?  What do you mean you

1  think he is?  Do you see it right there?

2  **A.**   No.

3  **Q.**   You don't see that?

4  **A.**   Let me put my glasses on.  I'll look again (brief pause).

5  Looks like he's grabbing the door handle.

6  **Q.**   All right.  And this is the guy that you're saying wasn't

7  going to leave your courthouse?

8  **A.**   Not 'till he got done saying his peace again.

9  **Q.**   Until he got done talking smack?

10 **A.**   Whatever he wanted to say again.  I mean, I know what he

11 was saying.

12 **Q.**   Sir, I'm going to ask you all about it.  So, is that why

13 you used force on him?

14 **A.**   You always use force when you arrest somebody.

15 **Q.**   That wasn't my question.  Is that --

16 **A.**   I grabbed him to arrest him.

17 **Q.**   Because he was talking smack to you?

18 **A.**   No, because he didn't want to leave.

19 **Q.**   Okay.  And so --

20 **A.**   He's disturbing the peace of the courthouse.

21 **Q.**   Did you tell him, "You're disturbing the peace of the

22 courthouse, I'm going to arrest you"?

23 **A.**   He's not a kid.  He doesn't need to be told that.  He

24 knows what he's doing.

25 **Q.**   You just arrest people without telling them that they're

1   under arrest?

2   **A.**   You think every arrest you stop and tell them:  "Sir,

3   you're disorderly, you were just in a bar fight, you won't

4   leave because the bartender told you to leave"?

5   **Q.**   Did you tell him to give you his hands?

6   **A.**   No, I didn't.

7   **Q.**   Did you say, "You're under arrest"?

8   **A.**   Yeah, I did.

9   **Q.**   Oh, you did?

10  **A.**   Told him, "You're going to jail."

11  **Q.**   When your hand was on his throat, you told him that?

12  **A.**   Somewhere in there.

13  **Q.**   Okay.  So, while you're choking him out--

14  **A.**   I didn't choke him.

15  **Q.**   --you told him, "You're under arrest"--

16  **A.**   I didn't choke him.

17  **Q.**   And you think that's a reasonable response?

18  **A.**   I didn't choke him.

19  **Q.**   So, explain to me, sir, how he's not leaving here?  You

20  see his hand --

21  **A.**   He stopped in the vestibule.

22  **Q.**   Do you see his hand on the door?

23  **A.**   I do see that, yes, sir.

24  **Q.**   And there's only one way out there, right?

25  **A.**   We talked about that.

1    **Q.**   So, it's a one-way street there, right?  Go ahead,
2    Charlie, play it.
3                          (Video Recording Played.)
4    **BY MR. MARKO**, CONTINUING:
5    **Q.**   And so he's not leaving?
6    **A.**   He turned.  He didn't want to go.  Why didn't he just keep
7    walking?  Let's make it real easy, why didn't he walk out the
8    door?
9    **Q.**   So, you can beat people up because of it?
10   **A.**   I didn't beat anybody up.
11   **Q.**   So, deescalate, right.  First thing you do is talk.  Did
12   you tell him he's under arrest?
13   **A.**   No, I told him he was going to jail.
14   **Q.**   You didn't tell him to give you his hands?
15   **A.**   No, I didn't tell him that, no.
16   **Q.**   Did you tell him to back up?
17   **A.**   No.
18   **Q.**   Did you tell him, move over here or move over there?
19   **A.**   I told him to leave the courthouse several times.
20   **Q.**   And you told him to leave the courthouse and in the
21   vestibule you didn't give him a single command, did you?  You
22   didn't give him a single command.  All that you said was,
23   "You're going to jail," and you put your hand on his throat?
24   **A.**   He's not a four-year-old, he knows what's going on.
25   **Q.**   What question are you answering, sir?

**PHILIP BARACH (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**
92

1    **A.**    I'm talking now.

2    **Q.**    Okay.  Can you answer my question?

3    **A.**    What was it?

4    **Q.**    You didn't give him any verbal direction, any opportunity

5    to do anything else at that moment.  You said -- you put your

6    hands on his throat and said, "You're going to jail," and that

7    was it, right?

8          **MR. SEWARD:**  That mischaracterizes the testimony.  He

9    never said he put his hand on his throat.

10         **THE COURT:**  Okay.  The witness can answer.  I mean,

11   he can indicate that, if that's the case many.

12         **THE WITNESS:**  I didn't put my hand on his throat.  If

13   it slipped up there, I don't know.  I went to grab somewhere on

14   his shoulder and I told him he's going to jail.

15   BY MR. MARKO, CONTINUING:

16   **Q.**    What question are you answering now?

17   **A.**    Why do you belabor this?

18   **Q.**    Because I don't understand what question you're answering.

19         You never gave him any opportunity to do anything else?

20   **A.**    Between the two of us he was probably told ten times to

21   leave the courthouse.  Is that not an opportunity?  Is that not

22   an opportunity?

23   **Q.**    Sir --

24   **A.**    Sir.

25   **Q.**    You have nine of us here.

1   **A.**   Yes, sir.

2   **Q.**   Not two of us.  My question is, did you give him any

3   opportunity to deescalate the situation by giving him verbal

4   commands before you grabbed him and told him, "You're going to

5   jail"?

6   **A.**   Yeah, he was told to leave the courthouse many times.

7   **Q.**   In the vestibule?

8   **A.**   Yes, sir.

9   **Q.**   In the vestibule you told him to leave the courthouse?

10  **A.**   No, it was done.  It was all over then.  He was going to

11  jail.

12  **Q.**   It was all over then, wasn't it?

13  **A.**   Yes, sir.

14  **Q.**   You had made the decision that the kid, according to you,

15  he was talking smack, you were going to arrest him, take him to

16  jail and do it by force, right?

17  **A.**   I was going to arrest him.

18  **Q.**   All right.  And so let's -- going back.  Remember how we

19  talk about how distance is one way to deescalate?

20  **A.**   I'm not required to step back from him.  I was doing my

21  job.  I told him to leave and I escorted him out.  He should

22  have left.

23  **Q.**   What question are you answering?

24  **A.**   Your question.

25  **Q.**   All right.  Distance, right?

PHILIP BARACH (Adverse Witness) - Cross
Tuesday/June 28, 2022

94

1    **A.**    I'm not required to back away from him.  I'm doing my job.

2    **Q.**    You're doing your job?  When someone comes up behind you

3    and puts their hand on you, what do you do?

4    **A.**    He knew what he was doing, I was escorting him out.

5    **Q.**    Sir, when someone comes up behind you --

6    **A.**    I'd probably turn around, see what's going on.

7    **Q.**    Oh, is that what Anthony Sevy did?

8    **A.**    I don't know what he did.

9    **Q.**    What do you mean you don't know what he did?

10   **A.**    I don't know what all his motive was to stay there and

11   argue longer.

12   **Q.**    Sir, when someone puts their hand your back, you turn

13   around to see what's going on, that's the exact same response

14   that he did, isn't it?

15   **A.**    He was told to leave the courthouse.

16   **Q.**    If Anthony Sevy took his hand and put it on your throat

17   and started choking you, you'd be within your right to shoot

18   him dead, wouldn't you?

19   **A.**    I wouldn't have shot him.

20   **Q.**    Sir, the question --

21   **A.**    You just asked me a question and I told you I wouldn't

22   have shot him.

23   **Q.**    You would be in your right to shoot him dead --

24   **A.**    I wouldn't have done it.

25               **MR. SEWARD:**  I guess it calls for a legal conclusion.

**17-13789; Anthony Sevy v. Philip Barach**

1          MR. MARKO:  This does not call for a legal

2     conclusion?

3          THE COURT:  Overruled.  But let's -- he's answered

4     the question.  Asked and answered.

5     BY MR. MARKO, CONTINUING:

6     Q.   Deadly force can be responded with deadly force, right?

7     What would you have done if Anthony Sevy turned around and put

8     his hands on your throat in the vestibule?

9     A.   Would have knocked him down.

10    Q.   All right.  And Mr. Sevy, even when you had your hands on

11    his throat he can kept telling you, "Why are you choking me,"

12    didn't he?

13    A.   I never heard that and I never choked him.

14    Q.   And Mr. Sevy never took one step toward you once you put

15    your hands on him, did he?

16    A.   I was arresting him.  We were struggling to get him to the

17    floor and put handcuffs on him.

18    Q.   What question are you answering?

19    A.   I thought I was answering your question, sir.

20    Q.   When you put your hands on Mr. Sevy's throat, he never

21    took any steps toward you, did he?

22    A.   I think I was backing him up.

23    Q.   And his steps go back, don't they?

24    A.   Backwards?

25    Q.   Yes.

**PHILIP BARACH (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

1    **A.**    I think so, yes.

2    **Q.**    And even with your hands on him, he never touched you, did

3    he?

4    **A.**    He resisted arrest.

5    **Q.**    That wasn't my question?

6    **A.**    He didn't hit me, no.

7    **Q.**    Even when you put your hands on a kid trying to pay a

8    parking ticket --

9    **A.**    He's a kid?  He's 33 years old.

10   **Q.**    He turned around --

11   **A.**    No, let's clarify that.  He's a 33-year-old man.

12   **Q.**    When you put your hands on Mr. Sevy--

13   **A.**    That's better.

14   **Q.**    --did he hit you?

15   **A.**    No, he didn't.

16   **Q.**    Did he even raise a hand?

17   **A.**    I don't remember if he raised a hand.

18   **Q.**    All right.  Let's see.  Let's look at his hands.

19   **A.**    I can't see from here.  (Video playing) We're struggling

20   to get him to the floor, at least I am.

21   **Q.**    Look at his hands.  Show me one time that he raised his --

22   **A.**    I didn't say he did.  I said he resisted arrest.  He

23   pulled back, he's flailing, he's not allowing himself to be

24   handcuffed.

25   **Q.**    Would you, if you were suddenly, without warning,

1   unexpectedly choked and had pressure put on your throat with a

2   downward direction toward the ground, don't you think you might

3   move around?

4   **A.**   Possibly, probably try to get away.

5   **Q.**   Did he -- did you -- and again, one last time.  Did you

6   give a single warning--

7   **A.**   No.

8   **Q.**   --prior to using force on Mr. Sevy?

9   **A.**   You mean, like, "I really, really mean it, you need to

10  leave the courtroom this time"?

11  **Q.**   No, how about, "Give me your hands"?

12  **A.**   No, I arrested him.

13  **Q.**   Okay.  Is that the preferred training method--

14  **A.**   Yes.

15  **Q.**   --to arrest people unexpectedly, without giving them any

16  warning who are non-violent?

17  **A.**   Every situation is different.

18  **Q.**   He was never a threat to you, you'd agree with that?

19  **A.**   He was disturbing the peace at the courthouse.  He wasn't

20  threatening me physically.

21  **Q.**   He was not a threat to you?  You didn't feel threatened for

22  your safety, did you, sir?

23  **A.**   I wasn't worried.

24  **Q.**   Exactly, you weren't worried.

25  **A.**   Okay.

1   **Q.**   He wasn't a threat to you.  And one of the main criteria

2   for use of force is whether someone is an immediate threat.

3          All right.  So, let's see, immediate threat, walking away

4   from you, true or false?

5   **A.**   What's the question?  Was he walking away?  Yes, sir.

6   **Q.**   Okay.  Walking away toward the front door of the

7   courthouse, where you had just told him to go, true?

8   **A.**   He was walking there, yeah.

9   **Q.**   Never struck you, we went over that.  Never raised his

10  fist, never hit you, right?

11  **A.**   Yes.

12  **Q.**   Never threatened you orally?

13  **A.**   No.

14  **Q.**   Never threatened you, threaten your safety?

15  **A.**   Yes.

16  **Q.**   Nor did he threaten the safety of anyone else at the

17  courthouse, right?

18  **A.**   The safety, no.

19  **Q.**   Okay.  Never threatened anybody.  There was no civilians

20  around, that's a risk, right, if there was, like, other people

21  inside that vestibule?  It's just you two in there, correct?

22  True?

23  **A.**   It looks like it.

24  **Q.**   Sir, you were there.

25  **A.**   I don't remember.  There's two people sitting there.  I

1    don't remember if people were coming in or out at the time.

2    **Q.**   All right.  Stepping back from you, he never stepped

3    forward to you, right?

4    **A.**   He stepped to me at the counter and he stepped right into

5    my face at the vestibule when he spun around.

6    **Q.**   All right.  Again, he was not under arrest for anything

7    that occurred inside the courthouse that you already told us

8    about because you had told him to leave?

9    **A.**   He was under arrest for being a disorderly person inside

10   the courthouse.

11   **Q.**   Okay.  What question are you answering?

12   **A.**   I thought I just answered your question.

13   **Q.**   Prior to the vestibule you had already told us he was not

14   under arrest?

15   **A.**   That's true, sir.

16   **Q.**   Okay.  So, anything that happened before, that's not a

17   basis to arrest because you said he was not under arrest.

18   **A.**   Oh, that's all out the window now?  All of his swearing

19   and telling the girls to suck his dick, that's all out the

20   window now?

21   **Q.**   No, you're going to --

22   **A.**   No, that's gone now because you say it's gone?

23   **Q.**   Let's talk about that.  You understand that you're the

24   only person in this entire case who has given a statement that

25   says he said, "Suck . . .," and then genitalia.  You

1   understand that, right?

2   **A.**   I don't -- I didn't know that.

3   **Q.**   Well, you were asked about it at your deposition?

4   **A.**   I know I was asked about it, but you're saying I'm the

5   only one who heard that, is that what you're saying?

6   **Q.**   Yes.  Who else gave a statement at the time of the

7   incident and said that he said that?

8   **A.**   I gave my deposition by myself, I don't know what the

9   other people said.

10  **Q.**   Marshall was there, wasn't he?

11  **A.**   Yeah, he was at my dep.

12  **Q.**   You and Marshall had your deps together, right?

13  **A.**   Yeah, I just remembered that.

14  **Q.**   Okay.  And then you had attorneys there, right?

15  **A.**   Yeah.

16  **Q.**   And they prepared you for your deposition, right?

17  **A.**   I just went in there and answered the questions from your

18  guy.

19  **Q.**   Right.  And you said that all this profanity, and again, I

20  don't want to belabor this, but profanity doesn't warrant

21  force, you already told us that?

22  **A.**   I didn't say that.

23  **Q.**   The jury can remember that.  I'll move on from that.

24  **A.**   Okay.  Thank you.

25  **Q.**   But do you understand that you're the only person that

1    says that and that other people said that he was swearing, but

2    that he never referenced what you just said?

3    **A.**    I'm not aware of that that no one else heard that.

4    **Q.**    Okay.  And you guys were all together at the front window,

5    right, you, the clerk, and Marshall?

6    **A.**    The clerk was behind the glass.  But I know what he told

7    her and I know what he told us.

8    **Q.**    Okay.  The clerk was behind the glass.  Did she -- did the

9    clerk tell you or command you that she felt she was in danger

10   and that she needed --

11   **A.**    No, she didn't say she was in danger, sir.

12   **Q.**    She never thought that she was in danger, did she?

13   **A.**    I don't know what she thought, but she never told me that.

14   **Q.**    And what about these other people, sir?  Charlie, can you

15   move to the left a little bit.  How about these citizens --

16   because there's no audio on this video, right?

17   **A.**    That's correct, sir.

18   **Q.**    Okay.  So, we can't show the jury -- you're not aware of

19   any type of audio recording that can show what was actually

20   being said or not being said at this time?

21   **A.**    Apparently it didn't have that capacity.

22   **Q.**    Okay.  You know that, right?

23   **A.**    No, I didn't know it.  They were just installing that when

24   that happened.

25   **Q.**    Okay.  And so, sir, who are these people so we can call

 1  them in here so they can testify to the jury about what they

 2  saw and what they heard?

 3  **A.**   I thought they were probationers and I thought they would

 4  have their name at the probation.  Usually anyone that sits

 5  there is waiting to go in and talk to a probation officer.

 6  **Q.**   Did you get their names because they were never given to

 7  me?

 8  **A.**   No, I didn't get them, no, sir.

 9  **Q.**   Would you know who they are so we can call them so they

10  can tell the jury what happened?

11  **A.**   No, I didn't know who they are.

12  **Q.**   You know that from your experience at Royal Oak it's a

13  good idea to get all witness statements, don't you?

14  **A.**   Yeah, but I didn't handle the investigation, so I don't

15  know what anyone did.

16  **Q.**   But you know that we can't call these people?

17  **A.**   I know you can't call them now, but I would have thought

18  they would be able to determine who they are because I believe

19  they were probation people going to talk to the probation

20  officer.

21  **Q.**   Did anyone ever tell you they found out who they are?

22  **A.**   I didn't ask, when they -- this whole deal wasn't a big

23  deal to me.  I didn't even know it was going to end up here.

24  **Q.**   Wasn't a big deal?

25  **A.**   No, just an arrest.

1    **Q.**   All right.  Just another arrest?

2    **A.**   Yes, sir.

3    **Q.**   All right.  They were in a good position to see

4    everything, weren't they?  Charlie, go back.

5    **A.**   I think they were.

6    **Q.**   In fact, they were standing right there and they could see

7    exactly what happened?

8    **A.**   You're telling me or asking me?

9    **Q.**   I'm asking you.

10   **A.**   I think they saw it, yes, sir.

11   **Q.**   Okay.  And you understand Marshall says he didn't see why

12   you had to use force?

13   **A.**   I didn't know he said that.

14   **Q.**   Okay.  Well, you were at this deposition, you were sitting

15   there?

16   **A.**   Hey, five years ago, I didn't even pay attention to it.

17   **Q.**   You don't care about this?

18   **A.**   No.  I think it's frivolous.

19   **Q.**   Do you care about what happens here?

20   **A.**   Yeah, I care about what happens, but I think this whole

21   thing is uncalled for.

22   **Q.**   Now, would you agree -- okay, we've got to finish this and

23   we're almost done.  So, stepping back you agree that Mr. Sevy

24   was moving away from you inside the courthouse?

25   **A.**   I'll agree to that, sir.

**PHILIP BARACH (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

1    **Q.**   Okay.  Never once did he move in your direction, right?

2    **A.**   I think he turned in toward me at the counter and he

3    turned toward me here.

4    **Q.**   Sir, after the point that you said, "Leave," and he took

5    his coins -- because had to wait to get his ticket back from

6    the --

7    **A.**   I didn't know any of that.

8            **MR. SEWARD:**  Hold on.  There seems to be several

9    statements and then a question.  I object to the form of it.

10           **THE COURT:**  If you could just try to limit it to one

11   question at a time.

12           **MR. MARKO:**  No problem, Judge.

13   **BY MR. MARKO**, CONTINUING:

14   **Q.**   He had to get his ticket back, right?

15   **A.**   I don't know, I don't know what was going on with his

16   ticket.  I don't know if he ever paid it.

17   **Q.**   You didn't see what happened?

18   **A.**   I saw him shoved the money under, shove the money back,

19   back and forth, back and forth.

20   **Q.**   They wouldn't take his coins, right?

21   **A.**   That's my understanding, yes, sir.

22   **Q.**   Okay.  They said, "We're not going to take these rolled

23   coins," isn't that true?

24   **A.**   I don't know what she said.

25   **Q.**   But you saw they would not accept the coins?

---

**17-13789; Anthony Sevy v. Philip Barach**

1  **A.**   I saw a confrontation that was going nowhere.  He would

2  shove the money under, Sylvia would send it back to him.  He'd

3  shove it under, it was going back and forth, back and forth and

4  nothing was being accomplished.

5  **Q.**   So, from this point that he leaves the counter, he

6  beeline's for the door and so he was stepping back or going

7  away from you, maybe that's a fair way to say it, right?

8  **A.**   He's on his way out the door, yes, sir.

9  **Q.**   He's on his way out the door now, isn't he?

10  **A.**   Correct.

11  **Q.**   All right.  Now, you had backup, in other words, you had

12  Marshall there, correct?  You already told us you weren't

13  scared, so --

14          **MR. SEWARD:**  You know, I guess --

15          **THE COURT:**  Just one question at a time.

16  **BY MR. MARKO,** CONTINUING:

17  **Q.**   Was Officer Marshall there?

18  **A.**   Officer Marshall was present, yes, sir.

19  **Q.**   So, you had backup.  You knew the police were nearby and

20  you could call police if you needed backup?

21  **A.**   I know the station is across the street, yes, sir.

22  **Q.**   You didn't feel like you needed to do that at the time,

23  you were going to handle this whole situation by yourself?

24  **A.**   That's correct.

25  **Q.**   You didn't even wait for Marshall?  You weren't going to

1   even wait for Marshall to handle the situation, right?

2   **A.**   Correct.

3   **Q.**   You're just going to do it all yourself?

4   **A.**   Yes, sir.

5   **Q.**   You already said, "Not on drugs or drunk," correct?

6   **A.**   Agreed.

7   **Q.**   And that you're trained in the use of force?

8   **A.**   Agree.

9   **Q.**   Okay.  You agree Anthony Sevy was not an immediate threat?

10  **A.**   Not a physical threat, no.

11  **Q.**   Okay.  So, you agree that that guidepost would warrant

12  against using force?

13  **A.**   There is always some force used when you arrest somebody.

14  **Q.**   We're just talking about that guidepost we talked about

15  that were set up to help protect him.

16  **A.**   Is there a question there?

17  **Q.**   Yeah, that this immediate threat, guidepost, would warrant

18  against you using force on anybody?

19  **A.**   I was trying to effect an arrest.

20  **Q.**   What question are you answering, sir?

21  **A.**   I'm trying to answer your's, sir.

22  **Q.**   Would you agree that there's no immediate threat,

23  therefore that guidepost would warrant against using force?

24  **A.**   I used force to arrest him.  It wasn't much force.

25  **Q.**   Would you agree that there was no immediate threat that

1   warranted the use of force?

2   **A.**   There's always some force used to arrest somebody.

3   **Q.**   Would you agree that there was no immediate threat that

4   warranted the use of force?

5   **A.**   I put my hands on him to arrest him.

6   **Q.**   Would you agree that there was no immediate threat that

7   warranted the use of force?

8   **A.**   You want me to harp on this?  I arrested him.  You have to

9   put hands on someone to arrest them.

10  **Q.**   Would you agree that there was no immediate threat that

11  warranted the use of force?

12  **A.**   It didn't warrant excessive force.

13  **Q.**   Okay.  Did it warrant force?  Was there an immediate

14  threat that warranted force?

15  **A.**   It didn't have to be a threat.  I was placing him under

16  arrest for being a disorderly being.

17  **Q.**   Sir, was there an immediate threat that warranted force?

18  **A.**   It didn't warrant excessive force.

19  **Q.**   Was there an immediate threat that warranted any force?

20          **MR. SEWARD:**  Your Honor, this has been asked and

21  answered now.  He answered it.

22          **THE WITNESS:**  I think I answered it.

23          **THE COURT:**  If he can't answer it, he can indicate he

24  can't answer it.

25          **THE WITNESS:**  Okay.  I can't answer it.

1  **BY MR. MARKO**, CONTINUING:

2  **Q.**   Why can't you answer that?

3  **A.**   I'm trying to answer it, you won't accept my explanation.

4  **Q.**   All right.  Let's talk about the severity of the crime

5  because you said that was a factor that we talked about.  Okay.

6  First of all, there was no arrest for anything that occurred

7  prior to that vestibule, we've already established, therefore,

8  he was free to leave, true?

9  **A.**   Yeah, I could have arrested him earlier and I'm trying to

10  give him some leeway and let him go out the door on his own

11  volition.

12  **Q.**   You can't arrest people for using foul language, sir, can

13  you?

14  **A.**   There's a disorderly clause with Royal Oak where if the

15  abusive, foul language tends to alarm the public or cause a

16  nuisance, that's a disorderly clause, he can be arrested for

17  that.

18  **Q.**   In general, you cannot arrest people for foul language,

19  that's the law in Michigan, isn't it?

20          **MR. SEWARD:**  I object to that.

21          **THE COURT:**  Sustained.

22  **BY MR. MARKO**, CONTINUING:

23  **Q.**   Do you believe that you can arrest people for foul

24  language, like, if I swore right here, that you could arrest

25  me?

1    **A.**   No, typically not.

2    **Q.**   Okay.  And he was, regardless of your ability, he was free

3    to leave?  You wanted him to leave, right?

4    **A.**   Say it again, sir?

5    **Q.**   He was free to leave?

6    **A.**   Yeah, he could have walked out.

7    **Q.**   No ticket, no arrest, correct, you told us about that?

8    **A.**   Yes, sir.

9    **Q.**   Now, he goes to pay with penny rolls, you'd agree with

10   that, correct?

11   **A.**   Well, I didn't know any of that at the time about penny

12   rolls and pennies.  I know he can't pay with pennies.

13   **Q.**   Is it illegal?

14           **MR. SEWARD:**  Calls for a legal conclusion.

15           **THE WITNESS:**  Now, hold on, I'll answer it.

16           **THE COURT:**  If he can or he can't.

17           **THE WITNESS:**  Yeah, they weren't accepting pennies

18   because a guy came in a week before and tried paying $17,500 in

19   buckets of pennies.

20   BY MR. MARKO, CONTINUING:

21   **Q.**   Who?  Mr. Sevy did?

22   **A.**   No, a different person did.  So, that prompted this that

23   they didn't want to take pennies.

24   **Q.**   My question is --

25   **A.**   I thought I answered it.

1    **Q.**   My question is --

2    **A.**   Yes, sir.

3    **Q.**   Can I ask the question?

4    **A.**   Sure.

5    **Q.**   My question is, is it illegal to pay in pennies where you

6    can arrest someone for doing that?

7    **A.**   I didn't arrest him for not paying in pennies.  But I

8    don't know about if you can pay in pennies or not.  I think

9    this -- I don't know, I don't know their rules.

10   **Q.**   All right.  So, the severity of the crime that you're now

11   telling us could be that he used foul language?

12   **A.**   He was arrested for holding up the court procedures and

13   being a disorderly person.

14   **Q.**   Did any Judge tell you that their court procedures were

15   held up?

16   **A.**   No, I was watching it.

17   **Q.**   And did any court person request that you do what you did?

18   **A.**   No, sir.

19   **Q.**   Sir, would you agree that in the totality of the

20   circumstances, by coming up to Mr. Sevy, closing the gap and

21   putting your hands on him, that you escalated this situation?

22   **A.**   I was trying to get him out the door.

23   **Q.**   Did you escalate the situation?

24   **A.**   Maybe in his mind.

25   **Q.**   In your mind, looking back, did you escalate the

1   situation?

2   **A.**   I was going to arrest him.  I was making sure he went out

3   the door.

4   **Q.**   What question are you answering?  Did you deescalate the

5   situation?

6   **A.**   No.

7   **Q.**   You're supposed to.

8           **MR. SEWARD:**  No, objection.  That's not true

9   whatsoever.

10          **THE WITNESS:**  I tried.

11          **MR. SEWARD:**  That's not --

12          **MR. MARKO:**  That's what he said.

13          **MR. SEWARD:**  That's, that's --

14          **THE COURT:**  All right.  One at a time.  Is there an

15   objection to the question?

16          **MR. SEWARD:**  Yes, there's an objection that he has to

17   deescalate the situation.  That is not the law --

18          **THE COURT:**  We're not talking about the law.  He's

19   asking based, I believe, based on this individual's training

20   and experience, right, not the law.

21   **BY MR. MARKO,** CONTINUING:

22   **Q.**   Did you deescalate the situation?

23   **A.**   I was hoping he'd go out the door.  Maybe it didn't

24   deescalate it, sir.

25   **Q.**   Okay.  I want to shift to the elevator.

1    **A.**   Yes, sir.

2    **Q.**   So, you took Mr. Sevy and handcuffed him behind his back,

3    true?

4    **A.**   Yes.

5    **Q.**   So, he was immobilized?  His hands were immobilized?  And

6    his arms were immobilized, true?

7    **A.**   He was handcuffed behind his back, yes, sir.

8    **Q.**   Right?  They were clicked in, I mean, they were secure

9    handcuffs, true?

10   **A.**   Hopefully, yeah.

11   **Q.**   Okay.  And then you and Marshall took him into the

12   elevator, is that true?

13   **A.**   That's correct.

14   **Q.**   Okay.  Can you show them going into the elevator

15   (Referencing Videographer).

16        And you understand, have you seen any video--

17   **A.**   No.

18   **Q.**   --that shows Mr. Sevy, after you handcuffed him and took

19   him down, assaulting you?

20   **A.**   No, I agree with that.

21   **Q.**   You agree there's no evidence and video of Mr. Sevy

22   assaulting you?

23   **A.**   That's correct, sir.

24   **Q.**   Now, hold on.  Charlie, go a little bit further and let's

25   stop it right there.

1      And there's no evidence of him resisting you on any video?

2  **A.**   No, he's doing fine.  He's walking to the elevator.

3  **Q.**   Okay.  And you and Marshall get on the elevator, correct?

4  **A.**   Yes.

5  **Q.**   All right.  Let's talk about this elevator because I went

6  there and I measured it and it's 57 by 80 and --

7           **MR. SEWARD:**  You know, there's no evidence of this.

8           **THE COURT:**  All right.  He's going to ask it a

9  different.

10          **MR. MARKO:**  Let me ask it a different way.

11  **BY MR. MARKO,** CONTINUING:

12  **Q.**   I marked on this floor, would you agree that this floor

13  right here, can you see these?

14  **A.**   Yeah, I was wondering what that was for.

15  **Q.**   So, you would agree that this is, approximately, the size

16  of that elevator that you went in.  Would you agree that's a

17  fair approximation?

18  **A.**   I'll tell you what, if you did good measurements, I'll

19  give you that.

20  **Q.**   Does this seem about right to you?

21  **A.**   Sure.

22  **Q.**   Okay.  And it goes from here to here?

23  **A.**   Okay.  I'll agree.

24  **Q.**   And these are the four corners of the elevator?

25  **A.**   Yes.

1    **Q.**   Charlie, can we mark between these so we can see the box.

2    And it's just an elevator?

3    **A.**   Yes, sir.

4    **Q.**   And this elevator goes from the first floor to the second

5    floor of the courthouse?

6    **A.**   Yes.

7    **Q.**   And the second floor of the courthouse you were taking

8    Anthony Sevy to the jail cell that's up there, right, the

9    booking cell?

10   **A.**   We have two holding cells, yes, sir.

11   **Q.**   Right?  And that's where you were planning on taking

12   Mr. Sevy, right?

13   **A.**   Yes, sir.

14   **Q.**   So, he's handcuffed behind his back with his big winter

15   coat that we talked about earlier, right?

16   **A.**   Yes.

17   **Q.**   And he's led by handcuffs into the elevator, correct?

18   **A.**   Yes.

19   **Q.**   And you are standing behind Mr. Sevy and that's what

20   you're trained to do, aren't you?

21   **A.**   I'm behind him going into the elevator.  He was walking

22   in.  He was cooperating there.

23   **Q.**   He's cooperating, right?

24   **A.**   Yes, sir.

25   **Q.**   And you bring him into the elevator and you stand behind

1    him?

2    **A.**    I did.

3    **Q.**    Okay.  And we'll just wait until Charlie is done.  Good

4    job, Charlie.

5        Now, once in the elevator, the Royal Oak Courthouse

6    elevator, where you were standing once you got in?

7    **A.**    Yeah, I believe, if that's the back wall?

8    **Q.**    Let's make this -- yeah, let's set the scene here.  This

9    is the front doors that open up.  So, the front doors are

10   facing the jury here?

11   **A.**    Okay.

12   **Q.**    And this is the back of the elevator over here, are you

13   with me?

14   **A.**    Yes, sir.

15   **Q.**    And so the buttons, where are they?  Are they this side or

16   this side?

17   **A.**    I can't recall, I'm sorry.

18   **Q.**    Okay.  And the doors open, right?  You agree, it's a

19   pretty small elevator?

20   **A.**    That's correct.

21   **Q.**    It's not, like, a big cargo elevator?

22   **A.**    That's correct.

23   **Q.**    So, where do you stand when you go in the elevator?

24   **A.**    I believe my back was on this wall and Mr. Sevy's in front

25   of me.

**PHILIP BARACH (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

1   **Q.**   And you're holding on to him, right?

2   **A.**   Yeah, I got him.

3   **Q.**   And where is Marshall standing?

4   **A.**   I can't recall, he's either one side or the other.

5   **Q.**   He's standing right next to you?

6   **A.**   No, he's not in the back like I am.

7   **Q.**   Where is he?

8   **A.**   I don't know, I mean, five years ago.  I got him here and

9   my back's against the wall.

10  **Q.**   Okay.  Show me where Mr. Sevy is so I can be Mr. Sevy?

11  **A.**   Yeah, I love this (Witness stepping out of witness box).

12          **THE COURT:**  You're going to have to talk very loudly.

13          **THE WITNESS:**  Here is Mr. Sevy, right there.

14  **BY MR. MARKO**, CONTINUING:

15  **Q.**   I'm Mr. Sevy.

16  **A.**   Yes, sir.

17  **Q.**   Okay.  And you're?

18  **A.**   Officer.

19  **Q.**   You're the court officer.  And you have me with my

20  handcuffs behind my back?

21  **A.**   Yes, sir.

22  **Q.**   And you're holding on to me, right?

23  **A.**   I believe I was.

24  **Q.**   And Marshall's right there, right (Pointing)?

25  **A.**   I don't know if he's there or there (Pointing).

1   **Q.**   And I have my big winter coat on, right?

2   **A.**   Yes, sir.

3   **Q.**   With that big, kind of, hood?

4   **A.**   Yeah, I pulled it off his head.

5   **Q.**   Because it kept flying into his head, didn't it?

6   **A.**   I pulled it off for him.

7   **Q.**   Okay.  And your testimony, you agree that you took

8   Mr. Sevy to the ground in the elevator, didn't you?

9   **A.**   Yeah, he headbutted me.

10  **Q.**   You're angry?

11  **A.**   I wasn't angry, I was just defending myself.  I put him

12  under control again.

13  **Q.**   Okay.  You put him under control again.

14  **A.**   I put him on the ground.  He's standing like you are.  He

15  slammed his head into my nose and I pulled him down.

16  **Q.**   With his big coat on?

17  **A.**   He had his coat on, yeah.

18  **Q.**   Did the padding get in between?

19  **A.**   He had the hood off.

20  **Q.**   He had the hood off?

21  **A.**   Yes, sir.

22  **Q.**   Okay.  So, your testimony is that Anthony Sevy, while he's

23  in this tiny elevator with hands behind back, did you know he

24  had pooped in his pants at that time or no?

25  **A.**   No, sir.

1   **Q.**   And with his winter coat on and with two officers

2   surrounding him --

3         **MR. SEWARD:**  Wait.  Hold up.  There's no evidence of

4   two officers surrounding him.

5         **MR. MARKO:**  There's two.

6         **THE WITNESS:**  It's me and Harold.

7         **THE COURT:**  All right.  He can reframe the question.

8   Two officers in the elevator, is that better?

9         **MR. SEWARD:**  Yes.

10        **THE COURT:**  All right.  Two officers in the elevator.

11  **BY MR. MARKO,** CONTINUING:

12  **Q.**   And you were violently and viciously attacked by Mr. Sevy?

13  **A.**   I said he headbutted me, it startled me, made my eyes

14  water and I threw him down.

15  **Q.**   And you threw him down to the ground, right?

16  **A.**   Yes, sir.  Never touched him after that.

17  **Q.**   And so what position -- was Mr. -- and his hands was still

18  behind his back?  And what position was he in?

19  **A.**   I don't know, he's on the floor.

20  **Q.**   Was he, like, in a fetal position?  Was he like this?

21  **A.**   He's on the floor.

22  **Q.**   Laid down like this?

23  **A.**   I don't know.

24  **Q.**   Well, was he laid scrawled down on the ground?

25  **A.**   He's on the floor, Mr. Marko.

1    **Q.**   Okay.  And you understand, sir, that Mr. Marshall, whom

2    you've worked with for how long?

3    **A.**   Well, I don't know when he hired into the court, but I've

4    been with him a few years at that time, I'm sure.  We merged

5    with Berkley.  He came from Berkley.

6    **Q.**   How many years, sir.

7    **A.**   I don't know what year we merged.

8    **Q.**   You work with him all the time, don't you?

9    **A.**   I did at that time, yes, sir.

10   **Q.**   And you understand that Mr. Marshall says that even though

11   he's standing in this small elevator that he didn't see

12   anything that caused Mr. Sevy to be taken to the ground?

13   **A.**   I don't know that he said that, but you're telling me it

14   right now.

15   **Q.**   You know he said it because you were sitting at his

16   deposition?

17   **A.**   I can't remember what was said then.

18   **Q.**   Okay.  And that he never saw Mr. Sevy headbutt you?

19   **A.**   If he said that.

20   **Q.**   Do you look at your shoes when you have a suspect

21   handcuffed in front of you?

22   **A.**   Do I?

23   **Q.**   Yeah, do you look at your shoes the whole time?  As the

24   elevator's going up to the second floor, were you looking down

25   at your shoes the whole time like this (Demonstrating)?

---

**17-13789; Anthony Sevy v. Philip Barach**

PHILIP BARACH (Adverse Witness) - Cross
Tuesday/June 28, 2022

120

1   **A.**   Are you insinuating I said that?

2           **THE COURT:**  He's asking were you doing that?

3           **THE WITNESS:**  No, I wasn't, no, Ma'am.

4   **BY MR. MARKO**, CONTINUING:

5   **Q.**   What was Marshall doing?

6   **A.**   I don't know, you'd have to ask him.

7   **Q.**   Can you explain how your buddy and --

8   **A.**   He's not my buddy, I work with him.

9   **Q.**   Your co-worker from a long time, didn't see this violent,

10  brutal attack on you in the elevator?

11          **THE COURT:**  Wait, he said he didn't know what

12  Mr. Marshall said, so, sustained.

13          **MR. SEWARD:**  And there's no description of a violent,

14  brutal attack either.

15  **BY MR. MARKO**, CONTINUING:

16   **Q.**   Well, let's show the pictures.  Sir, you understand there

17  were pictures that were taken of your face after you alleged

18  that Mr. Sevy headbutted you?

19   **A.**   Okay.

20   **Q.**   And this is Plaintiff's Exhibit 9A and B.

21       May I approach, Judge?

22          **THE COURT:**  Yes.

23  **BY MR. MARKO**, CONTINUING:

24   **Q.**   Is this you?

25   **A.**   Yes, sir.

**17-13789; Anthony Sevy v. Philip Barach**

 1   **Q.**   This from the date of the incident?

 2   **A.**   I think so.

 3   **Q.**   Is that an accurate picture?

 4   **A.**   Yeah.

 5   **Q.**   Is this you?

 6   **A.**   Yeah, that's me.

 7             **MR. SEWARD:**  You said 8 and 9?

 8             **THE COURT:**  9A and B.

 9   **BY MR. MARKO,** CONTINUING:

10   **Q.**   Is that from the day of the incident?

11   **A.**   I think it is.

12             **MR. MARKO:**  Okay.  Can we show these?

13             **THE COURT:**  No, no.  Let's move them.

14             **MR. MARKO:**  Move them for admission, Your Honor.

15             **THE COURT:**  All right.  Is there any objection?

16             **MR. SEWARD:**  No, not to 9A and B.

17             **THE COURT:**  All right.  They will be admitted.

18         (Plaintiff's Exhibit 9A, Photograph of Philip Barach,

19         identified.)

20         (Plaintiff's Exhibit 9A received into evidence.)

21         (Plaintiff's Exhibit 9B, Photograph of Philip Barach,

22         identified.)

23         (Plaintiff's Exhibit 9B received into evidence.)

24   **BY MR. MARKO,** CONTINUING:

25   **Q.**   Okay, sir.  So, this picture is of your face after the

1   incident, correct?

2   **A.**   I believe it is.

3   **Q.**   Okay.  You would agree that there's no indication of any

4   injury to your nose that we can see in this picture?

5   **A.**   Doesn't appear to be, no, sir.

6   **Q.**   Okay.  And then there was another picture taken directly

7   after the incident.  And do you see any injury to your nose in

8   this picture?

9   **A.**   No, I'm not claiming an injury to my nose, but he did

10  headbutt me in my nose and made my eyes water.  But no, I don't

11  see anything there.

12  **Q.**   Okay.  And then I think you produced a picture at your

13  deposition for the first time that your wife had texted you?

14  **A.**   May have.  I don't recall it.

15  **Q.**   That was taken after?

16  **A.**   Probably maybe when I got home.  I don't know.

17  **Q.**   Okay.  Well, you produced it for the first time at your

18  deposition, do you remember that?

19  **A.**   No, I don't.  If you say so, but I don't recall it.

20  **Q.**   All right.  Are you claiming that that shows an injury to

21  your nose?

22  **A.**   She must have thought it did.  It's no more than Sevy's

23  redness around his neck.

24  **Q.**   We have pictures of his neck.  You saw the redness around

25  his neck.

**PHILIP BARACH (Adverse Witness) - Cross**                    123
**Tuesday/June 28, 2022**

1    **A.**    I didn't see it, but I believe you.

2    **Q.**    Okay.  It's going to be an exhibit in this case.

3    **A.**    Okay, sir.

4    **Q.**    Okay.  Let's just play the video of the elevator with

5    Mr. Sevy getting in and then getting out after you claimed that

6    this happened, okay.

7                        (Video Recording Played.)

8    **BY MR. MARKO,** CONTINUING:

9    **Q.**    So, there's you and Marshall going in this elevator,

10   correct?

11   **A.**    Yes, sir.

12   **Q.**    And then let's show the video of Mr. Sevy coming out of

13   the elevator.

14                       (Video Recording Played.)

15   **BY MR. MARKO,** CONTINUING:

16   **Q.**    Stop it right there.

17         Sir, is that Marshall right there?

18   **A.**    I think it is.

19   **Q.**    And he's looking right down at the ground?

20   **A.**    I think Mr. Sevy's probably still on the floor.

21   **Q.**    Okay.  Mr. Sevy is still on the floor down there?

22   **A.**    Let's see (Witness viewing screen).  I think he still is.

23   I don't know if he's up or not.

24   **Q.**    And other people had entered the elevator, sir, at this

25   point?

**17-13789; Anthony Sevy v. Philip Barach**

1    **A.**    Yeah, I don't know who that is.

2    **Q.**    Okay.  Go ahead and play, Charlie.

3    **A.**    Yes, Officer Sidge and Officer Kowalski.

4    **Q.**    And is Mr. Sevy resisting or being violent?

5    **A.**    No, looks like he's walking to the holding cell, sir.

6    **Q.**    Even though he was just thrown to the ground?

7    **A.**    Yeah, looks like he's fine.

8    **Q.**    Okay.  Did you give him a bag to clean up?

9    **A.**    That happened later.  I never even was aware of this until

10   much later that this was -- I patted him down in the holding

11   cell, he hadn't defecated at that time.

12   **Q.**    Oh, you know he was given a bag though, right?

13   **A.**    I heard it later.

14   **Q.**    Yeah, but you know the police gave him a bag, correct?

15   **A.**    I heard that later.

16   **Q.**    But you know that now?

17            **MR. SEWARD:**  Well, I object.  It's been asked and

18   answered.

19   **BY MR. MARKO**, CONTINUING:

20   **Q.**    I don't know what that means, "I heard that later"?

21   **A.**    Well, I didn't know it at the time.  I heard, like, an

22   hour later.  An hour and a half later.

23   **Q.**    You didn't just hear from me in opening, right?  You heard

24   it an hour later?

25   **A.**    Sure.

1  **Q.**   Because your buddies at Royal Oak told you?

2  **A.**   They ain't my buddies, I knew some of them.

3  **Q.**   Did they tell you?

4  **A.**   Somebody told me.  I don't know who told me.

5  **Q.**   So, you think that he defecated himself after this while

6  he was just sitting in a jail cell by himself?

7  **A.**   Yes, I do.

8  **Q.**   Okay.  And why would he do that, sir?

9  **A.**   I don't know if he had an adrenaline dump.  Got scared.  I

10  don't know what.  He didn't do it -- when I patted him down, he

11  had not done it yet.

12  **Q.**   Looking back, can you just tell us -- would you agree that

13  the way you handled this situation was not reasonable?

14  **A.**   No, I thought it was reasonable at the time.

15  **Q.**   Would you do it again?

16  **A.**   No, I'd let him still be there yelling right now.

17  **Q.**   And your excuse for using is, just so we're clear . . .

18  **A.**   Okay.

19  **Q.**   That you were helping Mr. Sevy when you put your hands on

20  him to guide him out the courthouse?

21  **A.**   Yeah.

22  **Q.**   Like, a friendly escort?

23  **A.**   Yes, sir.

24  **Q.**   And that he took a defensive, combat stance toward you?

25  **A.**   No, I didn't use those words, you just did.

1   **Q.**   Wasn't that what you said in your deposition?

2   **A.**   I don't remember what I said in my deposition.

3          **MR. MARKO:**   Okay.  Thank you, sir.  I don't have any

4   other questions.

5          **THE COURT:**   Thank you Mr. Marko.

6       Mr. Seward.

7                          -   -   -

8                     **DIRECT EXAMINATION**

9   **BY MR. SEWARD:**

10  **Q.**   I want to start off with some preliminary things.

11  Mr. Marko asked about finding the names of these probationary

12  people.  Are you aware that Mr. Marko has subpoena powers to

13  the court?

14  **A.**   I imagine he does.

15  **Q.**   Certainly.  He could have issued a subpoena to the court

16  asking for who was in the probation, correct?

17  **A.**   Yeah, I think they were probationers.

18  **Q.**   Right, but he could have subpoenaed the court for those

19  records, correct?

20  **A.**   Yes.

21  **Q.**   Do you control those records?

22  **A.**   No, I don't.

23  **Q.**   Do you have access to those records where if somebody

24  says, "I want to know who that is," some person, some attorney,

25  or would you direct them to maybe the court administer and

1    issue a subpoena?

2    **A.**    I'd direct them to the court administer.

3    **Q.**    Okay.  Now, is the 44th District Court being sued or is it

4    just Philip Barach?

5    **A.**    I don't know how it reads.

6    **Q.**    Well, it is Philip Barach.

7            **MR. MARKO:**  Objection, Judge, now he's just thing.

8            **THE COURT:**  All right.

9            **MR. SEWARD:**  Well, I'd ask The Court to take judicial

10   notice that the complaint is Philip Barach --

11           **THE COURT:**  All right.  I think it was just the lead.

12   Just ask the question.

13   **BY MR. SEWARD,** CONTINUING:

14   **Q.**    All right.  So, it's not that you're hiding anything or he

15   didn't do his job or the court doesn't have it, that's not your

16   fault, is it?

17   **A.**    Well, I'm not responsible for finding out who those people

18   are.

19   **Q.**    All right.  Now, at the time of this incident, how old are

20   you?

21   **A.**    67.  Then I was 67.

22   **Q.**    When did you start at the Royal Oak Police Department?

23   **A.**    '78.

24   **Q.**    And when did you retire?

25   **A.**    '04.

**PHILIP BARACH (Adverse Witness) - Direct**
**Tuesday/June 28, 2022**

128

1    **Q.**   And between '04 and 2017, what do you think the percentage

2    of the people that you started with were still there, anyone?

3    **A.**   Yeah, there were a few.

4    **Q.**   One or two, three?

5    **A.**   No, it could have been five or six.

6    **Q.**   Out of how many that are in the police department?

7    **A.**   About 80 uniforms.

8    **Q.**   Okay.  And when you say, "Uniform," what colors are those

9    uniforms?

10   **A.**   Blue.

11   **Q.**   Okay.  Were you wearing a Royal Oak blue police uniform

12   this day?

13   **A.**   No, we wore white shorts and black.

14   **Q.**   Did it say, "Royal Oak Police"?

15   **A.**   No.

16   **Q.**   Now, he's implying that somehow the Royal Oak Police are

17   covering up for you.  Is that accurate?

18   **A.**   No.

19   **Q.**   Can you tell the jury why?

20   **A.**   Well, it's my understanding the Royal Oak Police, they

21   came over, took some statements, and either the deputy chief or

22   the chief sent it to the Oakland County Sheriff's Department

23   for an investigation, I guess, probably to show that it was an

24   independent investigation.

25   **Q.**   Now, you just said if you had to do this over again you

**PHILIP BARACH (Adverse Witness) - Direct**
**Tuesday/June 28, 2022**

 1   would not have done it.  Can you tell the jury what you meant

 2   by that?

 3   **A.**   I just think the aggravation is not worth it.  I was

 4   trying to do my job at the court and help Sylvia out at the

 5   front desk because I thought this guy was just badgering her.

 6   **Q.**   Okay.  Now, he's referenced on just one little aspect of

 7   using profanity.  The decision to arrest him, was that just

 8   because he used profanity?

 9   **A.**   No.

10   **Q.**   Was he saying, "Oh, I don't like this crap," or some other

11   word to say that?

12   **A.**   Well, there was lead up to this.  It started when he first

13   came through the metal detector.

14   **Q.**   And he was screaming and yelling and being loud, correct?

15   **A.**   Yes.

16   **Q.**   And you could see in the video how other people are

17   turning around finding out why he's being the way he is,

18   correct?

19              **MR. MARKO:**  Judge, objection.  This is very leading.

20              **MR. SEWARD:**  That's true.  That's true.  We'll get

21   back to that.

22              **THE COURT:**  Or you could just reframe it.

23              **MR. SEWARD:**  Do I have the option to call Mr. Barach

24   during my Case-in-Chief?

25              **THE COURT:**  No, this witness will be called one time.

**17-13789;  Anthony Sevy v. Philip Barach**

1    So, I will allow you-all to question him accordingly.

2    **BY MR. SEWARD,** CONTINUING:

3    **Q.**   All right.  So, are you aware that in Harold Marshall's

4    statement he said that Mr. Sevy was using the words, "Cock

5    sucker"?

6    **A.**   No.

7    **Q.**   Okay.  It's similar to what you've heard him say, right,

8    just different words expressing the same thought?

9    **A.**   I know what he said and I remember what he said both

10   times, on his way in and later.

11   **Q.**   Okay.  Now, we're going to talk about that.

12       Now, I'm going to show you Exhibit 1, it's Defendant's

13   Exhibit 1?

14            **MR. MARKO:**  What is it?

15            **MR. SEWARD:**  You want me to show it?

16            **MR. MARKO:**  Yeah, I have no objection.

17            **MR. SEWARD:**  Okay.  Your Honor, at this time I would

18   move for the admission of Defendant's Exhibit Number 1.

19            **THE COURT:**  Any objection to Exhibit 1?

20            **MR. MARKO:**  Well, as long as he lays a foundation to

21   this witness.  I don't think they've laid a foundation.

22            **MR. SEWARD:**  Okay.  Before you put it up -- okay if I

23   approach?

24            **THE COURT:**  Yes.

25            **MR. SEWARD:**  Thank you.

1    **BY MR. SEWARD,** CONTINUING:

2    **Q.**   I've shown you Exhibit 1.  Is that a sticker or a sign

3    that is on the front windows of the 44th District Court?

4    **A.**   It's similar to the one I remember, yeah.

5    **Q.**   Okay.  And does it communicate the court's policy, not

6    Phil Barach's, but The Court's policy on accepting coins?

7    **A.**   It's the court's policy.

8    **Q.**   Okay.  And you're aware of that?

9    **A.**   I've seen this many times at the court, yeah.

10   **Q.**   Okay.  Even before this incident?

11   **A.**   Yes.

12          **MR. SEWARD:**  Your Honor, at this time I move for

13   admission of Exhibit Number 1.

14          **THE COURT:**  Any objection?

15          **MR. MARKO:**  No objection.

16          **THE COURT:**  Okay.  It will be admitted.

17       (Defendant's Exhibit 1, Court Notice Document,

18       identified.)

19       (Defendant's Exhibit 1 received into evidence.)

20   **BY MR. SEWARD,** CONTINUING:

21   **Q.**   Now, this notice, and Mr. Barach, if you take a look at,

22   this is a notice that's up in the counter where Mr. Sevy went

23   the first time and the second time, is that accurate?

24   **A.**   Yeah, but I didn't know that.  He had already been there

25   once when he came through.

**PHILIP BARACH (Adverse Witness) - Direct**
**Tuesday/June 28, 2022**

132

1    **Q.**   But I want you to assume that he was there the first time,

2    all right, and he was certainly there the second time, correct?

3    **A.**   He was there the time I dealt with him, yes, sir.

4    **Q.**   Right.  And you could even see Harold Marshall pointing to

5    sign too, can't you?

6    **A.**   I didn't pay attention to it, but . . .

7    **Q.**   Okay.  But the sign indicates, per M.C.L., Michigan

8    Compile Laws, the court is not required to accept payments in

9    coin, correct, unless they're pure silver and gold, correct?

10   **A.**   That's what it says.

11   **Q.**   That's a State statute, that's not Philip Barach's rule,

12   isn't it?

13   **A.**   Correct, sir.

14   **Q.**   Okay.  And you were told by the court people that the

15   court doesn't accept coins, does it?

16   **A.**   Well, I was aware of this, yeah.

17   **Q.**   Okay.  Unless they totaled a dollar or less, correct?

18   **A.**   Yes, sir.

19   **Q.**   Okay.  That's not your policy, you're there to help

20   enforce the court's policy, correct?

21   **A.**   Yes, sir.

22   **Q.**   Now, there's a lot of questions about he wasn't arrested

23   until he got in the vestibule.  Had he committed disturbing the

24   peace when you were there up at the counter?

25   **A.**   Yes, sir.

**PHILIP BARACH (Adverse Witness) - Direct**
**Tuesday/June 28, 2022**
133

1   **Q.**   Why didn't you arrest him there because -- why did you not

2   arrest him there?

3   **A.**   I was trying to give him some leeway to just leave the

4   courtroom -- courthouse.

5   **Q.**   And now in hindsight, if he would have just done it, we

6   probably wouldn't even be here today, correct?

7   **A.**   Absolutely.  Correct.

8   **Q.**   Would you put your hand on the back of my arm?

9   **A.**   Okay.

10  **Q.**   Now, if I tense, can you feel that?

11  **A.**   Yeah, I can feel that.

12  **Q.**   Okay.  Is it seeable?

13  **A.**   Perhaps.

14  **Q.**   Now, if I tense up my back, okay -- no, put your hand on

15  there.  When I push back on you, can you see that -- well, you

16  can feel that, right?

17  **A.**   Correct, sir.

18  **Q.**   Okay.  You've been train, haven't you -- or have you been

19  trained to try to get a situation under control before it gets

20  out of control?

21  **A.**   Yes.

22  **Q.**   Okay.  So, when you talk about the bar fights and the

23  like, do you come out to that person who is drunk and being

24  obnoxious and say, "Mr., please calm down or I may have to

25  arrest you"?

1    **A.**   No.  Usually it goes something like this, the bartender

2    wants you to leave, you've got to leave.

3    **Q.**   Okay.  And if that person goes like this, how do you

4    interpret that (Demonstrating).

5    **A.**   Well, I'd usually -- I'd push him back to keep him away

6    from me.

7    **Q.**   Because now he's taken an aggressive stance?

8    **A.**   Yes, sir.

9    **Q.**   And communication isn't all just verbal, is it?

10   **A.**   No, sir.

11   **Q.**   In fact, a lot of it is non-verbal actions, correct?

12   **A.**   Correct.

13   **Q.**   And in this situation Mr. Sevy, on multiple times,

14   expressed his displeasure with the court's policy both verbally

15   and non-verbally, is that accurate?

16   **A.**   Yes.

17   **Q.**   Okay.  Let's go through the video.  Can we start from the

18   beginning, John, and let's do the lobby view.  And can we focus

19   on the metal detector, the x-ray machine.  Thank you.  And can

20   we go through to where Mr. Sevy is walking in (Video playing).

21   Okay.  Let's stop it here.

22        Can you see what's going on?  Is that screen big enough to

23   see?

24   **A.**   Yeah, he took his coat off and was probably going to place

25   his items in one of the trays.

1    **Q.**   Okay.  Can we go through to the point where he's on the

2    other side of the metal detector?  There.  Right.  All right.

3         And what is going on right now?

4    **A.**   Well, if you give me a couple of minutes, I'll explain.

5    We had just got this.  Tony and I were the only one's trained

6    on that.  We had just got the x-ray machine and I'm telling

7    Harold, If it's light green and it's brown or yellow, you let

8    the stuff go through.  And anything that came through black,

9    they want it to physically go into -- the handbag, purse,

10   whatever they're carrying, to inspect and see what it is.

11   **Q.**   And go ahead, can you explain a couple more frames?

12   **A.**   So, I believe I saw on this screen what was black in the

13   bag and I had an idea what it was.

14   **Q.**   Hold on.  Is that a bag or is that an envelope?

15   **A.**   I don't know, maybe it's an envelope.  I don't remember

16   now.

17   **Q.**   Okay.  Did it say anything like, "Property of Chase Bank"?

18   **A.**   No, I don't recall that.

19   **Q.**   Okay.  And so what are you doing now?

20   **A.**   I'll tell you exactly what I told him.  I called Mr. Sevy

21   I said, "Sir, I don't believe they're going to take this."

22   **Q.**   Now, why would you say that?

23   **A.**   Because it looked like it was rolls of pennies, of loose

24   -- well, it was pennies and I was pretty sure they wouldn't

25   take it.

1    **Q.**   Because of that exhibit where they --

2    **A.**   Yeah.

3    **Q.**   Now, did you ever have any previous experience with

4    persons trying to --

5    **A.**   Yeah, I just happened to be at the machine maybe a week or

6    two weeks before and I think the guy was trying to prove his

7    point, he came through with two white buckets like the bankers

8    have and he had $17,500 pennies in it.  He wanted to prove a

9    point, I suppose.

10   **Q.**   Okay.  And because of that, this notice, you knew that?

11   **A.**   I said, "I don't think they'll take these."

12   **Q.**   And you communicated that to Mr. Sevy?

13   **A.**   Yeah, and he responded.

14   **Q.**   And how did he respond?

15   **A.**   He said, "They'll fucken take it, all right, because they

16   wouldn't fucken take my card."  I thought he had a credit -- I

17   wasn't there the first time.  I thought maybe his credit card

18   got denied.  I didn't know anything about the 1.50 surcharge, I

19   didn't know any of that stuff.  That was Mr. Sevy's response to

20   me.

21   **Q.**   Say that again, how did he respond?

22   **A.**   He said, "They'll fucken take it, all right, they wouldn't

23   fucken take my card."  I assume he meant a Visa Card that got

24   turned down.

25   **Q.**   Now, someone who comes in, "They'll fucken take it," does

1    that, kind of, pique your interest as to what's going to happen
2    or what's going on?
3    **A.**    Yeah, I mean, I was paying attention.
4    **Q.**    Okay.  If somebody just came in and said, "Yeah, they said
5    I could pay with coins"?
6    **A.**    I'd say, "Go and try, I don't think they're going to take
7    it."
8    **Q.**    Okay.  Did you escalate the situation?
9    **A.**    No, I didn't say anything back to him.  I was just a
10   little startled by his response.
11   **Q.**    All right.  Can you back out a little bit, John.
12        All right.  Now, can you go to the window, rotate it to
13   the teller window.  And can you play it and I'll tell you when
14   to stop.
15                    (Video Recording Played.)
16             **MR. SEWARD:**  Can you stop it for a second?
17        Your Honor, would I be disrespectful if you allow me to
18   ask questions watching this monitor?
19             **THE COURT:**  No, that's fine.
20   **BY MR. SEWARD,** CONTINUING:
21   **Q.**    All right.  Can you -- John, can you play that?  Please,
22   stop it just as he starts to walk toward the counter (Video
23   playing).  Okay.  Can we stop it right there.
24        The young lady with the blond hair and glasses, do you
25   know who that is?

1    **A.**    Sylvia.

2    **Q.**    Does Sylvia have a last name?

3    **A.**    I think because she got married.  I've been gone for

4    awhile, I don't remember her last name.

5    **Q.**    Fair enough.  All right.  Can you play that?  (Video

6    playing).  Now, stop it.  Can you go back a couple of frames?

7    Yeah, right there.

8         All right.  And you can see that Mr. Sevy is approaching

9    Sylvia, correct?

10   **A.**    Yes, sir.

11   **Q.**    All right.  Now, is he -- was he saying anything, at this

12   point, that you could hear?

13   **A.**    I don't recall.

14   **Q.**    Okay.  Now, play it and I'll tell you when to stop (Video

15   playing).  Now stop it.

16        Did you hear or see what caused Ms. Sylvia to back away?

17   **A.**    No.

18   **Q.**    Okay.  Did you hear anything?

19   **A.**    I don't recall hearing anything.

20   **Q.**    All right.  Go ahead and play it (Video playing).  Now,

21   stop here.  We see Harold Marshall coming in, correct?

22   **A.**    Yes, sir.

23   **Q.**    What's going on at this point?

24   **A.**    I don't remember the exact words.  I mean, I can surmise

25   what she's saying.  She's saying --

**PHILIP BARACH (Adverse Witness) - Direct**
**Tuesday/June 28, 2022**

139

1   **Q.** Let me stop. Do you know the gist of what was being said?

2   **A.** Yeah, "We can't -- I'm not taking them. We don't take

3   this," something --

4       **MR. MARKO:** Judge, I don't have any problem with

5   this, but I want to make sure it's his personal knowledge and

6   that he has a foundation for it. If he wasn't hearing any of

7   this stuff.

8       **THE WITNESS:** I can hear voices, I can't really

9   understand what they're saying, sir.

10   BY MR. SEWARD, CONTINUING:

11   **Q.** Okay. You could hear voices?

12   **A.** Yes.

13   **Q.** And could you hear what would be Mr. Sevy's voice?

14   **A.** Yeah.

15   **Q.** And was it conversational?

16   **A.** No, I knew it was getting let out of control. He's

17   getting a little loud.

18   **Q.** And could you understand the substance, the gist of what's

19   being said?

20   **A.** Yeah, I took it, she wasn't going to take his form of

21   payment.

22   **Q.** And why do you say she wasn't going to take the form of

23   payment?

24   **A.** Like I said, it's been a few years. I know they're

25   arguing about taking the pennies, that's all I knew.

**PHILIP BARACH (Adverse Witness) - Direct**
**Tuesday/June 28, 2022**                          140

```
 1   Q.   Okay.  All right.  So, let's keep watching it.  Now, let
 2   me stop right here.  Have you heard the concept that officer's
 3   presence is a form of force?
 4   A.   Yes.
 5   Q.   Okay.  And at this point, Harold Marshall had made his
 6   presence known?
 7   A.   Yes.
 8   Q.   Okay.  And so that's a form of force, isn't it?
 9   A.   I guess it's on their force continuum.
10   Q.   Okay.  Now, let's keep playing it (Video playing).  Let's
11   stop here.
12        Is that a solid plexiglass between Ms. Sylvia and
13   Mr. Sevy?
14   A.   It's glass, you know.  I don't think it's bullet-proof,
15   but it's glass.
16   Q.   And can you hear Mr. Sevy's voice?
17   A.   I can hear Mr. Sevy's voice, I can't hear Harold or
18   Sylvia's.
19   Q.   And how would you describe Mr. Sevy's voice?
20   A.   Well, at this point I don't remember what he's saying, I
21   just know that he's argumentative and he wants to be able to
22   pay.
23   Q.   All right.  Let's keep playing it.
24                    (Video Recording Played.)
25             THE WITNESS:  They're still arguing about how to pay
```

**17-13789; Anthony Sevy v. Philip Barach**

1    this.

2    **BY MR. SEWARD**, CONTINUING:

3    **Q.**   Why do you still say they're still arguing?

4    **A.**   I can hear it then.  I don't remember the exact words, no.

5    **Q.**   Okay, but --

6    **A.**   I mean, I'm listening to it at the front desk.

7    **Q.**   So, now your interest has piqued even more?

8    **A.**   Well, I'm paying attention to it.

9    **Q.**   Okay.  Why are you paying attention to it?

10   **A.**   Because I think it's getting out of hand up there.

11   **Q.**   And is part of your job to make sure it's calm and quiet

12   in the court building?

13   **A.**   Well, I believe that's part of my job, yes, sir.

14   **Q.**   Because there's the probation there, there's courtrooms,

15   and people coming and going, correct?

16   **A.**   Yeah, it's open to the public.

17   **Q.**   All right.  Keep playing it.

18                      (Video Recording Played.)

19   **BY MR. SEWARD**, CONTINUING:

20   **Q.**   Now, could you hear what Harold just said?

21   **A.**   No.  No.

22   **Q.**   All right.  Now, let's stop it here.  Can you now hear

23   Harold talk -- I'm not asking you if you could tell us the

24   words, but I'm asking, can you hear Harold's voice?

25   **A.**   I could hear his voice.

1  **Q.**   Okay.  And can you hear Mr. Sevy's voice?

2  **A.**   Yes.

3  **Q.**   Have you ever heard of the term, "Verbal commands"?

4  **A.**   Yes, sir.

5  **Q.**   Now, is that also a use of force?

6  **A.**   Yes, sir.

7  **Q.**   All right.  Now, is Harold giving verbal commands to

8  Mr. Sevy, do you know?

9  **A.**   I think before this Mr. Harold told him once you go home

10  and mail a check in and it will only cost you .48 cents instead

11  of the 1.75.  Sevy didn't want to hear that either.

12          **MR. MARKO:**  Your Honor, Mr. Marshall is the next

13  witness and so I object to hearsay as to what Mr. Marshall

14  said.

15          **MR. SEWARD:**  Your Honor, I'm not offering it for any

16  assertions of fact.

17          **THE COURT:**  All right.

18  **BY MR. SEWARD,** CONTINUING:

19  **Q.**   Now, at this point, can you hear Mr. Marshall giving

20  verbal commands to Mr. Sevy?

21  **A.**   I heard him say a couple times to leave the courthouse.

22  **Q.**   Okay.  Is that verbal commands?

23  **A.**   Yes, sir.

24  **Q.**   And is that a use of force?

25  **A.**   Yes, sir.

PHILIP BARACH (Adverse Witness) - Direct
Tuesday/June 28, 2022

143

1    **Q.**   Okay:  Let's keep playing it.

2                        (Video Recording Played.)

3    **BY MR. SEWARD,** CONTINUING:

4    **Q.**   Let's stop it right here.

5         Now, do you see how Mr. Sevy leaned into Harold Marshall?

6    **A.**   Yes, sir.

7    **Q.**   You, as an officer, what does that mean to you?

8    **A.**   I just think Mr. Sevy is getting a little more aggressive

9    and he's being told to leave repeatedly and I think it's going

10   nowhere.  I just think he's not going to leave.

11   **Q.**   And that's an act of aggression, isn't it?

12   **A.**   I believe.

13   **Q.**   Okay.  Let's keep playing it -- well, hold on, let's stop.

14   Can you hear his voice?

15   **A.**   Mr. Sevy's?

16   **Q.**   Yes.

17   **A.**   Yeah, I don't remember what's being said.

18   **Q.**   Well, was it calm and polite?

19   **A.**   No, he's yelling.

20   **Q.**   Okay.  Let's keep playing it.

21                        (Video Recording Played.)

22            **THE WITNESS:**  I didn't pay attention before, but I

23   think he's pointing out -- he's pointing to the sign that says

24   they won't take the coins.

25   BY MR. SEWARD, CONTINUING:

**17-13789; Anthony Sevy v. Philip Barach**

**PHILIP BARACH (Adverse Witness) - Direct**
**Tuesday/June 28, 2022**

144

1    **Q.**   And why are we seeing you come into the picture?

2    **A.**   Because I feel this is going nowhere and it's time to get

3    him to leave.

4    **Q.**   Now, can you explain to the members of the jury because we

5    don't have sound?  Now, that's all your fault, right?  You

6    designed the system, right?

7    **A.**   I didn't do the system, but it was a brand new system but

8    apparently the audio wasn't set up yet.

9    **Q.**   So, do you hear Mr. Sevy's voice?

10   **A.**   Oh, I hear it, yeah.

11   **Q.**   Okay.  Is it a pleasant voice?

12   **A.**   No, he's very argumentative with the cashier.

13   **Q.**   Okay.  Explain what you mean by that?

14   **A.**   It's just that Sylvia is saying, "We can't take it."  He's

15   saying, "Take it," you know, back and forth and it's not --

16   it's just not accomplishing anything.

17   **Q.**   Well, was his, "Take it," punctuated with profanity?

18   **A.**   I don't know at this point if it happened.  Maybe when I

19   got up and talked and said something to him is when he

20   unleashed his displeasure, I guess.

21   **Q.**   Okay.  Let's keep going (Video playing).  Now, let me stop

22   it right here.  Do you see Sylvia's body standing up and away

23   from the window?

24   **A.**   Yeah, she's leaning away from it.

25   **Q.**   Now, typically doesn't she just sit in the chair?

**17-13789; Anthony Sevy v. Philip Barach**

1    **A.**    Yes, she does and takes their checks and Visa cards.

2    **Q.**    The fact that she's standing up and, kind of, away, is

3    that a clue to you or a non-verbal language that shows that

4    there is something to be concerned about?

5    **A.**    Yes, sir.

6    **Q.**    Okay.  Even though we had plastic in front of her, she's

7    stepping back away from him, is that what the video shows?

8    **A.**    Yes, sir.

9    **Q.**    And you, as an officer, does that show to you that there

10   is something wrong going on?

11   **A.**    Yes, sir.

12   **Q.**    Okay.  Why don't you arrest him right now?  Do you have

13   that discretion?

14   **A.**    Yeah, I do, but it's -- I'm just trying to give him a

15   break.  Just let him leave the courthouse.

16   **Q.**    So, he's upset.  He's clearly upset, right?

17   **A.**    Yeah, it's time to go, but he's not going.

18   **Q.**    Right.  And you could have, but you chose not to.  You

19   gave him some leeway is what you just told the jury?

20   **A.**    Yes, sir.

21   **Q.**    All right.  Can we keep playing it (Video playing).

22        Now, what's going on right here?

23   **A.**    I told Sylvia --

24   **Q.**    Stop it right there.  Back up a little bit.  Can you play

25   it back to when he starts walking and I'll tell you when to

1    stop?  (Video playing).  That's good.  Let's stop it right

2    here.

3        What's going on at this point?

4    **A.**   I told Sylvia, "Enough is enough.  We're not going to get

5    anything done here."  I said -- whatever she had, I said, "Take

6    back," and I told Mr. Sevy it's time to take off.

7    **Q.**   Why did you do that?

8    **A.**   He wasn't listening.  We weren't getting nowhere.  He's

9    just going to sit there and argue all day about taking the

10   pennies or whatever his purpose was.

11   **Q.**   All right.  Let's play it and I'll tell you when you stop

12   John.  (Video playing) Stop.

13       Did you see Mr. Sevy just step forward with you and

14   extending his face into you?

15   **A.**   Yeah, he got a little hot right there.

16   **Q.**   Really?  Do you see that as yet another sign of

17   aggression?

18   **A.**   Yeah, I do.  And did, too, at the time.

19   **Q.**   Now, at this point, could you have arrested him?

20   **A.**   Yes, sir.

21   **Q.**   Is it your training to try to bring -- well, let me ask

22   this, you have the discretion when to arrest, don't you?

23   **A.**   Yes.

24   **Q.**   Okay.  But you don't charge people, is that the

25   prosecutor's job?

1   **A.**   We just write a report and it goes to the detectives and

2   then they present it to the prosecutor.

3   **Q.**   And ultimately the prosecutor decides charges or what

4   charges will be brought?

5   **A.**   Either issues a warrant or not.

6   **Q.**   Okay.  Now, at this point, could you have taken him under

7   arrest?

8   **A.**   Yes.

9   **Q.**   Explain to the jury why you could have?

10   **A.**   I think he's disrupting the court procedures.  It's

11   causing alarm.  There's all kinds of people around here.  I

12   don't know why they couldn't identify any of them.  They're all

13   standing there watching this and I think he's just disrupting

14   the court.

15   **Q.**   Okay.  But you tried to then deescalate the situation?

16   **A.**   Trying to get him to leave.

17   **Q.**   Okay.  Can you play it?

18                       (Video Recording Played.)

19   BY MR. SEWARD, CONTINUING:

20   **Q.**   Now, what's happening right now?

21   **A.**   I assume he's done talking and he's going to finally

22   leave.

23   **Q.**   Had he said any words that were pleasant?

24   **A.**   Right when he got ready to leave this is exactly what he

25   said.

1   **Q.**   Hold on, let's go back to that, John.  (Video playing)

2   Okay.  Tell John when to stop.  Back it up a little bit more.

3   **A.**   He's arguing with me.  Now, I don't know what he's saying,

4   but at some point right here, his exact words, Sylvia's behind

5   the glass, I don't know what Harold said.  He said, "She can

6   suck my dick."  Points at Harold, "You can suck my dick."  And

7   he says it to me, and I said, "Get out."

8   **Q.**   Okay.  Let's see if we could see it (Video playing).  Stop

9   it.

10      Had the conversation about he can suck --

11  **A.**   Yeah, it's already done.

12  **Q.**   All right.  And we don't see him actually pointing at

13  anybody?

14  **A.**   Right.

15  **Q.**   Is there any doubt in your mind he said to you, Harold,

16  and to Sylvia he could --

17  **A.**   No doubt.

18  **Q.**   All right.  Now, let's back it up.  Zoom out.  And let's

19  look -- can you spin it?  Can we try to get the two people over

20  here and him when they're walking out?  Is there any way of

21  doing that, John?

22  **A.**   You can see these people from probation are alarmed and

23  looking around the corner now.

24  **Q.**   Right, but can you do it so we can see what's happening at

25  the window when they start getting interested?  (Video playing)

1    there we go.  So, let's back up to the point before Officer

2    Barach comes in and can we start playing it.  Hold on.

3         And Mr. Barach, do you see two people sitting off to what

4    would be the left?

5    **A.**   Yes.

6    **Q.**   Okay.  If you see them -- can we back it up a little bit,

7    looks like they're already turning around (Video panning).

8    Okay.  There we go.  Can you start playing it?  Let's do it

9    where Harold starts walking out of the room.  There we go.

10        And Mr. Barach, can you watch, I mean it's not a great

11   picture and we'll zoom it in, but tell us when you see those

12   persons starting to look around the corner.

13        I want to see everything going on, John.  Don't -- thank

14   you.  So, can we back it up to where Harold is.  Thanks.  Let's

15   play it forward.

16                    (Video Recording Played.)

17        **THE WITNESS:**  Yeah, they're looking right now.

18   **BY MR. SEWARD,** CONTINUING:

19   **Q.**   Okay, stop.  Now, John, can you blow up or zoom in on that

20   area?  Okay.  Keep going (Video zooming in).

21        And now we can see somebody looking around, correct?

22   **A.**   Yes, sir.

23   **Q.**   Okay.  Now, can you twist it to where we're at the

24   counter?  Go back a little bit, twist it.

25        You're not even up there yet, is that accurate, when

PHILIP BARACH (Adverse Witness) - Direct
Tuesday/June 28, 2022

150

1  people are starting to look around?

2  **A.**   Correct, sir.

3  **Q.**   Okay.  Can you go back to where the people are looking

4  around and zoom in on that.  Can you play it?

5  **A.**   Right there.

6  **Q.**   Okay.  Let's stop it right here.  Let's see what's going

7  on at the counter.

8       Now, is there anybody else making noises other than

9  Mr. Sevy?

10  **A.**   No.

11  **Q.**   All right.  Can we just slowly rotate all the way around

12  to see.

13       Who else is in the lobby?

14  **A.**   Well, you can see the other clerks are alarmed, too, right

15  there.

16  **Q.**   And we got this one gentleman here, correct?

17  **A.**   Yeah, he just came in.

18  **Q.**   All right.  And we see Officer Barach still behind his

19  deck, correct?  Correct?

20  **A.**   Yes, sir, I'm sorry.

21  **Q.**   Now, let's go back to the people.  Now, play it some more.

22                      (Video Recording Played.)

23  **BY MR. SEWARD,** CONTINUING:

24  **Q.**   Okay.  Let's stop.  Let's zoom and see what's going on

25  right now.

**PHILIP BARACH (Adverse Witness) - Direct**
**Tuesday/June 28, 2022**
151

1       So, you're just starting to walk up?

2   **A.**   Yeah, I keep -- but I'm keeping my hands in my pocket so

3   Sevy doesn't get all alarmed that two officers are there and

4   I'm just trying to stay calm so he would leave.

5   **Q.**   And are these three people looking over at Mr. Sevy?

6   **A.**   Yes.

7   **Q.**   All right.  Can we go back to where they're sitting.  Can

8   you play it.

9                       (Video Recording Played.)

10  **BY MR. SEWARD,** CONTINUING:

11  **Q.**   Okay, stop it.  Now we've got another gentleman looking

12  around the corner?

13  **A.**   He's standing up now.

14  **Q.**   Let's see what's going on at this point.

15  **A.**   Yes, it's getting loud and out of hand.

16  **Q.**   Okay.  Let's just play it forward.  Let's see -- can you

17  go back a few frames?  Keep going back.

18  **A.**   Sevy is the aggressor, certainly not me.

19  **Q.**   Okay, good.  Let's play it.

20  **A.**   Got my hands in my pocket, I'm no threat to him.

21                       (Video Recording Played.)

22  **BY MR. SEWARD,** CONTINUING:

23  **Q.**   Stop it.  Let's see what's happening with the two people.

24  Oh, look at that, he isn't up yet.  Okay.  Stop it as soon as

25  we see him stand up.  Go ahead (Video playing).  Stop.  Let's

**17-13789; Anthony Sevy v. Philip Barach**

1  see what's going on at this point.

2      Are you screaming?

3  **A.**   No.

4  **Q.**   Who is screaming?

5  **A.**   Sevy.

6  **Q.**   And is he using profanity?

7  **A.**   He used it, I don't know at what point in our conversation

8  here.

9  **Q.**   And clearly he's now caused a ruckus where people are

10 wondering or looking at what's going on, right?

11 **A.**   That's correct, sir.

12 **Q.**   Is this at a point where you could have arrested him?

13 **A.**   Yes.

14 **Q.**   Okay.  Let's keep playing it.  And let's follow them,

15 John, please.

16                    (Video Recording Played.)

17 **BY MR. SEWARD,** CONTINUING:

18 **Q.**   Let's go back a couple.  I'm going to tell you when to

19 stop, John (Video panning).  Stop.

20      He just turned his head toward you, right?

21 **A.**   I don't know if it's toward me or towards what he dropped

22 on the floor.

23 **Q.**   Well, let's go back.  Tell me if you remember him voicing

24 his displeasure with everything going on at this time.

25 **A.**   He's talking the whole time, but it's been awhile, I don't

1    remember what he said.  Yeah, he's talking there again.

2    **Q.**    He's looking up at you, isn't he?

3    **A.**    Yeah, that's why I'm answering him right there, "Just

4    leave."

5    **Q.**    Just leave?

6    **A.**    Yeah.

7    **Q.**    Is he following your directions?

8    **A.**    He's kinda following them.

9    **Q.**    But his words, his demeanor, does it tell you that he's

10   walking peacefully and he's going to comply and walk out the

11   door?

12   **A.**    He's begrudgedly leaving, I guess.

13   **Q.**    And does that put you on alert as to whether he's going to

14   comply or not comply?  Are you concern about that?

15   **A.**    Well, I was hoping he would.  It's not going good.

16   **Q.**    Okay.  So, you're hoping it would, but he's giving you

17   indications that it's not going to go smoothly, is that what

18   you're telling the jury?

19   **A.**    Yes, sir.

20   **Q.**    Okay.  Let's keep going.

21                        (Video Recording Played.)

22   **BY MR. SEWARD,** CONTINUING:

23   **Q.**    Okay, let's stop it right here.  Now, you just quickened

24   your pace?

25   **A.**    Yes.

1    **Q.**    Why?

2    **A.**    'Cuz he's mother-fucking me right there.  That's exactly

3    what he was saying, "Fuck you guys.  Fuck this court."  And I'm

4    thinking, "Let's get out."

5    **Q.**    Could you have arrested him right there?

6    **A.**    Probably could have arrested him at any point I wanted to,

7    but . . .

8    **Q.**    And when he's saying, "Mother fucker," to you, is that a

9    sign it's going to go smoothly or is that a sign to you that

10   this could get bad?

11   **A.**    I just want him to leave, that's all.

12   **Q.**    Does your training teach you to try to end the situation

13   before it gets out of hand?

14   **A.**    Bump my training.  I've probably already been doing this

15   40-something years when this happened.  I just wanted him to

16   leave.

17   **Q.**    All right.  So, why are you putting your hand on the small

18   of his back?

19   **A.**    I want to make sure he goes out the door and keeps going.

20   **Q.**    Could he run back in through the doors that he just came

21   through?

22   **A.**    Could he run back in through those doors?  Not once

23   they're closed, he'd have to pry them open with his fingers.

24   **Q.**    What about the door that he came in originally from the

25   outside, does he have access to those doors?

PHILIP BARACH (Adverse Witness) - Direct
Tuesday/June 28, 2022

155

1    **A.**    If he wants to head that way.

2    **Q.**    Okay.  Keep playing it.

3                         (Video Recording Played.)

4    **BY MR. SEWARD,** CONTINUING:

5    **Q.**    Now, we don't see much here, do we?

6    **A.**    Well, I'm throwing him on the ground.  I'm trying to throw

7    him on the ground.

8    **Q.**    Are you strangling him?

9    **A.**    No, I'm just wrestling with his shoulders and trying to

10   throw him and never choked him.  They can say how small he is.

11   He's a grown man.  He doesn't want to be handcuffed.  He's

12   probably 35 years younger than me.  I'm sure he's quicker,

13   faster and stronger.  It's not easy trying to arrest someone

14   who doesn't want to be handcuffed.

15   **Q.**    Okay.  Now, can we go to the probation view, please.  And,

16   John, can you zoom in?  That's good right there.  Let's watch

17   the whole scene unfold.

18                        (Video Recording Played.)

19   **BY MR. SEWARD,** CONTINUING:

20   **Q.**    So, at this point, Mr. Sevy is just walking to the

21   counter?

22   **A.**    He's already there.

23   **Q.**    We could see you walking toward there?

24   **A.**    Yes, I don't think it's going very well up there.

25   **Q.**    (Video playing).  Let's just stop it -- okay, keep

**17-13789; Anthony Sevy v. Philip Barach**

**PHILIP BARACH (Adverse Witness) - Direct**
**Tuesday/June 28, 2022**

156

1   playing.  Stop it right here.

2        She just turned around toward, what, that front window?

3   **A.**   Yes, sir.

4   **Q.**   Well, let's see what's going on at that front window at

5   this time.  Can you rotate it, John?  Perfect.  You're not even

6   up there yet, are you?

7   **A.**   No.

8   **Q.**   Okay.  And look at this gentleman, he's looking over there

9   also, right?

10  **A.**   Yes.

11  **Q.**   And at this time, is he being a pleasant, calm, courteous

12  person?

13  **A.**   He's causing some commotion up there.

14  **Q.**   Okay.  Let's go back to the view we had before, John,

15  please (Video playing).  Okay.  Let's stop it right here.

16  Let's see what's going on at this point.

17       So, you've got Harold with his arms folded, correct?

18  **A.**   Yes.

19  **Q.**   And we don't see you, do we?

20  **A.**   Not right now.

21  **Q.**   Okay.  John, can we try to find that exact frame from the

22  lobby view, please?  Because we can -- you saw the time stamp?

23  It's 1:10:22.  No, John, turn it around so at the top.

24       Okay.  So, we can see here, Harold, Mr. Marshall's got his

25  hands folded, correct?

1    **A.**    Yes.

2    **Q.**    Okay.  Now, can we go back to the probation view and let's

3    go back to 1:10:22.  Keep playing it.  Oh no, let's go back

4    where he first stands up.  Okay.  Now, let's play it, please.

5    And now stop.

6         So, at this point you haven't even started walking toward

7    the door, correct?

8    **A.**    Correct.

9    **Q.**    And now you've gathered the attention of at least two

10   people?

11   **A.**    Yes.

12   **Q.**    Okay.  Let's keep playing it.  And from this angle, John.

13   Let's stop it right here.  He just start to move back and got

14   his attention again, correct?

15   **A.**    Yes.

16   **Q.**    Okay.  Let's see what was happening at this point.  Can

17   you zoom in?  So, this is where he dropped the bag and that's

18   when he's mother-fucking you again?

19   **A.**    I'm not saying anything.  I think that's why that

20   gentleman stood up to look again because he's using the foul

21   language and yelling again.

22   **Q.**    Okay.  Let's keep following him out the door on the

23   probation view.  Okay.  Slow it down.  Hold on.  Hold on.

24        Now, during this time is he saying anything?

25   **A.**    He's talking the whole time.

**PHILIP BARACH (Adverse Witness) - Direct**
**Tuesday/June 28, 2022**

158

1   **Q.**   Well, when you use the word, "Smack," what do you mean by

2   that?

3   **A.**   He's just swearing at us:  "This court this.  Fuck you."

4   It's just bad language and he's like a little kid that won't

5   grow up.  No one ever told him no his whole life.  So, if

6   someone told him no, he didn't want to do it.

7   **Q.**   Okay.  Well, let's keep going.

8          **THE COURT:**  All right.  Well, I think we're going to

9   take our second morning break and we'll reconvene at 12:15.

10  And again, please do not discuss the case during the break and

11  we'll see you in just a few minutes.

12                   **(Jury out at 12:01 p.m.)**

13          **THE COURT:**  All right.  We'll be in recess until

14  12:15.

15       **(A break was taken from 12:01 p.m. to 12:19 p.m.)**

16                        **- - -**

17          **THE CLERK:**  The Court recalls Case Number 17-13789;

18  <u>Sevy versus Barach</u>.

19      Will Counsel please restate your appearances, for the

20  record.

21          **MR. MARKO:**  John Marko and Charlie Kersten, on behalf

22  of Anthony Sevy.

23          **MR. SEWARD:**  Joe Seward and Kali Henderson, on behalf

24  of Officer Barach.

25          **THE COURT:**  All right.  Thank you.  And Mr. Barach,

**17-13789; Anthony Sevy v. Philip Barach**

PHILIP BARACH (Adverse Witness) - Direct
Tuesday/June 28, 2022

159

1 you may resume the witness box and we're going to bring the

2 jury back in.

3                              **(Jury In 12:23 p.m.)**

4              **THE COURT:** All right. You may be seated.

5        And Mr. Seward, you may proceed.

6              **MR. SEWARD:** Thank you. Do I have to wear my mask

7 even when I'm standing here?

8              **THE COURT:** No, not when you're questioning the

9 witness.

10 **BY MR. SEWARD,** CONTINUING:

11 **Q.** Now, during this break, Mr. Barach, did you and I or did

12 you and Kali or did you, Kali, and I at all have any

13 conversations outside of the courtroom?

14 **A.** No.

15 **Q.** And any conversation can we had was with Mr. Sevy present

16 -- I'm sorry, Mr. Marko present?

17 **A.** I didn't think we had any conversation.

18 **Q.** No, we talked about your wife's work, right?

19 **A.** Oh, yeah.

20 **Q.** And your pocket flap, right?

21 **A.** Yeah.

22 **Q.** Okay. All right. What's going on at this point, just to

23 bring -- to start the flow again, what's going on at this

24 point?

25 **A.** Mr. Sevy's going out the door.

**17-13789; Anthony Sevy v. Philip Barach**

**PHILIP BARACH (Adverse Witness) - Direct**
**Tuesday/June 28, 2022**

160

1   **Q.** And is he expressing his pleasure with you and the

2   situation?

3   **A.** I just know at some point while we're walking he kept

4   mouthing his displeasures of what was going on, I guess.

5   **Q.** All right. Let's start. Keep playing it. (Video

6   playing). Stop. Back it up.

7       Right here, what's going on right here?

8   **A.** I believe I'm telling him just go out the door.

9   **Q.** And is his face extended into you?

10   **A.** Yes.

11   **Q.** Is he getting into your face?

12   **A.** Yes. Yes, sir.

13   **Q.** Is he, again, using profanity language?

14   **A.** Yeah, I don't remember what he said at this time but he

15   was displeased.

16   **Q.** So, he's not saying, "Oh, gheez, Officer Barach, I'd be

17   more than happy to continue walking out the door." He's not

18   saying that, is he?

19   **A.** No, sir.

20   **Q.** Okay. And at this point, this is a threatening situation,

21   is it?

22   **A.** I'm just making up my mind right here to arrest him.

23   **Q.** Why?

24   **A.** Because I don't think it's going anywhere. I don't think

25   he's going to leave without him getting his last few say-so's

**17-13789; Anthony Sevy v. Philip Barach**

**PHILIP BARACH (Adverse Witness) - Direct**
**Tuesday/June 28, 2022**

1    or he's just not going to walk out the door completely.

2    **Q.**   Okay.  So, you're concerned about the overall safety in

3    the courthouse?

4    **A.**   I'm just doing my job, I'm having him leave.

5    **Q.**   All right.  Can you play it -- let's just go frame by

6    frame at this point.

7                      (Video Recording Played.)

8    **BY MR. SEWARD,** CONTINUING:

9    **Q.**   Back up one frame.  One more.  Stop.  Can you blow that

10   up, please?

11       Now, let's take a look at your fingers.  Are your fingers

12   on his throat?

13   **A.**   No.

14   **Q.**   Are your fingers toward his shoulder collar?

15   **A.**   Yes.

16   **Q.**   Okay.  Are you strangling him?

17   **A.**   No, sir.

18   **Q.**   Can you strangle with your hand in that position?

19   **A.**   I can't.

20   **Q.**   Why can't you?

21   **A.**   Well, I crashed my mountain bike and I had -- instead of

22   dislocating one finger and one thumb, these all four went at

23   90 degrees and I had to have pins in them for 58 days.  I don't

24   have much strength in my left hand.

25   **Q.**   And did you have much strength in your left hand on

1    February 13th of 2017?

2    **A.**   No, sir.

3    **Q.**   Okay.  Now, let's keep playing it.  Now, is he willingly

4    just walking out the door?

5    **A.**   I'm trying to arrest him.  I'm trying to gain control of

6    Mr. Sevy and I'm going to eventually try to throw him on the

7    ground and handcuff him.

8    **Q.**   And is he resisting?

9    **A.**   Yes, sir.

10   **Q.**   Okay.  And so do you understand, there's no claim of false

11   arrest in this lawsuit, is that your understanding?

12   **A.**   It's my understanding.

13   **Q.**   All right.  And, in fact, he's got a conviction for

14   disturbing the peace, is that your understanding?

15   **A.**   I think disorderly person is probably proper terminology.

16   **Q.**   Okay.  Can you arrest someone without using force?

17   **A.**   Probably happens on rare times.  Someone will comply, put

18   their hands right behind their back.

19   **Q.**   Did Mr. Sevy?

20   **A.**   No, sir.

21   **Q.**   Now, there has been a lot of questions.  Did you give him

22   the opportunity to do so?

23   **A.**   At that point I didn't give him any opportunity.  I just

24   grabbed him to arrest him.

25   **Q.**   Why?  Why did you do that?  Explain to the jury why that's

PHILIP BARACH (Adverse Witness) - Direct
Tuesday/June 28, 2022

163

1    the right thing to do?

2    **A.**    Felt it was time.  I felt we keep playing around, playing

3    around and he didn't need to be told to leave any more.

4    **Q.**    Now, the elevator situation.  Did you anticipate that he

5    would headbutt you?

6    **A.**    No.

7    **Q.**    Did you violently slam his head up against the door?

8    **A.**    No, and I wasn't aware they were saying that either.

9    **Q.**    Okay.  What happened?

10   **A.**    At some point I backed him into the elevator and he

11   slammed his head against my nose, startled me, made my eyes

12   water and I just threw him on the ground again.

13   **Q.**    Now, if he says he was just trying to shake that hood off

14   of his head, does that matter to you?

15   **A.**    I already had the hood off his head.

16   **Q.**    Okay.  And so the fact is that he hit your nose, right?

17   **A.**    Yeah.

18   **Q.**    Did he break your nose?

19   **A.**    No, I'm not claiming I'm seriously injured.

20   **Q.**    Did he break the skin?

21   **A.**    No.

22   **Q.**    Did it bleed?

23   **A.**    No.

24   **Q.**    So, why did you have to take him down to the ground?

25   **A.**    To keep him under control.

1    **Q.**    So he can't do it again?

2    **A.**    Correct, sir.

3    **Q.**    Did you know his intentions?

4    **A.**    I don't know them, I just know he wasn't very cooperative.

5    **Q.**    Now, can we go to the booking view?  It should be

6    upstairs, the holding cell.  There we go.  Can you play that.

7    Now, let's stop it right here.

8          At any time did he complain to you that he was

9    unconscious?

10   **A.**    No, sir.

11   **Q.**    Did he say anything about defecating in his underwear?

12   **A.**    No, sir.

13   **Q.**    All right.  Let's play it.

14   **A.**    I mean, you want me to tell you what I'm doing here or

15   not?

16   **Q.**    Sure.

17   **A.**    Okay.  I'm taking his handcuffs off.  We take his coat and

18   his shoes and put his personal property in a plastic bag and

19   label it.  And I'm going to pat him down.  I crotch him.  He

20   had --

21   **Q.**    Hold on.  What do you mean crotched him?

22   **A.**    Make sure there's no weapons, or ink pens, or tooth

23   brushes or anything he's not supposed to have on him.

24   **Q.**    So, do you run your hand underneath his crotch?

25   **A.**    Yeah, for a male.

**PHILIP BARACH (Adverse Witness) - Recross**
**Tuesday/June 28, 2022**                         165

1   **Q.**   Okay.  Go ahead (Video playing).  Did he at all walk funny

2   like he had a mess in his pants?

3   **A.**   No, and I do pat him down subsequent to this pretty

4   shortly here I believe.  He looks fine.  See my left hand, my

5   right hand, both of them on his crotch.  Ain't nothing wrong

6   with him.

7   **Q.**   Okay.  Now, what are you doing?

8   **A.**   I think I'm going to leave the room.  I think the other

9   guys finish this.  They're going to make him sit down, take his

10  shoes and shake his shoes out.

11  **Q.**   Take a look at it?

12  **A.**   All right.  They must have asked me to do it again or I'm

13  looking to see if he's got anything in his pockets because . .

14  .

15  **Q.**   Have you had any other contact with him?

16  **A.**   No, I never saw him again after this.

17         **MR. SEWARD:**  Thank you, Mr. Barach.  I have no other

18  questions.

19         **THE COURT:**  All right.  Thank you, Mr. Seward.

20      Mr. Marko.

21         **MR. MARKO:**  Thank you, Your Honor.

22      Mr. Seward, your notes are up there, I don't want to see

23  your secret notes.

24         **MR. SEWARD:**  Thank you.

25                         -   -   -

**17-13789; Anthony Sevy v. Philip Barach**

PHILIP BARACH (Adverse Witness) - Recross
Tuesday/June 28, 2022

166

1                         RECROSS-EXAMINATION

2     BY MR. MARKO:

3     Q.   All right, sir, you've got to clear a couple things up.

4     A.   Yes, sir.

5     Q.   So, this whole idea -- I thought I heard you say that in

6     all the hundred times that you've arrested people it's a rare

7     thing for you to be able to arrest someone without having to

8     use force on them?

9     A.   Typically you have to use force.

10    Q.   You're telling me, sir, that the general population, when

11    you tell them, "You're under arrest, give me your hands," you

12    have to take them down to the ground to arrest them?

13    A.   No.  Sometimes when we have warrant pickups and stuff

14    they're pretty cooperative.  They just go.  I've had drunk

15    drivers be cooperative, I've had them be uncooperative.

16    Q.   When the defense counsel asked you, you said it's a rare

17    occasion that somebody could be arrested without using force?

18    A.   Well, I'm thinking back to my last ten years when I worked

19    the downtown detail and all we did was seven guys and the

20    supervisor went from bar fight to bar fight from 11:00 p.m. to

21    3:00 a.m., so that's a different type of crowd, sir.

22    Q.   A different type crowd than a courtroom crowd, right?

23    A.   Yes, sir.

24    Q.   And we can't compare what happens out in the streets at

25    midnight, passed midnight in the early hours, in the darkness

17-13789; Anthony Sevy v. Philip Barach

1   of the night, with people who you are encountering who are

2   drunk and intoxicated, to what occurred in this case?

3   **A.**    You're correct, Mr. Marko.

4   **Q.**    Apples and oranges, sir, right?

5   **A.**    Yes, sir.

6   **Q.**    And you talked about this coin thing.  So, this coin

7   thing, how do we understand this?  You told us that they

8   weren't going to accept the coins, right?

9   **A.**    It's what it appeared to be to me that they're having some

10  trouble at the counter and they didn't want them to take them

11  and Mr. Sevy wanted them to take them.

12  **Q.**    And that the clerk wasn't going to take them, correct?

13  **A.**    That's what it looked like to me.

14  **Q.**    And that you would change the policy.  We saw an exhibit

15  --

16  **A.**    I changed the policy?

17  **Q.**    I'm sorry.  When I say you -- I guess that was unfair.

18  The Royal Oak Courthouse that you were employed by and working

19  in your capacity at the time of this incident, you told us

20  about the story, on questioning from the defense counsel, about

21  how you change up -- you don't accept pennies any more?

22  **A.**    Not me, the court.

23          **MR. SEWARD:**  He didn't say he changed up.

24          **THE WITNESS:**  The court, sir, I understand it.

25

1   **BY MR. MARKO**, CONTINUING:

2   **Q.**   I'm not trying to say, sir, that you controlled the

3   policies of the Royal Oak Courthouse.  But I thought you told

4   us a story to explain why this happened?

5   **A.**   I'm pretty sure that's why it happened.

6   **Q.**   Okay.  Now, if that's the case, they weren't going to take

7   Mr. Sevy's pennies, why would the clerk tell him, "We'll accept

8   rolled pennies"?

9   **A.**   I didn't know anything about that until, like, four years

10  later.

11  **Q.**   But you understand that that's what she said in a

12  statement?

13  **A.**   I think that's what occurred, but I didn't hear any of

14  that, sir.

15  **Q.**   And you understand that your attorney, you were sitting

16  here when she did opening and said the court was going to

17  accept the coins?

18  **A.**   Yes, had he written his name and address on it.  That's my

19  understanding now.

20  **Q.**   Now, it's five year's later?

21  **A.**   Much later, yes, sir.

22  **Q.**   Did the guy who tried to pay with $17,500 pennies get

23  choked out to the point of defecating in his pants?

24  **A.**   No.

25  **Q.**   Why not?

1    **A.**   Because when I told him, I said -- I don't know what

2    exactly, I said, "I'm pretty sure they're not taking these."

3    And he said, "Who says that?"  I heard this loud, booming voice

4    behind me, "I did," and it turned out to be the court

5    administrator was standing behind him when he walked in and it

6    ended pretty quickly and he just left.

7    **Q.**   Okay.  No need to use force in that instance?

8    **A.**   That's correct, sir.

9    **Q.**   Now, we talked a little bit about -- we heard a lot about

10   swearing, "M-F this," "M-F that," all these horrible

11   profanities, right?

12   **A.**   They're profanities.

13   **Q.**   You're used to that, right?

14   **A.**   Sure.

15   **Q.**   People sometimes -- you have all kinds of people coming in

16   the courthouse and working in Royal Oak.  You're used to people

17   using profanities all the time, right?

18   **A.**   I hear them.

19   **Q.**   You use them, too, don't you?

20   **A.**   Sure, on occasion, yes, sir.

21   **Q.**   All right.  And profanities do not justify deadly force,

22   right?

23   **A.**   Well, if it's disturbing the public or causing public

24   alarm, then you can use it -- oh, deadly force?  I answered too

25   quickly.  You're talking about deadly force?  No, you can't use

1    that.

2    **Q.**   Okay.  And since choking is deadly force, profanities

3    don't allow choking or strangulation?

4    **A.**   I agree to that, sir.

5    **Q.**   And profanities don't allow you to increase your level of

6    force on someone, right?  If you were going to have take them

7    down to the ground because you heard them swear or say bad

8    things about you, you can't throw them twice as hard into the

9    ground, can you?

10   **A.**   I take them down with whatever force it requires.  But

11   you're right, no, you can't use excessive for that.

12   **Q.**   But it's the same level of force regardless of what they

13   said?

14   **A.**   He was being arrested -- I was arresting him for being

15   disorderly.

16   **Q.**   But you're not trying to tell us that if the jury believes

17   that Anthony Sevy swore, that it was okay to choke him?

18   **A.**   You're right, it's not okay.

19   **Q.**   Or that because he swore, it was okay to use excessive

20   force on him?

21   **A.**   You're correct, sir.

22   **Q.**   And you said in your deposition, and I thought I heard you

23   say here today, that he was pointing and he did a three, he did

24   everyone.  He said, "You can . . .," I won't say the words?

25   **A.**   Yeah, I don't know if he pointed, but he said, "You can do

1   this" and "You can do this" and "You can do that."

2   **Q.**   You said he pointed?

3   **A.**   Well, maybe I misspoke.

4   **Q.**   You said he pointed --

5   **A.**   I said maybe I misspoke.

6   **Q.**   Let me tell you what you said because I have the

7   transcript right here.

8   **A.**   I'm sure you do.  I'm sure you do.

9            **MR. SEWARD:**  Can we have the page, please?

10           **MR. MARKO:**  Yes, Page 38.

11  BY MR. MARKO, CONTINUING:

12  **Q.**   All right.  You said today, before the attorney showed you

13  the video, that he pointed at Mr. Marshall --

14  **A.**   If I said that Mr. Sevy pointed, I misspoke.  He did use

15  those words, sir.

16  **Q.**   And you said at the time of your deposition again that he

17  pointed as he was saying these things, right?

18  **A.**   You're asking me later on to try to recall what happened.

19  I know he said them, I don't remember if he pointed or not.

20  **Q.**   You said on 10-4-2018, he pointed.  And then you had your

21  defense attorney even identify the exact moment in this video,

22  you were very clear, that was the moment that he said this.

23  **A.**   I said he said them, I don't remember saying he pointed.

24  I'm trying to answer your question.

25           **MR. SEWARD:**  Can you show him his deposition?

1    BY MR. MARKO, CONTINUING:

2    **Q.**   You said, quote, "She can . . .," and I'm not going to

3    repeat here.

4    **A.**   I understand that.

5    **Q.**   And he pointed to Harold, Mr. Marshall, right and said --

6    **A.**   Maybe he looked at them.  But he insinuated, Sylvia can do

7    this, Harold could I do this, and I could do that.  That was

8    turning around on his way to exit.

9    **Q.**   You're withdrawing that statement?  You were wrong when

10   you said that?

11   **A.**   If I said he pointed, maybe I misspoke.

12   **Q.**   Okay.  And the clerk never -- this idea this clerk behind

13   this glass, she never called for help.  There's a button,

14   right, that if she feels threatened and there's an actual

15   button underneath and she can push for emergency, right?

16   **A.**   I think one of them pushed it, but not her.

17   **Q.**   Well, one of them pushed it after Mr. Sevy was getting

18   thrown to the ground in the vestibule, sir, isn't that true?

19   **A.**   I know somebody pushed it.

20   **Q.**   Sir, nobody pushed that button until Mr. Sevy was taken to

21   the ground?

22   **A.**   That's correct.  I'm not disputing that.

23   **Q.**   Okay.  So, let's just make sure --

24   **A.**   I just made it clear.

25   **Q.**   Precision, right?  We're talking precision.  We've got to

1  be precise.  It would have been a different experience if she

2  was pushing an emergency button because she was so scared that

3  she could get hurt?

4  **A.**   Well, she was behind glass.

5  **Q.**   She was behind glass.

6  **A.**   She wasn't going to get hurt physically.

7  **Q.**   You can't get back there.  She wasn't going to be hurt,

8  correct?

9  **A.**   I said that, yeah.

10  **Q.**   She didn't press the emergency button to call for help,

11  did she?

12  **A.**   You're correct, sir.

13  **Q.**   She didn't call you over.  She didn't yell, "Hey,

14  Marshall, hey, defendant, Mr. Barach, come over here."  She

15  didn't do that, did she?

16  **A.**   She didn't need to, I could see what was going on.

17  **Q.**   As far as you could tell, her safety was not, in any way,

18  jeopardized?

19  **A.**   Correct, sir.

20  **Q.**   Okay.  And this arrest, now, are you saying now that you

21  can arrest anyone, at any time, for anything?

22  **A.**   I'm not a policeman any more.  I don't arrest anybody.

23  **Q.**   All right.  Let's go back to 2017.

24  **A.**   Okay.  I wasn't -- I can do -- I had an arrest authority

25  in the court.

**PHILIP BARACH (Adverse Witness) - Recross**
**Tuesday/June 28, 2022**

174

1   **Q.**   Right, but you can't arrest anybody, at any time, for

2   anything?

3   **A.**   That's correct.

4          **MR. SEWARD:**  Your Honor, I think this goes beyond the

5   scope of my direct.

6          **THE COURT:**  Overruled.

7   **BY MR. MARKO**, CONTINUING:

8   **Q.**   You can't arrest any -- like, you can't say, "Mr. Marko,

9   you're really getting under my skin, I'm going to arrest you"?

10  **A.**   Yeah, can't do that.  You're right.

11  **Q.**   Can't do that, right?  Can't say, "I don't like the way

12  you look, I'm going to arrest you."  You have to have a valid

13  basis under the law to perform an arrest, right?

14  **A.**   You're correct, sir.

15  **Q.**   And you already told us that prior to this going into the

16  vestibule that --

17         **MR. SEWARD:**  You know, Your Honor, if he's -- there's

18  no false arrest claim here and I think that's already clear.

19  So, I object to the relevancy and the suggestion that somehow

20  he did have the authority to arrest.  I object to that.

21         **THE COURT:**  There was no question, so let me hear the

22  question.

23  **BY MR. MARKO**, CONTINUING:

24  **Q.**   Okay.  Because you were asked a whole bunch of questions

25  about your attorney now about:  Profanity, profanity,

**17-13789; Anthony Sevy v. Philip Barach**

**PHILIP BARACH (Adverse Witness) - Recross**
**Tuesday/June 28, 2022**

175

1  profanity; arrest, arrest, arrest.  Do you remember that?

2  **A.**   Yes.

3  **Q.**   Okay.  So, I need to address this because this is now

4  something that I need to address.  But when we talked, you said

5  there was no arrest until this tense up?

6  **A.**   That's because I showed him a lotta, lotta leeway to

7  leave, without being arrested.

8  **Q.**   And you showed us with your defense attorney, you were

9  nice enough to show with him on this tensing up.  You remember

10  you grabbed his arm?

11       **MR. SEWARD:**  That mischaracterizes it.  I showed it.

12       **MR. MARKO:**  We showed it together.  We'll say that.

13  Can we say that?

14  **BY MR. MARKO,** CONTINUING:

15  **Q.**   You showed it together.  Remember that?

16  **A.**   I want to know your question, sir.

17  **Q.**   That was the basis that you told me, before you were

18  questioned by your attorney on why you needed to arrest

19  Mr. Sevy, not because he said bad things?

20  **A.**   It all came into play.

21  **Q.**   But the decision to arrest, remember we wrote it down

22  together?

23  **A.**   Yes, sir, I remember saying that.

24  **Q.**   Was that truthful?

25  **A.**   Yes.

PHILIP BARACH (Adverse Witness) - Recross
Tuesday/June 28, 2022

176

1    **Q.**   Was this tense up.

2         Now, you also said, let's look at this, Charlie, just go

3    ahead and let's watch this in slow motion here.  This choking

4    and you still are taking the stance, sir, I just want to make

5    sure because this is the last time I get to question you in

6    this case, ever, okay.

7    **A.**   Okay.

8    **Q.**   That you did not choke Mr. Sevy, you still want to tell us

9    that?

10   **A.**   Yes, sir.

11   **Q.**   And that you never put your hand on his throat?

12   **A.**   Grabbed him up here by his collar.  If it slipped up there

13   for a second or two, that was it.

14   **Q.**   Can we zoom in on that?

15         **MR. SEWARD:**  Want to look at it on this monitor?  We

16   can turn it around.

17         **MR. MARKO:**  It's okay.  I trust Charlie.

18         **THE WITNESS:**  All I'm doing is gaining control over

19   him.  I'm not choking him.  I'm not strangling him, like the

20   language you use.

21   **BY MR. MARKO,** CONTINUING:

22   **Q.**   You're not touching his neck?

23   **A.**   I could be right there, part of my hand, maybe, I don't

24   know.

25   **Q.**   What do you mean, like your hand brushed against his neck?

**17-13789; Anthony Sevy v. Philip Barach**

1   **A.**   I'm not saying that.  I'm just grabbing him somewhere to

2   gain control and put him on the ground, sir.

3   **Q.**   All right.  And you decided to use your left hand to do

4   that?

5   **A.**   I guess it was closest to him.

6   **Q.**   Okay.  We talked about the elevator.

7   **A.**   Yes, sir.

8   **Q.**   Okay.  I don't want to have to show the jury this picture

9   again, and I promised them in opening I wasn't going to show it

10  again, only once, this picture of the feces?

11  **A.**   Never saw it.

12  **Q.**   Okay.  But you saw it in my opening, right?

13  **A.**   N'all, I didn't look.  I don't need to look.  I mean, I

14  believed you that it was there.

15  **Q.**   All right.  And I know that bag was given him by the Royal

16  Oak Police?

17  **A.**   All right.  But I left after I patted him down.  So, I

18  left this holding cell.  What happened subsequent to that, you

19  have to ask the Royal Oak Police.

20  **Q.**   Did you pull his underwear out to look inside?

21  **A.**   No, I did not.

22  **Q.**   Okay.  And you were asked about statements that Mr. Sevy

23  may or may not have made to you at that time.  Do you think it

24  would be unreasonable for a civilian who was just -- if they

25  were assaulted two times, in two different locations --

**PHILIP BARACH (Adverse Witness) - Recross**
**Tuesday/June 28, 2022**

178

1  **A.**   I'm listening.

2  **Q.**   So, in a public courthouse area and then in an elevator,

3  in the elevator that we talked about, who is handcuffed and has

4  police officers coming around him, do you think it would be

5  reasonable that maybe they don't want to make statements to the

6  person who did that to them?

7         **MR. SEWARD:**  Calls for speculation, Your Honor, I

8  object.

9         **THE COURT:**  All right.  If the witness can answer.

10        **THE WITNESS:**  Well, I can't answer what Mr. Sevy was

11  thinking.

12  **BY MR. MARKO,** CONTINUING:

13  **Q.**   Okay.  Would you be surprised that he didn't make a

14  statement?  Did he make any other statements to you up there?

15  **A.**   He never talked to me, sir.

16  **Q.**   He never talked to you at all, right?

17  **A.**   I don't believe so.  No, sir.

18  **Q.**   And who -- one moment, sir (brief pause).  Sir, what you

19  told us today is the reason that you took him down in the

20  elevator is because he headbutted you?

21  **A.**   That's true, sir.

22  **Q.**   So, you threw him to the ground again?

23  **A.**   Yeah, and that was it.

24  **Q.**   And, sir, you knew the Royal Oak Police came in and

25  watched the video?

**PHILIP BARACH (Adverse Witness) - Recross**
**Tuesday/June 28, 2022**

179

1   **A.**   What you talking about?  You mean just them?

2   **Q.**   Yeah.

3   **A.**   I don't know.

4   **Q.**   Well, did they watch it with you?

5   **A.**   No.  I never saw the video ever, maybe until just

6   recently.  I didn't care about it.  I never watched it.  Didn't

7   mean anything to me.

8   **Q.**   Okay.  And the Royal Oak took a statement from you that

9   day, right?

10  **A.**   I wrote a witness statement, yeah.

11  **Q.**   And you told them what happened?

12  **A.**   I believe so, yes, sir.

13  **Q.**   And is it your testimony that you told them -- well,

14  Strike that.

15      You understand that the Royal Oak Police released

16  Mr. Sevy?

17  **A.**   I didn't know that that day.  I probably got off, went

18  home.  I might have found out much later.  I didn't know if he

19  had went across the street, if they were going to hold him for

20  arraignment.  I think they probably released him pending

21  further investigation and then the chief or someone deemed it

22  necessary to turn it over to the Oakland County sheriffs.

23  That's all the knowledge that I had about it.

24  **Q.**   Sir, do you know who Police Officer Wern is?

25  **A.**   Yes, yes, sir.

**PHILIP BARACH (Adverse Witness) - Recross**
**Tuesday/June 28, 2022**

1  **Q.**  Who is he?

2  **A.**  He might have worked with me for a couple of years before

3  I retired.

4  **Q.**  So, this is another police officer you knew from the

5  force?

6  **A.**  Yes, he is, I knew him.

7  **Q.**  Okay.  And he's one of the officers that responded,

8  because remember you were asked by your counselor about these

9  officers who responded to the scene?

10 **A.**  Yeah, I probably knew a couple of them and didn't know a

11 couple of them.

12 **Q.**  Okay.  I think he said, remember he asked you, like, do

13 you know one, two, four or whatever?

14         **MR. SEWARD:**  I never asked any of those questions.

15         **THE WITNESS:**  He may have, but --

16         **MR. SEWARD:**  No, I didn't.

17         **THE COURT:**  There was questioning about officers.  He

18 can inquire.

19 **BY MR. MARKO,** CONTINUING:

20 **Q.**  And Mr. Wern was one of the police officers who came to

21 investigate this incident, wasn't he?

22 **A.**  I believe.  He came over.

23 **Q.**  And you talked to him, didn't you?

24 **A.**  I think I did, maybe -- I don't know if I talked to

25 Stehlin.  I might have talked to Wern.  I don't remember.

1    **Q.**   And you remember, like, they had these body cameras?

2    **A.**   Yeah, they didn't have them when I worked, but I think

3    they had them.

4    **Q.**   Okay.  Sir, you talked to Officer Wern about, quote,

5    "Getting your ducks in a row," following this incident?

6    **A.**   I don't recall that.

7    **Q.**   If that's in a transcript, do you have any reason to

8    disagree?

9    **A.**   No, no, I don't.  I said that word, "Get your ducks in a

10   row"?

11   **Q.**   We have to get our ducks in a row.

12           **MR. SEWARD:**  You know, I have to object.  This is

13   beyond the scope of my cross examination.

14           **THE COURT:**  Overruled.

15           **THE WITNESS:**  I don't recall that, Mr. Marko.

16   **BY MR. MARKO**, CONTINUING:

17   **Q.**   Sir, if it's in -- do you have any reason to disagree if

18   that's what's in the transcript.

19   **A.**   If I said it, I said it.  I don't recall saying it.

20   **Q.**   All right.  It was talked about, "So, if this plays out,

21   let's say the guy gets an attorney," you had that conversion

22   with Mr. Wern?

23   **A.**   I don't remember that.

24   **Q.**   Well --

25   **A.**   I don't.

**PHILIP BARACH (Adverse Witness) - Recross**
**Tuesday/June 28, 2022**

182

1  **Q.**  Well, would it be surprising that you're talking to your

2  buddy from the force, following this incident, while Mr. Sevy

3  is sitting in a jail cell, about getting your ducks in a row?

4  **A.**  I don't remember when Wern came over, if it was 20

5  minutes, five minutes, ten minutes, I don't remember.

6  **Q.**  So, what was meant by this, "Get our ducks in a row"?

7  **A.**  I don't remember saying it.  But if you say I said it, I

8  said it.

9  **Q.**  And were you worried about Mr. Sevy getting an attorney at

10  that time?

11  **A.**  No.

12  **Q.**  Were you worried about what the video was going to show?

13  **A.**  I didn't even know the video was working.

14  **Q.**  Oh, you didn't know the video was -- you thought --

15  **A.**  They kept calling them and having technicians working on

16  it.  I mean, they replaced an old video system because the

17  camera angles weren't right, but that's all I know about it.

18  **Q.**  So, at the time, you didn't even think the system was

19  working at all, right?

20  **A.**  I knew the techs had been there re-wiring through the

21  ceiling tiles.

22  **Q.**  So, there would be no video of any of this?

23  **A.**  Oh, I don't know.  They wanted to be able to see different

24  camera angles.  And I thought there was an audio when you told

25  me there was a video.  I didn't know anything about it.

**PHILIP BARACH (Adverse Witness) - Redirect**
**Tuesday/June 28, 2022**

183

1          **MR. MARKO:**  Thank you, sir.

2          **THE COURT:**  Mr. Seward, anything further?

3          **MR. SEWARD:**  Yes.

4                         -   -   -

5                   **REDIRECT EXAMINATION**

6    **BY MR. SEWARD:**

7    **Q.**   Did you ever tell Officer Wern, "We have to get our ducks

8    in a row"?

9    **A.**   I don't recall that.  I could have, but I don't know why.

10   **Q.**   Now, I'm going to show you part of what's Defendant's

11   Exhibit Number 4, which is your statement.  I'd just like you

12   to review it.

13   **A.**   Okay.  Yeah, I see it.

14   **Q.**   Anywhere in that statement that you say, "We have to get

15   our ducks in a row?"

16   **A.**   Not, in this statement.  This is the witness statement

17   that I wrote.

18   **Q.**   Right, right after the incident, right?

19   **A.**   Yeah.

20   **Q.**   Okay.  And it says the exact same things that you told us

21   today about him saying, "Suck my . . .,"  you know what?

22   **A.**   Actually, I haven't seen this in four years.  I can see

23   what he's saying now.  Now I remember it.

24          **MR. MARKO:**  Judge, I'm going to object.  This is

25   hearsay.

**PHILIP BARACH (Adverse Witness) - Redirect**
**Tuesday/June 28, 2022**

184

```
 1              THE COURT:  Sustained.

 2              MR. SEWARD:  It's being used to counter that he said

 3    something different.

 4              THE COURT:  Sustained.

 5              MR. MARKO:  And I never said --

 6              THE COURT:  I sustained the objection.

 7              MR. SEWARD:  And I'm not offering it into evidence

 8    yet.

 9              THE COURT:  That's the point.  I mean, if there's a

10    question and this witness needs his recollection refreshed, we

11    can deal with that.

12    BY MR. SEWARD, CONTINUING:

13    Q.   Okay.  Does that refresh your recollection?

14    A.   I mean, it's basically almost the same, but it helps.

15    Q.   And is there any indication of you saying, "We got to get

16    our ducks in a row"?

17    A.   No, not on this written statement.

18              MR. SEWARD:  All right.  Thank you.  I have no other

19    questions.

20              THE COURT:  All right.  Thank you, Mr. Barach.  You

21    may step down.

22         And Mr. Marko, you may call your next witness, please.

23              MR. MARKO:  Okay, Judge.  Let me just grab my folder.

24    We're going to call Officer Marshall.

25              MS. HENDERSON:  Can I go and get him, Your Honor?
```

**17-13789; Anthony Sevy v. Philip Barach**

HAROLD MARSHALL (Adverse Witness) - Cross
Tuesday/June 28, 2022

185

```
 1          THE COURT:  Yes.  Sure.

 2      All right.  Mr. Marshall, come right up to the front.

 3  We're going to put you in this seat right up here.

 4                       -   -   -

 5                  HAROLD MARSHALL,

 6      at 12:56 p.m., being first duly sworn by the

 7      Court to tell the truth, was examined and

 8      testified upon oath as follows:

 9          THE COURT:  Thank you.  Have a seat.  And, sir, if

10  you wish to remove your mask to testify, that's fine.  The

11  chair does not move, but the microphone does.  So, if you need

12  to readjust it.

13      Mr. Marko, you may proceed.

14                       -   -   -

15                  CROSS-EXAMINATION

16  BY MR. MARKO:

17  Q.  Good afternoon sir.

18  A.  Good afternoon, counsel.

19  Q.  So, let's just talk a little bit about who you are.  We

20  only have an half hour.  We'll do as much as we can to get you

21  out of here.  We know by now you are a security officer at the

22  Royal Oak Courthouse, correct?

23  A.  Yes, sir.

24  Q.  And you were working on the date of this incident, right?

25  A.  Yes, sir.
```

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

1   **Q.**   And you had a long-working relationship with the

2   defendant?

3            **MS. HENDERSON:**  I'm going to object to form, Your

4   Honor.  Leading.

5            **MR. MARKO:**  He's an adverse witness, Your Honor.

6            **THE COURT:**  He's calling him as an adverse witness.

7   I'll allow it.

8            **THE WITNESS:**  Yes, sir.

9   **BY MR. MARKO,** CONTINUING:

10  **Q.**   Okay.  And how long did you guys work together?

11  **A.**   Since I came over to the 44th District Court from the

12  Berkley District Court.

13  **Q.**   And how long is that?

14  **A.**   Four, five year's about.  I believe we came over in 2013,

15  I may be wrong.

16  **Q.**   Okay.  So, about five year's, I'm not going to hold you to

17  it exactly.  But the point is, you guys worked together on a

18  daily basis when you were at the courthouse?

19  **A.**   Yes.

20  **Q.**   And you guys were cordial with each other?

21  **A.**   Yes.

22  **Q.**   And you had a good working relationship?

23  **A.**   Yes.

24  **Q.**   And you look out for your -- was he a partner?

25  **A.**   Yes.

**17-13789; Anthony Sevy v. Philip Barach**

1   **Q.**   Okay.  And he looked out for you, right?

2   **A.**   Yes.

3   **Q.**   Let's go straight to the elevator incident, I'd like to

4   start there.  There was a point where Anthony said he was taken

5   into an elevator, correct?

6   **A.**   Yes.

7   **Q.**   And just to be clear because we talked a little bit about

8   the setup of this courthouse.  The courtrooms are on the second

9   floor of this courthouse, is that true?

10  **A.**   Yes.

11  **Q.**   Okay.  On the first floor there's the clerk's, kind of,

12  division where you could pay parking tickets and the like?

13  **A.**   Yes.

14  **Q.**   And then on the far end is the probation division,

15  correct?

16  **A.**   Yes.

17  **Q.**   Okay.  But there's no courtrooms down there, right?

18  **A.**   There is a Magistrate's courtroom.

19  **Q.**   Oh, Magistrate's courtroom, okay.  But the Judges, the

20  District Court Judges are upstairs, correct?

21  **A.**   Correct.

22  **Q.**   And the Magistrate's does, like, parking tickets and

23  stuff, right?

24  **A.**   Correct.

25  **Q.**   And they're not in there all the time or they are in there

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

188

1   on certain days they do parking tickets?

2   **A.**   Correct.

3   **Q.**   Okay.  So, after Mr. Sevy is being taken out, let's -- can

4   you see this video, Officer Marshall?

5   **A.**   Yes.

6   **Q.**   All right.  So, Mr. Sevy, can you see him with his hood

7   over his head going through the metal detecter?

8   **A.**   Yes.

9   **Q.**   And you're there and you're with, I believe it's the head

10  of the Clerk's Office?

11  **A.**   I believe that's the Deputy Court Administrator.

12  **Q.**   Okay.  Gary Dodge?

13  **A.**   No, that's Lori, last name -- she's the Deputy Court

14  Administrator.

15  **Q.**   All right.  So, Mr. Sevy's handcuffed behind his back,

16  right?

17  **A.**   He is.

18  **Q.**   And the defendant's taking control of him, right?

19  **A.**   Correct.

20  **Q.**   And there was absolutely no resistance on the way to the

21  elevator whatsoever, correct?

22  **A.**   Correct.

23  **Q.**   And he wasn't threatening you or trying to kick you or

24  punch you or run away or anything like that?

25  **A.**   No.

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

189

1    **Q.**   Okay.  "Complying," is the word, right?

2    **A.**   Yes.

3    **Q.**   Okay.  So, you and Mr. Barach -- go ahead and play it,

4    Charlie -- you two go into this elevator, correct?

5    **A.**   Correct.

6    **Q.**   Now, we had the defendant estimate and he agreed that you

7    see on the floor in front of you the tape, it's not part of the

8    courtroom normally -- no, no, officer, right here.

9    **A.**   Yes, sir (Witness looking on floor in front of him).

10   **Q.**   Okay.  Now, the defendant agrees that this is roughly a

11   good approximation of the size of the elevator, would you agree

12   with that?

13   **A.**   It's approximate.

14   **Q.**   Okay.  Great.  So, you go into the elevator and where does

15   the defendant stand in the elevator, sir?

16   **A.**   He was on -- he was in front of Officer Barach on the west

17   side of the elevator.

18   **Q.**   Okay.  You know my client's not a defendant in this case?

19   I know you're used to calling the civilian the defendant

20   working at the courthouse.

21   **A.**   I apologize.

22   **Q.**   That's okay.  Anthony is the plaintiff in this case, so,

23   no problem.  When I say, "The defendant," I'm referring to

24   Defendant Barach?

25   **A.**   Correct.

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

190

1  **Q.**  So, where was the defendant in the elevator?

2  **A.**  He was behind Mr. Sevy on the west side of the elevator.

3  **Q.**  Okay.  So, if this is the elevator and we orient -- I'll

4  bring you up to speed.  This side is where the two doors are,

5  they open and close, facing the jury.

6  **A.**  Yes, sir.

7  **Q.**  And closest to you, that's the back of the elevator.

8  **A.**  Yes.

9  **Q.**  Okay.  Can you show us where -- maybe it would be easier

10  -- Charlie, can you come up here and represent the defendant?

11  Tell Charlie where to stand and he'll represent the defendant.

12  **A.**  Stand with your back -- no, turn back a little bit, in the

13  middle (Demonstration).

14  **Q.**  Okay.  Thank you very much.

15  So, this is Defendant Barach?

16  **A.**  Yes.

17  **Q.**  And his back is toward the wall of the elevator?

18  **A.**  Yes.

19  **Q.**  Okay.  And -- so the doors are right here, right?

20  **A.**  Yes.

21  **Q.**  I just want to make sure we're oriented together.  Okay.

22  What about Anthony Sevy, where was he positioned in the

23  elevator?

24  **A.**  He was -- his back would be to his chest.

25  **Q.**  Okay.  So, maybe -- Craig, will you please be Anthony

**17-13789; Anthony Sevy v. Philip Barach**

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

191

1    Sevy?  Because you understand there's no cameras from inside

2    the elevator?

3    **A.**    Correct.

4    **Q.**    So, I'm doing the best I can.  Now, tell Craig where to

5    stand?

6    **A.**    He's standing in the right spot (Demonstrating).

7    **Q.**    Okay.  Now, why don't you stand where you were actually

8    standing at the time?

9    **A.**    Okay (Demonstrating).

10   **Q.**    So, Officer Marshall, you're standing where you were

11   standing at the time?  Is this an actual demonstration

12   depiction?

13   **A.**    Yes.

14   **Q.**    You agree that Anthony Sevy was thrown to the ground in

15   the elevator?

16   **A.**    Yes.

17   **Q.**    Sir, you -- your testimony is that you didn't see why,

18   true?

19   **A.**    Correct.

20   **Q.**    Your testimony is, despite standing directly in front of

21   Anthony Sevy, with him directly in front of you, that you were

22   looking at his feet the whole time?

23   **A.**    Yes.

24   **Q.**    And that you never saw and cannot tell us, even here

25   today, why in the world Anthony Sevy was thrown to the bottom

**17-13789; Anthony Sevy v. Philip Barach**

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

192

1    of the elevator?

2    **A.**    Correct.

3    **Q.**    And that you never saw Anthony Sevy headbutt anybody,

4    that's true?

5    **A.**    Correct.

6    **Q.**    And you never heard him make any threats of violence like,

7    "I'm going to headbutt you," true?

8    **A.**    True.

9    **Q.**    So, there's no video in there.  The only person who can

10   tell us what happened, since you didn't see it, is Anthony Sevy

11   and the defendant?

12   **A.**    Correct.

13   **Q.**    Okay.  Thank you, very much.  Thank you, everybody.  Thank

14   you, Craig.  Thank you, Charlie.

15        All right.  Let's show the -- and by the way, sir, you're

16   a former Berkley Police Officer, right?

17   **A.**    Yes.

18   **Q.**    You don't want to see the defendant get in any trouble at

19   any time, right, if he can avoid it?

20   **A.**    Correct.

21   **Q.**    You are trained as an officer to be aware of your

22   surroundings at all times, right?

23   **A.**    Yes.

24   **Q.**    It's very important -- you do prisoner transport.  I

25   believe you said a Judge even told you once that you had to go

1   do a prisoner transport and you had to use force on a guy,

2   right?

3   **A.**   Correct.

4   **Q.**   And so doing prisoner transports, you're trained to be

5   aware of your surroundings and to always be on alert, right?

6   **A.**   Correct.

7   **Q.**   And to be aware of everything that's going on around you,

8   right?

9   **A.**   Correct.

10  **Q.**   But you didn't see why Anthony Sevy was thrown to the

11  ground?

12  **A.**   I did not.

13  **Q.**   You're not trained to stare at your feet the whole time,

14  are you?

15  **A.**   When you're possibly going to be kicked, maybe in the

16  groin, yes, you are.

17  **Q.**   Did Anthony Sevy kick you?

18  **A.**   His foot brushed my leg; but, no.

19  **Q.**   He never tried to kick you, sir.

20  **A.**   No, sir.

21  **Q.**   You never told anybody that he tried to kick you?

22  **A.**   No, sir.

23  **Q.**   You're not going to tell us today that Anthony Sevy tried

24  to kick you?

25  **A.**   No, sir.

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**                                            194

```
 1    Q.   He didn't try to kick the defendant, did he?

 2    A.   No.

 3    Q.   He never said, "I'm going to kick you"?

 4    A.   No.

 5    Q.   He never did anything that gave you a sincere belief that

 6    he was going to kick you, did he?

 7    A.   No.

 8    Q.   All right.  Let's see it on the video.  (Video playing).

 9    Okay, stop it right there.

10         Sir, is that you right there?

11    A.   Yes.

12    Q.   What are you looking at?

13    A.   His feet.

14    Q.   Whose feet?

15    A.   Whoever is -- I believe that's Mr. Sevy's feet there.

16    Q.   He's on the ground in the elevator on the floor?

17    A.   Yes.

18    Q.   What position was he in down there, by the way, because he

19    has his hands behind his back, doesn't he, in cuffs?

20    A.   Yes.

21    Q.   Is he face down?

22    A.   No.

23    Q.   Tell us?

24    A.   He was sitting on his rear hands, cuffed behind his back

25    in front of Officer Barach on the west side of the elevator.
```

---

**17-13789; Anthony Sevy v. Philip Barach**

1   **Q.**   Okay.  Let's talk a little bit -- you can take that down,

2   Charlie.  Thank you.

3        Let's talk a little bit about use of force and we've

4   already discussed it a lot.  But you would agree that there was

5   no reason to use deadly force on Anthony Sevy?

6   **A.**   Correct.

7   **Q.**   And you agree that choking someone is a form of deadly

8   force?

9   **A.**   Correct.  If you did it long enough, you would kill

10  someone.

11  **Q.**   Right.  And you were never ever trained, were you, sir,

12  that an appropriate technique used to arrest a subject is to

13  grab them by the front of their throat and squeeze?  That was

14  never an approved technique that you ever trained in, was it?

15  **A.**   No.

16  **Q.**   Okay.  And, in fact, you're not allowed to do that, are

17  you?

18  **A.**   No.

19  **Q.**   It's banded, isn't it?

20  **A.**   Yes.

21  **Q.**   Because it can kill somebody?

22  **A.**   It could.

23  **Q.**   Okay.  So -- and then there's a whole bunch of other

24  things, you know, like, you know that you should use your words

25  first, right?

HAROLD MARSHALL (Adverse Witness) - Cross
Tuesday/June 28, 2022

196

1    **A.**    Yes.

2    **Q.**    Words first, you try to deescalate the situation?

3    **A.**    Yes.

4    **Q.**    If you can, right?

5    **A.**    Correct.

6    **Q.**    Even if the suspect is being rude to you.  You've had

7    people be rude to you in your career?

8    **A.**    Yes.

9            **MS. HENDERSON:**  Objection to form.  It was compound.

10           **THE COURT:**  Okay.  If the witness understands it.

11   **BY MR. MARKO,** CONTINUING:

12   **Q.**    Have you ever had people be rude to you?

13   **A.**    Yes, sir.

14   **Q.**    Were they rude to you in your career?

15   **A.**    Yes, sir.

16   **Q.**    And were they rude to you in your capacity as a peace

17   officer?

18   **A.**    Yes, sir.

19   **Q.**    Okay.  You can't use force because they're rude to you,

20   can you?

21   **A.**    No.

22   **Q.**    Okay.  Have you had people swear around you?

23   **A.**    Yes.

24   **Q.**    Have you had people swear around you in your position as a

25   court officer as police officer?

**17-13789; Anthony Sevy v. Philip Barach**

```
 1    A.    Yes.
 2    Q.    You can't use force on someone because they swear at you,
 3    can you?
 4    A.    No.
 5    Q.    It's not illegal to swear, is it?
 6    A.    No.
 7    Q.    People have freedom of speech, don't they?  Even if you
 8    don't like it?
 9    A.    Yes.
10    Q.    Have people said things to you that you don't like and it
11    maybe hurt your feeling or make you upset?
12    A.    Yes.
13    Q.    Are you allowed to use force on them?
14    A.    No.
15    Q.    If someone said, "Oh, it's okay to use force on someone
16    because they said a swear word," that wouldn't be true?
17    A.    Correct.
18    Q.    Okay.  So, did you use words, reason, and logic, I believe
19    that's your mantra, isn't it?  Words first, you try to use your
20    reason, and you use logic when dealing with people?
21    A.    Correct.
22    Q.    And do you try to live by that?
23    A.    Yes.
24    Q.    Are you still working, by the way?  I'm sorry, I didn't
25    ask you that.
```

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

198

1   **A.**   Yes.

2   **Q.**   Okay.  Are you still at Royal Oak?

3   **A.**   Yes.

4   **Q.**   Are things still going well?  Have you had problems?

5   **A.**   No.

6   **Q.**   You never thought it necessary to escalate the situation

7   with Anthony Sevy to the point of using force on him that day,

8   correct?

9   **A.**   Correct.

10  **Q.**   You never laid your hand on him, did you?

11  **A.**   No.

12  **Q.**   Well, to be clear, before he was taken to the ground, you

13  never touched Mr. Sevy?

14  **A.**   No, other than--

15  **Q.**   Before the --

16  **A.**   --in the video, I think.

17  **Q.**   Yeah, I mean, I understand that you helped --

18  **A.**   I assisted, I think, on the ground in the video.  I don't

19  remember doing it, but I guess I did.

20  **Q.**   You assisted the defendant after he initiated the use of

21  force?

22  **A.**   Yes, sir.

23  **Q.**   Okay.  As is your duty to do, right?

24  **A.**   Yes, sir.

25  **Q.**   And you never felt, during any time that day, it necessary

**17-13789; Anthony Sevy v. Philip Barach**

1    that Anthony Sevy was such a threat to you or the courthouse

2    that you needed to use physical force with him, did you?

3    **A.**    No.

4    **Q.**    Okay.  Let's talk about the first time, the first visit

5    because you were there when Anthony came the first time to the

6    courthouse, right?

7    **A.**    Yes.

8    **Q.**    Okay.  Everything was fine the first time, wasn't it?  No

9    problems?

10    **A.**    No problems.

11    **Q.**    He came in, went through security, and then went to the

12    clerk's window, right?

13    **A.**    Yes.

14    **Q.**    You didn't have to intervene, did you?

15    **A.**    No.

16    **Q.**    There was -- nobody came to you and said, "Oh, this guy is

17    a huge problem," or anything like that?

18    **A.**    No.

19    **Q.**    You never had to do anything other than help him get

20    through security, right?

21    **A.**    Correct.

22    **Q.**    He went to the window and then he left, right?

23    **A.**    Correct.

24    **Q.**    And did you hear what happened at the window or no?

25    **A.**    He was upset.  I don't remember what he said over -- there

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

200

1   was discussion with the clerk of form of payment.

2   **Q.**   Okay.  You were standing at the security area though?

3   **A.**   Yes.

4   **Q.**   So, you weren't up by the window, right?

5   **A.**   No.

6   **Q.**   Okay.  Then Sevy comes back, Anthony comes back about a

7   half an hour later, right?

8   **A.**   Yes.

9   **Q.**   And that's when we have the video of him coming in?

10  **A.**   Yes.

11  **Q.**   A little bit after 1:00 p.m.?

12  **A.**   Yes.

13  **Q.**   And now you and the defendant is at the front as well,

14  right?

15  **A.**   Yes.

16  **Q.**   And you guys put him through security, correct?

17  **A.**   Yes.

18  **Q.**   And you saw the rolls in the machine, right?

19  **A.**   Yes.

20  **Q.**   You knew he had these penny rolls, true?

21  **A.**   Yes.

22  **Q.**   They show up as a black block on the screen?

23  **A.**   Yes.

24  **Q.**   You have, like, a video screen, right, coming through?

25  **A.**   Yes.

**17-13789; Anthony Sevy v. Philip Barach**

1  **Q.**  Okay.  And you knew that he didn't have -- he cleared

2  security successfully, no weapons, nothing like that, Mr. Sevy?

3  **A.**  Correct.

4  **Q.**  Okay.  And he went to the window and he waited in line,

5  right?

6  **A.**  Yes.

7  **Q.**  Okay.  Now, you eventually came over, and we're not going

8  to watch the whole video again because we've now seen it a lot

9  of times through this trial.  But you eventually came over to

10  the area where Mr. Sevy was talking to the clerk, correct?

11  **A.**  Yes.

12  **Q.**  No one called you for assistance to do that, right?

13  **A.**  No.

14  **Q.**  Like, we just talked with the defendant, like, there's an

15  emergency button that they could push if there's an emergency,

16  call for help, nobody pushed that button, right?

17  **A.**  Correct.

18  **Q.**  The clerk never said, "Help me, Mr. Marshall, Officer

19  Marshall, I need you to come over here," correct?

20  **A.**  No.

21  **Q.**  I'm correct on that?

22  **A.**  Yes, sir.

23  **Q.**  You just went over there?

24  **A.**  Yes.

25  **Q.**  Okay.  And you end up going back in behind this glass

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**                                    202

1   where the clerk is?

2   **A.**   Yes.

3   **Q.**   Okay.  And you were back there and you came back out and

4   you start talking to Mr. Sevy, right?

5   **A.**   Yes.

6   **Q.**   And you told Mr. Sevy that we're not going to accept these

7   rolled coins, right?

8   **A.**   Yes.

9   **Q.**   And you even asked the clerk, you said, "Isn't that right,

10  clerk," something to the effect of, "We're not going to accept

11  these rolled coins," correct?

12  **A.**   When I went behind the glass I asked the clerk for

13  clarification:  "Are we going to accept rolled pennies or not?"

14  **Q.**   And she told you no?

15  **A.**   Correct.

16  **Q.**   All right.  So, if someone told the jury in opening that

17  the clerk was going to accept these pennies, that would not be

18  a true statement, would it?

19  **A.**   She told me, "I can't can accept them."

20  **Q.**   Right, the clerk?

21  **A.**   Yes.

22  **Q.**   The clerk that Anthony was standing in front of with the

23  glass in between them, right?

24  **A.**   Yes, sir.

25  **Q.**   And you're right there?

HAROLD MARSHALL (Adverse Witness) - Cross
Tuesday/June 28, 2022

203

1   **A.**   Yes.

2   **Q.**   And you heard this and you saw this with your own eyes?

3   **A.**   Yes.

4   **Q.**   And you told Anthony, "We're not going to accept your

5   rolled coins"?

6   **A.**   Yes.

7   **Q.**   And the clerk told Anthony, "We're not going to accept"--

8   in front of you said, "We're not going to accept these rolled

9   coins"?

10  **A.**   Yes.

11  **Q.**   And so it was made clear to Anthony that he wasn't going

12  to be able to use those rolled coins that day, right?

13  **A.**   Correct.

14  **Q.**   So, if someone told the jury that, "Oh yes, we were going

15  to accept these coins, it's Anthony's fault," that wouldn't be

16  true, would it?

17       I'll break it down.  If someone represented, someone said

18  the statement -- and Charlie, can you hand me that opening

19  transcript?

20       If someone told --

21          **MS. HENDERSON:**  Your Honor, I'm going to object at

22  this point to the fact that we're going to use opening

23  statements as evidence.

24          **THE COURT:**  It's just the question.

25

1   **BY MR. MARKO**, CONTINUING:

2   **Q.**   If someone says that the clerk, quote, "Would have taken

3   the coins.  She was going to.  She was trying to take his

4   coins," that would be inconsistent with what you saw, heard,

5   and observed on that day, wouldn't it, sir?

6   **A.**   Correct.

7   **Q.**   And it would be inconsistent because you heard and you

8   told on Anthony, "These coins will not be accepted by this

9   courthouse"?

10  **A.**   Correct.

11  **Q.**   And the clerk told Anthony, after you checked with her,

12  "We will not accept your coins"?

13          **MS. HENDERSON:**  I'm going to object.  That

14  mischaracterizes the witness's own testimony.

15          **MR. MARKO:**  It doesn't mischaracterize it.  I just --

16  BY MR. MARKO, CONTINUING:

17  **Q.**   What I said, is that a true statement?

18          **THE COURT:**  This witnesses?

19          **MS. HENDERSON:**  Yes, Your Honor.

20          **THE COURT:**  This witness can answer.

21  BY MR. MARKO, CONTINUING:

22  **Q.**   Is that a true statement?  Am I saying a true statement?

23  **A.**   Can you repeat the statement?

24  **Q.**   You heard -- you checked with the clerk --

25  **A.**   Yes.

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

205

1    **Q.**   And the clerk -- this is the same clerk that Anthony's

2    talking to, right?

3    **A.**   Yes.

4    **Q.**   I want to make sure, here's the window, let's pretend this

5    is the window, I'm Anthony, the clerk is over here, it's that

6    clerk?

7    **A.**   Yes.

8    **Q.**   And she confirmed and said, "These penny rolls will not be

9    accepted"?

10   **A.**   Correct.

11   **Q.**   Okay.  And so Anthony couldn't pay his ticket with penny

12   rolls, right?

13   **A.**   Correct.

14   **Q.**   Has anyone else ever tried to pay with pennies?

15   **A.**   Not that I'm aware of.  I'm sure someone has.

16   **Q.**   I mean, if someone rolled in, like, a wheelbarrow of

17   $17,500 worth of pennies, don't you think you would have known

18   about that?

19   **A.**   Oh, yes, I'm familiar with Google cases, you know, people

20   attempting --

21   **Q.**   I'm not talking about Google cases, I'm talking about at

22   your courthouse?

23   **A.**   Nobody ever tried to come in with a vast amount of pennies

24   and pay a fine.

25   **Q.**   Nobody ever backed up with a truck, that you know of, and

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

206

1    try to dump pennies out or anything like that?

2    **A.**   No, sir.

3    **Q.**   Nobody tried to bring in $17,500 worth of pennies?

4    **A.**   No, sir.

5    **Q.**   Okay.  So, Sevy goes to the window and you agree, sir,

6    that he was not yelling?

7    **A.**   I don't agree with that.  He was yelling.

8    **Q.**   When he was waiting in line was he yelling?

9    **A.**   No.

10   **Q.**   And when you say, "Yelling," was he screaming at the top

11   of his lungs yelling?

12   **A.**   Not at the top of his lungs.

13   **Q.**   Okay.  And you walked over, right?

14   **A.**   Yes.

15   **Q.**   And Mr. Sevy never did anything physically threatening to

16   you, he was just standing there, correct?

17   **A.**   Correct.

18   **Q.**   And at no time from the window did he do anything

19   physically threatening to you?

20   **A.**   No.

21   **Q.**   Am I correct in that statement?

22   **A.**   You're correct, sir.

23   **Q.**   At no time when Mr. Sevy left that window to go to that

24   exit door of the courthouse, did he ever do anything physically

25   threatening to you?

**17-13789; Anthony Sevy v. Philip Barach**

HAROLD MARSHALL (Adverse Witness) - Cross
Tuesday/June 28, 2022

207

1    **A.**   No.

2    **Q.**   Am I correct?

3    **A.**   You're correct.

4    **Q.**   Therefore, at no time during the entire episode, from the

5    moment that Anthony Sevy walked into that courthouse to the

6    moment that he put his hands and started pushing on that door,

7    front door, did you ever see him do anything physically

8    threatening to you, correct?

9    **A.**   No.

10   **Q.**   Am I correct in that statement?

11   **A.**   You're correct.

12   **Q.**   No physical threats?

13   **A.**   No.

14   **Q.**   No physical -- am I correct in that?  I know you say,

15   "No," but --

16   **A.**   You're correct.

17   **Q.**   Just so we're precise.

18       And you never saw him do anything physical, physically

19   threatening to the defendant, did you?

20   **A.**   No.

21   **Q.**   You didn't see anything physically threatening to the

22   defendant?

23   **A.**   No.

24   **Q.**   I'm correct?

25   **A.**   You're correct.

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**                                        208

1    **Q.**   That's true?

2    **A.**   That's true.

3    **Q.**   Okay.  And we'll just play this one video of Mr. Sevy

4    going toward the front door.  And by the way, there's been a

5    lot of talk about profanity.  I understand that you heard

6    Mr. Sevy say some profanity?

7    **A.**   Yes.

8    **Q.**   But you don't remember exactly the use of the profanity,

9    do you?

10   **A.**   Not specifically.

11   **Q.**   "F" words?

12   **A.**   Yes.

13   **Q.**   You never told anyone that he pointed to you and said,

14   "Suck . . .," and then referred to his genitals?

15   **A.**   I don't recall hearing that.

16   **Q.**   You do not recall Anthony ever saying that, do you, sir?

17   **A.**   I don't recall that, no.

18   **Q.**   And you were standing right there?

19   **A.**   Yes.

20   **Q.**   And you were listening.

21        Did you ever see Mr. Sevy point to the court clerk and

22   say, "Suck my . . .," you know what?

23   **A.**   I don't recall what he said.

24   **Q.**   Did you ever tell anyone prior to today that Mr. Sevy

25   pointed at the court clerk and said, "Suck . . ."?

---

**17-13789; Anthony Sevy v. Philip Barach**

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

1    **A.**    I don't remember saying that.

2    **Q.**    Okay.  And do you remember seeing or hearing or tell

3    anyone that he pointed at Barach and said, "Suck . . ."?

4    **A.**    I don't remember that.

5    **Q.**    You don't him ever saying that, do you?

6    **A.**    I do not.

7    **Q.**    He -- you remember him saying some general profanities,

8    don't you?

9    **A.**    Yes.

10   **Q.**    Okay.  And it wasn't, like, threatening profanities.  It

11   wasn't, like, "Hey, Officer Marshall, I'm going to 'F' you up."

12   He never said anything like that, right?

13   **A.**    No.

14   **Q.**    It was venting frustration profanities that you remember,

15   like, "This sucks," things of that nature?

16   **A.**    Yes.

17   **Q.**    You experienced that before with people?  People sometimes

18   are not too happy at the courthouse?

19   **A.**    Correct.

20   **Q.**    Okay.  So, let's look at just Anthony walking out the

21   front door because you're standing there, right?

22   **A.**    Yes.

23   **Q.**    And he had been told to leave, right?

24   **A.**    Yes.

25   **Q.**    Did you tell him to leave?

HAROLD MARSHALL (Adverse Witness) - Cross
Tuesday/June 28, 2022

210

1    **A.**    Yes.

2    **Q.**    Did the defendant tell him to leave?

3    **A.**    Yes.

4    **Q.**    And what did Anthony Sevy do after you told him to leave?

5    **A.**    After -- he ignored me.  But when Officer Barach came up

6    to him and said, "Come on, let's go," he ultimately turned

7    around and started walking toward --

8    **Q.**    And when you say, "Ultimately," this was all within

9    seconds, wasn't it?

10   **A.**    Yes.

11   **Q.**    Okay.  And so when the defendant gave him a command to

12   leave, he turned and begin to leave, didn't he?

13   **A.**    Yes.

14   **Q.**    Okay.  Let's watch what happened.

15                        (Video Recording Played.)

16   **BY MR. MARKO**, CONTINUING:

17   **Q.**    Stop it right there.

18       Did you ever see Anthony do anything that led you to the

19   belief that he was not going to continue walking out those

20   front doors to leave?

21   **A.**    No.

22   **Q.**    Did Anthony ever tell you, orally, "Hey, I know it looks

23   like I'm walking to the front door, but I'm not going to

24   leave"?

25   **A.**    No.

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

1    **Q.**    Did he ever say anything that could lead a reasonable
2    person to believe that he was not going to leave?
3    **A.**    No.
4    **Q.**    Did you believe that he was trying to leave?
5    **A.**    Yes.
6    **Q.**    Why?
7    **A.**    Because he was walking in front of Officer Barach toward
8    the door.
9    **Q.**    And were you worried or concerned that he was not going to
10   leave?
11   **A.**    I had my reservations whether this was -- whether he was
12   going to complete his exit.
13   **Q.**    But he never did anything that caused you genuine concern,
14   is that a true statement?
15   **A.**    That's true.
16   **Q.**    Okay.  So, you did not see the initial -- did you see the
17   defendant push Anthony?
18   **A.**    No.
19   **Q.**    And you didn't see the initial -- did you see the initial
20   force?
21   **A.**    All I remember is that door open and then -- because my
22   view from here is blocked by this partition where the bulletin
23   board is.  And it occurred so fast.
24   **Q.**    Really fast?
25   **A.**    Really fast.

1    **Q.**   Unexpected?

2    **A.**   My adrenaline was still pumping from the window.

3    **Q.**   It was unexpected, correct?

4    **A.**   It was unexpected.

5    **Q.**   It was out of the blue, correct?

6    **A.**   From my view, yes.

7    **Q.**   It was sudden, correct?

8    **A.**   Yes.

9    **Q.**   There were no warnings given, correct?

10   **A.**   Correct.

11   **Q.**   There was no, how did you describe it:  Words, logic and

12   reasons.  You heard no words, true?

13   **A.**   True.

14   **Q.**   You saw no logic, true?

15   **A.**   True.

16   **Q.**   And you saw no reason, did you?

17   **A.**   True.

18   **Q.**   And you watched the video, right?

19   **A.**   Yes.

20   **Q.**   And you were showed it at your deposition, right?

21   **A.**   Yes.

22   **Q.**   And would you agree that on the video -- we could show, go

23   ahead, click ahead.

24                        (Video Recording Played.)

25

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

213

1    **BY MR. MARKO**, CONTINUING:

2    **Q.**    Stop, go back.  One.

3          Sir, you agree that based on your view of the video and

4    your presence there that it appeared that the defendant put his

5    hand around Mr. Sevy's throat, correct?

6    **A.**    It would appear on his shoulder, but . . .

7    **Q.**    The shoulder?  Go ahead.  Click it (Video playing).  Stop.

8          Do you see the hand on the throat?

9    **A.**    On the neck area, yes.

10   **Q.**    Well, what's the neck area because he didn't have a

11   necktie on?  You were asked in your deposition --

12            **MS. HENDERSON:**  Objection, Your Honor, to the form.

13   This is compound.  He's not even letting him answer.

14            **THE COURT:**  All right.  Ask the specific question.

15   **BY MR. MARKO**, CONTINUING:

16   **Q.**    Would you agree that defendant's hand was on the front of

17   Anthony Sevy's throat?

18   **A.**    I don't see it on the front, I see it on the side.

19   **Q.**    The right side?

20   **A.**    Right side.

21   **Q.**    Right side.  Were you aware that records -- is that

22   consistent with records that would show pain on the right side

23   of the neck?  EPIC care records?  Go ahead, Charlie, pull those

24   up, I think it's 6 or 7.

25          So, you saw the right side of the neck?  Sorry, one

**17-13789; Anthony Sevy v. Philip Barach**

**HAROLD MARSHALL (Adverse Witness) - Cross**
**Tuesday/June 28, 2022**

214

1    second.

2                            (A brief pause)

3    **BY MR. MARKO**, CONTINUING:

4    **Q.**   Let me read it to you so we don't waste everybody's time.

5    It's the end of the day.  Is what you saw, grabbing on the

6    right side of the neck, correct?

7    **A.**   Yes.

8    **Q.**   Would that be -- oh, and it was mentioned that you

9    actually, because you were from Berkley, you had some medical

10   training?  First responder training?

11   **A.**   Yes, sir.

12   **Q.**   Okay.  First responder training requires a little bit of

13   knowledge about anatomy or whatnot?

14   **A.**   In my case, very little.

15   **Q.**   Okay.  Very little. We'll go through this together.  Would

16   point tenderness on the soft tissue on the right neck, with

17   bruising and swelling noted, be consistent with someone being

18   grabbed on the right side of the neck as you described?

19         **MS. HENDERSON:**  I'm going to object to form and

20   foundation.

21         **THE COURT:**  If the witness can answer.

22         **THE WITNESS:**  Point tenderness from right neck.

23   **BY MR. MARKO**, CONTINUING:

24   **Q.**   You see it says, "Right neck"?

25   **A.**   Correct.

**Jury Trial**
**Tuesday/June 28, 2022**
215

1    **Q.**    Is that consistent with what you saw?

2    **A.**    Correct.

3    **Q.**    Grabbing of the right neck?

4    **A.**    Correct.

5    **Q.**    Defendant grabbing Anthony Sevy's right neck?

6    **A.**    Correct.

7    **Q.**    Okay.  Charlie, can you put --

8         **THE COURT:**  All right.  If you're at a good point to

9    end, we're at the end of our day.  We will be resuming tomorrow

10   morning at 8:30.

11        And I'll just remind the members of the jury to please do

12   not discuss the case during our evening recess.  Have a good

13   evening and we'll see you back here tomorrow morning.

14              **(Jury out at 1:30 p.m.)**

15        **THE COURT:**  All right.  You may be seated.  And

16   Mr. Marshall, you may step down.  And we'll see you back here

17   tomorrow morning at 8:30.

18        And Counsel, probably tomorrow you should all bring your

19   calendars because we're going to probably have to talk

20   scheduling.

21        **MS. HENDERSON:**  Judge, I did want to remind everyone,

22   and I believe this was discussed during the Joint Final

23   Pretrial Conference and we notified Mr. Marko before that, that

24   Dr. Catherine Frank, our expert, is only available to testify

25   tomorrow morning because of her schedule.  And also Lori

**17-13789; Anthony Sevy v. Philip Barach**

**Jury Trial**
**Tuesday/June 28, 2022**

216

1    Maurice, one of our witnesses, is also only available tomorrow

2    because she is leaving after tomorrow.  She's leaving on

3    Thursday morning at 5:00 a.m.  And I believe that was also

4    discussed both times.

5            **THE COURT:**  Counsel, can we take them out of order?

6            **MR. MARKO:**  You know what, I have no objection to

7    their expert.  I know how hard it is with experts for

8    scheduling, so I have no objection.

9        I am a little -- as long as The Court explains to the

10   jury, this is not my case, they are calling out of order and

11   I'm okay with that.

12           **THE COURT:**  Okay.  Yes, you-all write up some

13   language that you're comfortable with and you can agree on and

14   I'll explain it to the jury.

15           **MR. MARKO:**  Okay.  And with Lori Maurice, when is she

16   going to be back?

17           **MS. HENDERSON:**  It's my understanding that she's gone

18   for at least a week, like, the entirety of next week.

19           **THE COURT:**  And I'm starting another trial on the

20   7th, so if you all are not done, we're going to be on hiatus.

21   Because this case was not going to be -- you thought we'd be

22   done Thursday.  You didn't want me to excuse Juror Number 1.

23   You said we'd be done Thursday.  And I discussed with you-all

24   the schedule and I told you-all the schedule at the final

25   pretrial.

**17-13789; Anthony Sevy v. Philip Barach**

**Jury Trial**
**Tuesday/June 28, 2022**                                    217

```
 1          MR. MARKO:  Why don't we do a video of Lori so we can
 2   get it in and then they can play it?
 3          THE COURT:  I don't have a problem if you want to do
 4   a de bene esse trial dep.
 5          MS. HENDERSON:  Your Honor, I think we would really
 6   prefer to bring her here and that's why we notified Mr. Marko
 7   of her schedule as soon as we found out well before the final
 8   pretrial conference so that we could agree to take these
 9   witnesses out of order and accommodate their schedules.  And so
10   we'd really prefer that she be brought in.  She was prepared to
11   be here tomorrow.  She's ready to testify tomorrow.
12          MR. MARKO:  Who is this witness?
13          MS. HENDERSON:  She's the deputy court administrator
14   that you referenced to.
15          THE COURT:  And how long is she?
16          MR. SEWARD:  I'd say less than an hour.
17          MS. HENDERSON:  Yeah, she shouldn't be that long?
18          THE COURT:  Mr. Marko, how long, do you think?
19          MR. MARKO:  I don't know, an hour on the deputy court
20   administrator?
21          MS. HENDERSON:  She was the one in the vestibule.
22   She runs out to the vestibule.
23          THE COURT:  An hour on both ends?
24          MS. HENDERSON:  Well, I wouldn't think on both ends.
25          THE COURT:  You mean an hour total?
```

**17-13789; Anthony Sevy v. Philip Barach**

1              **MR. MARKO:**  Okay.  If we can do an hour total with --

2              **THE COURT:**  Well, if she's very quick, what if you

3        did her first and then finish with -- are you close to

4        finishing with Henderson?

5              **MS. HENDERSON:**  Your Honor, we have Dr. Frank in the

6        morning as well.  Lori Maurice, she's available all day.  She

7        doesn't have that limitation.

8              **THE COURT:**  So, Dr. Frank would go first, then do

9        Henderson, then do Maurice?

10             **MS. HENDERSON:**  Marshall?

11             **THE COURT:**  I'm sorry, Marshall.

12             **MR. MARKO:**  So, who are we going to do?  We're going

13       to do Frank in the morning?

14             **MS. HENDERSON:**  And then Marshall and then Maurice.

15             **MR. SEWARD:**  How long will you be with her?

16             **MR. MARKO:**  I don't know.  I'm sure I can think of a

17       ton of questions tonight.

18             **MS. HENDERSON:**  Because we could do Frank and then

19       Maurice and then finish with Marshall and he can always come

20       back on Thursday.

21             **MR. MARKO:**  Let's do Frank, let's please finish with

22       Marshall, since I already started.

23             **THE COURT:**  And then if you -- she leaves when?

24             **MS. HENDERSON:**  She leaves Thursday at 5:00 a.m.

25             **THE COURT:**  And we can even see if the jurors can

**17-13789; Anthony Sevy v. Philip Barach**

1    stay a little bit longer.  I don't know if we have anything

2    tomorrow afternoon?  I think we do.

3                         (Brief pause.)

4              **THE COURT:**  What we'll do, I think we should take the

5    expert first and then finish with Mr. Marshall.  And then how

6    far we get with Maurice.  And if we can finish her, great; if

7    not, you-all can go video her in the afternoon and we'll finish

8    her by video, all right.  Okay.

9         All right.  Anything else before we recess?

10             **MR. SEWARD:**  Just for planning, I understand you're

11   going to start another trial on the 7th, let's just say we get

12   the evidence in on the 5th, the jury, argument on the 6th,

13   would you bring them back at least for deliberation?

14             **THE COURT:**  Oh, yes, I'll have them deliberate.

15   We'll probably just put them in a different room.  See, we're

16   off Friday.  The court's closed Friday and Monday.

17             **MS. HENDERSON:**  So, then we're open on Tuesday the

18   5th, right?

19             **THE COURT:**  Right, we're open Tuesday, Wednesday.

20        All right.  We do have an evidentiary hearing in just a

21   few minutes, so if you-all could make some space at counsel

22   table because we are going to need to use the equipment.

23        All right.  So, anything else before we adjourn for the

24   evening?  Mr. Marko?  Mr. Seward?  Ms. Henderson?  All right.

25   Thank you.  We'll see you-all in the morning.  Have a good

1    evening.

2              **(Whereupon proceedings concluded at 1:38 p.m.)**

3                        -    -    -

**Jury Trial**
**Tuesday/June 28, 2022**                                    221

1

2                                - - -

3                    **C E R T I F I C A T I O N**

4              I, Nefertiti A. Matthews, official court reporter

5       for the United States District Court, Eastern District of

6       Michigan, Southern Division, appointed pursuant to the

7       provisions of Title 28, United States Code, Section 753,

8       do hereby certify that the foregoing is a correct

9       transcript of the proceedings in the above-entitled cause

10      on the date hereinbefore set forth.

11              I do further certify that the foregoing

12      transcript has been prepared by me or under my direction.

13

14      Date: July 4, 2022

15

16      s:/Nefertiti A. Matthews
        Nefertiti A. Matthews,
17      Official Court Reporter

18                                - - -

19

20

21

22

23

24

25

**17-13789; Anthony Sevy v. Philip Barach**